**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**



STARWOOD HOTELS & RESORTS
WORLDWIDE, INC.,

Plaintiff,

- *against* -

HILTON HOTELS CORPORATION, ROSS
KLEIN AND AMAR LALVANI,

Defendants.

No.

**09 CIV. 3862**

*JUDGE ROBINSON*

**COMPLAINT**

Plaintiff, Starwood Hotels & Resorts Worldwide, Inc. ("Starwood" or "Plaintiff"),

by its undersigned counsel, as and for its Complaint against Defendants Hilton Hotels Corpora-

tion ("Hilton"), Ross Klein ("Klein") and Amar Lalvani ("Lalvani"), alleges as follows:

## NATURE OF LAWSUIT

1.       Starwood and Hilton are direct, head-to-head competitors.  In 2007, the

Blackstone Group, a private equity firm, acquired Hilton for over $20 billion in a top-of-the-

market, highly leveraged buyout.  As reported in the press: "With Blackstone having paid a su-

per-premium price for Hilton, [CEO Christopher Nassetta] will be under intense pressure to de-

liver immediate results."  This case involves the ransacking and theft of more than 100,000 elec-

tronic and hard copy files containing Starwood's most competitively sensitive information, and

the improper use by Hilton of that information in the development of Hilton's new Denizen hotel

brand and in unfair competition with Starwood.  The large volume of confidential information

taken is extraordinary.  This is the clearest imaginable case of corporate espionage, theft of trade

secrets, unfair competition and computer fraud.

2.       Defendants Klein and Lalvani were President and Senior Vice President,

respectively, of Starwood's Luxury Brands Group.  Both were intimately involved in and aware

of the strategy and planned future development of Starwood's lifestyle and luxury hotel brands: the St. Regis, W Hotels and The Luxury Collection. Both Klein and Lalvani had access to the forward-looking strategic development plans approved at Starwood's highest level for the marketing, growth and development, worldwide, of Starwood's lifestyle and luxury hotel brands. In addition to their duties of loyalty, both Klein and Lalvani had written agreements with Starwood requiring them to protect the confidentiality of the Starwood information to which they had access.

3.      Unbeknownst to Starwood, in February 2008 Christopher Nassetta, Hilton's President & Chief Executive Officer, began recruiting Klein to join Hilton. Klein immediately misused his position as President of Starwood's Luxury Brands Group to request large volumes of confidential information from Starwood employees, which he took home, had loaded on a personal laptop computer and/or forwarded to a personal e-mail account, and which he then took to and used at and for Hilton. Klein lied to Starwood, stole confidential information, and, through fraud and deceit, extracted a severance payment of more than $600,000.

4.      Unbeknownst to Starwood, in March 2008 Steven Goldman, Hilton's President of Global Development & Real Estate, began recruiting Lalvani to join Hilton. Goldman told Lalvani that Hilton was a "clean slate" and "you're the first guy on my list." Lalvani responded: "Other idea is bring over the core W team which has created an enormous amount of value and is very loyal to me to build a new brand for you guys. Not sure your appetite but I know I could make that happen as well." Before joining Goldman at Hilton, Lalvani, too, misused his position at Starwood and secretly downloaded large quantities of confidential Starwood documents, which he brought with him to and used at Hilton.

-2-

5.      In June 2008, Klein and Lalvani began work at Hilton as Hilton's Global Head of Luxury & Lifestyle Brands and Global Head of Luxury & Lifestyle Brand Development, respectively.  Hilton announced their appointments, stating:

> "These new hires will help advance Hilton's strategic goal of further developing its presence in the luxury and lifestyle sectors. . . . At Hilton, Mr. Klein will oversee the company's global luxury and lifestyle brand portfolio, including Waldorf-Astoria, the Waldorf-Astoria Collection and Conrad, and will spearhead the company's entry into the lifestyle segment.  Mr. Lalvani will lead the global development of Hilton's luxury and lifestyle segments."

6.      This is not a case where an employee took with him or her to a new job a few confidential mementos of a prior career.  This case involves corporate espionage and the looting through computer fraud of a mountain of information.  Unbeknownst to Starwood at the time, and in contravention of their fiduciary duties, Starwood policy and the express terms of their written agreements with Starwood, Klein and Lalvani took and encouraged other Starwood employees to take with them to Hilton over 100,000 electronic and hard copy files, many containing highly confidential and proprietary Starwood information and trade secrets.  The sheer volume of theft is extraordinary, and may be unprecedented.  The materials taken to Hilton by Klein and Lalvani are among Starwood's most competitively sensitive information and included:

- **Starwood's Forward-Looking Strategic Development Plans,** containing Starwood's highly confidential and proprietary current and prospective strategies for the development of its W, St. Regis and The Luxury Collection brands, including the W Hotels Worldwide Strategic Brand Plans for 2007-2009 and 2008-2010; the St. Regis Strategic Brand Plan for 2008-2010; and The Luxury Collection Strategic Brand Plan for 2008-2010.

- **Starwood's Principal Term Prioritization Worksheets,** containing Starwood's highly confidential and proprietary current and prospective negotiation strategies with owners ranked by importance to Starwood for numerous deal terms, including performance tests, termination on sale provisions, residential fees, technical services fees, financing-related provisions, investment requirements, legal issues and many other terms.

- **Starwood's Property Improvement Plan** templates for how to create "the Ultimate W Experience" in conversion properties, providing step-by-step details for how to convert a hotel property to a W branded hotel.

-3-

- **Starwood's confidential computer files** containing the names, addresses and other non-public information for its Luxury Brands Group owners, developers and designers compiled by Starwood.

- **Recent presentations to Starwood's executive leadership team** containing current and prospective financial, branding and marketing information for Starwood's lifestyle and luxury brands.

- **Starwood's site-specific Project Approval Requests**, which set out in detail the costs, fee structures, termination provisions and other highly sensitive and competitively useful information for Starwood properties and targeted properties around the world.

- **Confidential and proprietary marketing and demographic studies**, confidential to Starwood and used by Starwood in its global marketing and development plans, for which Starwood paid third parties over $1,000,000.

- **Starwood's W Residential Guidelines 2008**, containing Starwood's strategies and proprietary toolkits for residential development in or at W hotels.

- **Starwood's W Hotels "Brand in a Box" modules and training materials**, containing Starwood's proprietary training, operational materials and procedures for opening a new lifestyle hotel, as well as materials for promotional strategies and detailed guidelines on how to launch a new brand.

- **Starwood's W Advisory Board Presentation**, containing the strategic thinking and considerations of the Advisory Board for Starwood's W brand.

- **Starwood's Luxury Brands Group "Brand Bibles," brand handbooks, brand immersion materials, and brand marketing plans,** containing detailed plans for current and prospective branding, marketing, development and expansion of Starwood's leading lifestyle and luxury brands, including the complete set of proprietary design genres and signature elements for W and St. Regis.

       7.     Hilton, Klein and Lalvani did not stop at the theft of large volumes of Starwood's confidential and proprietary information. Hilton and Blackstone, in many instances through Klein or Lalvani, also recruited additional Starwood employees to join Klein and Lalvani at Hilton and to bring with them to Hilton additional confidential, competitively sensitive Starwood information in violation of their fiduciary duties and the express terms of their obligations to and employment agreements with Starwood. These included:

| **Individual** | **Former Starwood Position** | **Current Hilton Position** |
|---|---|---|
| Christopher Kochuba | Vice President, Development Planning & Design Management, Luxury Brands Group | Vice President, Planning and Programming, Global Luxury and Lifestyle Brands |
| Erin Shaffer | Senior Manager, Brand Marketing, Luxury Brands Group | Senior Director, Communications and Partnerships |
| Jeff Darnell | General Manager W Hotel Los Angeles | Vice President Brand Operations |
| Stephanie Heer | Marketing Manager, W Hotel Los Angeles | Brand Marketing Manager, Conrad Hotels |
| Erin Green | Director, W Development, Europe, Africa and Middle East | Senior Development Director, Luxury and Lifestyle (Europe and Africa) |
| Elie Younes | Senior Director, Acquisitions & Development, Europe, Africa and Middle East | Vice President, Development (Middle East) |
| Leah Corradino | Marketing Manager, W Hotel San Diego | Brand Marketing Manager, Waldorf Astoria & Waldorf Astoria Collection |
| Susan Manrao | Senior Manager, Interior Style & Design Standards | Senior Director of Design and Brand Experience |

8.     In light of the continued solicitation of Starwood employees, in November 2008, Starwood commenced an arbitration against Klein based on violation of the non-solicitation provisions of his employment contract and his separation agreement with Starwood.

9.     At the time, Starwood had no idea that Klein, Lalvani and others working in concert with them and with Hilton had looted Starwood's computer and paper files and had purloined Starwood's most confidential and competitively sensitive information for use by Hilton.

10.    The unauthorized accessing of Starwood's computer systems and files and the theft of Starwood's highly confidential and competitively sensitive business plans and other confidential and proprietary information was unknown to Starwood until February 2009, when,

three months after Starwood requested that Hilton preserve all information relevant to the arbitration with Klein, Hilton delivered to Starwood eight large boxes of computer hard drives, zip drives, thumb drives and paper records containing massive quantities of highly confidential and proprietary Starwood files.  On the computer drives returned by Hilton are over 100,000 files downloaded from Starwood's computers systems and files.

11.    In delivering this mountain of confidential material to Starwood, Hilton informed Starwood that Defendant Klein and "other Hilton employees who formerly worked for Starwood" had "brought to Hilton documents or materials that they developed or acquired while they worked for Starwood."  Hilton further informed Starwood that former Starwood employees now at Hilton had additional Starwood materials "at home."  Despite knowing that Klein and Lalvani have stolen a huge amount of confidential information from Starwood, Hilton continues to employ them, Hilton continues hold them out to the public as Hilton's brand leaders, and Hilton continues to present them as Hilton representatives in meetings with owners and developers that are in contract relationships with Starwood where they are using Starwood's playbook.  Hilton has embraced and is continuing to seek to benefit from the wrongdoing of Klein and Lalvani.

12.    The eight boxes delivered to Starwood by Hilton (and the electronic media contained therein) contained more than 100,000 files, including highly confidential and proprietary Starwood information and trade secrets, only a small portion of which is outlined in paragraph 6 above (collectively, the "Starwood Confidential Information").  Virtually every category of documents and information defined as Confidential Information in Klein's and Lalvani's employment agreements with Starwood is contained in the materials found at Hilton and in the homes of former Starwood employees now working for Hilton.  Among other things, the Starwood Confidential Information provides a step-by-step guide to developing and launching a new

hotel brand from conception to opening, to strengthening and repositioning existing luxury brands, and to competing unfairly with Starwood. Quite literally, the materials include Starwood's blueprints for building a "Brand in a Box," creating a lifestyle brand, negotiating with owners and developers, implementing the related development strategy, marketing a brand program, and putting it all to work on the ground, including operating materials and proprietary brand-centric training manuals.

13.     The Starwood Confidential Information is a veritable mother lode of computer and hard copy information that has been created or commissioned by Starwood (at great expense) in connection with the further development and promotion of its lifestyle and luxury hotel brands, including St. Regis, W and The Luxury Collection. The material contains current and prospective information, and consists of highly confidential and proprietary site-specific materials, cost and fee structures, and other trade secrets. It includes detailed costs, fee structures and other highly sensitive and competitively useful information for Starwood properties and targeted properties around the world that can be used by Hilton to undercut or outperform Starwood in competitive markets. This brand-in-a-box information provides Hilton with the means to bring a competitive hotel chain to market expeditiously and without expending tens of millions of dollars and many years on development, thereby avoiding the inevitable and costly trial and error along the way. Instead, Hilton has been able to exploit the time and tens of millions of dollars that was invested by Starwood to create these materials.

14.     Hilton's wrongful exploitation of the stolen Starwood Confidential Information is obvious. On February 9, 2009, virtually the same day that eight boxes of Starwood information arrived back at Starwood from Hilton, Hilton announced that it would be launching a new brand (then code-named "Project Global21"). On March 10, 2009, just nine months after

-7-

Klein and Lalvani left Starwood for Hilton, Hilton launched its new brand under the name "Denizen." Klein has represented to the hospitality press that the process to develop Denizen started in "June 2008, started June 10." Klein has stated that the development of Denizen was done in "a compressed time frame."

15.     Klein and Hilton have trumpeted the name Denizen, which has a familiar ring within Starwood. Contained within the boxes of Starwood Confidential Information wrongfully taken to Hilton are confidential references to a W Hotel concept christened a "zen den." Klein and Hilton have publicly stated that Hilton's new brand will employ a "restro-lounge" concept in the "living room" area. That concept is also familiar to Starwood. Contained among the boxes of Starwood Confidential Information wrongfully taken to Hilton are confidential plans concerning the launch of a W dining concept referred to internally as a "restro-lounge," specifically designed to optimize food and beverage services in the lobby-bar area in all W hotels (coined by Starwood as the "Living Room").

16.     The similarities of the ostensibly Klein-developed Denizen concept to Starwood brands did not go unnoticed. The hospitality press in attendance at Hilton's March 10 launch of Denizen reported that Denizen is "cut from the same cloth as W in many respects" and that in terms of "'brand DNA', you can't help but think of W Hotels."

17.     Generally, even for the most experienced hotel operators and developers, it takes years to develop a new luxury or lifestyle brand. As Klein has stated: "Part of the cost is also speed to market." The theft of Starwood Confidential Information by Klein and Lalvani, and others working with them, and its wrongful use by Hilton in, among other uses, developing and launching a new upscale hotel brand in record time (months not years), is the clearest imag-

inable case of corporate espionage, theft of trade secrets and unfair competition perpetrated by, among other means, computer fraud.

18.     Starwood is in active negotiation with third parties regarding the expansion of its luxury and lifestyle brands.  There is no doubt that Hilton has used and intends to further wrongfully use the Starwood Confidential Information misappropriated by Klein and Lalvani and the others working in concert with them to Hilton's own competitive advantage.  In addition to Hilton's stealing W's brand DNA to launch Denizen, former Starwood employees now at Hilton are stating in press interviews that although Denizen was just launched, Hilton is already in negotiation with 20 developers.  In fact, representatives of Hilton — including Nassetta, Goldman, Klein and Lalvani — already have been approaching owners and franchisees of properties under contract with Starwood and are using Starwood's playbook in competing for those properties.  Klein has stated that "[w]e haven't announced any, but we have signed some and I think they will be announced within 30 days."  The press is also currently reporting that Hilton is in "[a]ctive development negotiations . . . for resorts and destinations in key cities throughout the globe" with developers regarding the expansion of its luxury lifestyle brands (sometimes referred to as Hilton's "Luxury & Lifestyle portfolio" or the "Prestige Portfolio").

19.     Starwood is entitled to preliminary and permanent injunctive relief and to substantial money damages from Hilton, Klein and Lalvani.  The Starwood Confidential Information found within Hilton offices and in the homes of Hilton management level employees unjustly provides Hilton with an unfair competitive advantage gained at Starwood's expense.  As a result, Hilton, Klein and Lalvani, and all those in active concert or participation with them, should be, at a minimum:

(i)    preliminarily and permanently enjoined from using or benefiting, directly or indirectly, from the use of Starwood's highly confidential, proprietary and trade secret information, including without limitation the Starwood Confidential Information;

(ii)    ordered immediately to return all Starwood Confidential Information in their possession, custody or control;

(iii)    ordered immediately to destroy and to certify under oath the destruction of all materials derived in any way directly or indirectly in whole or in part from any Starwood Confidential Information;

(iv)    ordered immediately to destroy and to certify under oath the destruction of all documents and information relating to the promotion and roll-out of Hilton's Denizen brand — thus requiring Hilton to start over without the benefit of its theft of Starwood Confidential Information;

(v)    ordered to impose a constructive trust on and provide a detailed accounting of all revenues derived and expenses saved by Hilton from the use of the Starwood Confidential Information;

(vi)    enjoined for a reasonable time from pursuing any hotel owners for hotel properties in the locations identified in the Starwood Confidential Information as targeted for Starwood Luxury Brand Group properties;

(vii)    enjoined for a reasonable time from negotiating with any investors with whom Starwood has current management contracts;

(viii)    ordered to disgorge all unjust enrichment as a result of their taking and use of Starwood Confidential Information;

(ix)    ordered, jointly and severally, to pay Starwood compensatory damages in an amount to be proven at trial; and

(x)    ordered to pay Starwood punitive damages in amounts to be proven at trial.

## <u>SUBJECT MATTER JURISDICTION</u>

20.    Subject matter jurisdiction in this Court exists under 28 U.S.C. § 1332. Plaintiff Starwood is a citizen of Maryland and New York. Defendant Hilton is a citizen of Delaware and California, and defendants Klein and Lalvani are citizens of California. There is complete diversity of citizenship between Plaintiff and all Defendants, and the amount in controversy far exceeds $75,000, exclusive of interest and costs.

21.    Subject matter jurisdiction in this Court also exists under 28 U.S.C. § 1331 as the Eleventh Claim For Relief arises under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. Subject matter jurisdiction over the First through Tenth Claims For Relief also exists

-10-

pursuant to 28 U.S.C. § 1367 because those claims for relief are so related to the Eleventh Claim For Relief as to form part of the same case or controversy.

## PERSONAL JURISDICTION AND VENUE

22.     Personal jurisdiction over all Defendants is appropriate under New York's long arm statute, C.P.L.R. § 302.

23.     In addition, Defendants Klein and Lalvani each are subject to a "NON-SOLICITATION, CONFIDENTIALITY AND INTELLECTUAL PROPERTY AGREEMENT" with Starwood in which Defendants Klein and Lalvani each irrevocably and unconditionally submits to the exclusive jurisdiction of this Court.

24.     Venue in this Court is appropriate under 28 U.S.C. § 1391(a)(2).

25.     In addition, Defendants Klein and Lalvani each are subject to a "NON-SOLICITATION, CONFIDENTIALITY AND INTELLECTUAL PROPERTY AGREEMENT" with Starwood in which Defendants Klein and Lalvani each irrevocably waives any objection to the laying of venue in this Court, including any objection that suit in this Court is inconvenient. Their employment agreements with Starwood are expressly governed by the laws of New York, without regard to the principles of conflicts of laws, and provide that any action seeking equitable relief for violation of the confidentiality provisions thereof may be commenced in this Court.

## THE PARTIES

26.     Plaintiff Starwood is organized under the laws of the State of Maryland and has its principal place of business at 1111 Westchester Avenue, White Plains, New York 10604. Starwood is one of the world's largest hotel and leisure companies. Starwood conducts its hotel and leisure business both directly and through subsidiaries. Starwood's brand names

include: St. Regis, The Luxury Collection, W, Westin, Le Méridien, Sheraton, Four Points, Aloft and Element.

27.    Defendant Hilton is organized under the laws of the State of Delaware and has its principal place of business at 9336 Civic Center Drive, Beverly Hills, California 90210. Hilton owns, operates and franchises hotels, resorts and spas throughout the United States and throughout the world. Hilton's brand names include: Waldorf Astoria, The Waldorf Astoria Collection, The Prestige Collection, Denizen, Conrad and Hilton.

28.    Defendant Klein is a citizen of the State of California, with his principal residence in Los Angeles, California. Until June 2008, Klein was President of Starwood's Luxury Brands Group, and was responsible not only for the W Hotel group, but also for the St. Regis and The Luxury Collection brands of Starwood Hotels. On or about May 16, 2008, Klein signed an employment agreement with Defendant Hilton as Global Head of Hilton's Luxury & Lifestyle Brands, a position he commenced on or about June 2, 2008.

29.    Defendant Lalvani is a citizen of the State of California, with his principal residence in Pacific Palisades, California. Until June 2008, Lalvani was Senior Vice President of Starwood's Luxury Brands Group, and was responsible for the development of Starwood's lifestyle and luxury brands, including W Hotels, St. Regis and The Luxury Collection brands. Since on or about June 14, 2008, Lalvani has been employed by Defendant Hilton as Global Head of Hilton's Luxury & Lifestyle Brand Development.

## ADDITIONAL INTERESTED PERSONS

30.    Christopher Kochuba ("Kochuba") is a citizen of the State of California, with his principal residence in San Francisco, California. Until May 2008, Kochuba was Vice President, Development Planning & Design Management for Starwood's Luxury Brands Group.

Upon information and belief, Kochuba has been employed by Defendant Hilton as Vice President, Planning and Programming, Global Luxury and Lifestyle Brands, since approximately June 2008.

      31.    Erin Shaffer ("Shaffer") is a citizen of the State of California, with her principal residence in Los Angeles, California. Until August 2008, Shaffer was Senior Manager, Brand Marketing for Starwood's Luxury Brands Group. Upon information and belief, Shaffer has been employed by Defendant Hilton as Senior Director, Communications and Partnerships since approximately August 2008.

      32.    Jeff Darnell ("Darnell") is a citizen of the State of California, with his principal residence in Westlake Village, California. Until October 2008, Darnell was the General Manager of the W Los Angeles Hotel. Upon information and belief, Darnell has been employed by Defendant Hilton as Vice President, Brand Operations since approximately October 2008.

      33.    Stephanie Heer ("Heer") is a citizen of the State of California, with her principal residence in Los Angeles, California. Until November 2008, Heer was the Marketing Manager of the W Los Angeles Hotel. Upon information and belief, Heer has been employed by Defendant Hilton as Brand Marketing Manager, Conrad Hotels since approximately November 2008.

      34.    Erin Green ("Green") is a citizen of the State of California. Until December 2008, Green was Director of W Development for the Europe, Africa and Middle East (EAME) region of Starwood. Green is currently employed by Defendant Hilton as Senior Development Director, Luxury and Lifestyle for Europe and Africa.

35.    Elie Younes ("Younes") is a citizen of the State of California.  Until December 2008, Younes was Senior Director of Acquisitions & Development for the Europe, Africa and Middle East (EAME) region of Starwood.  Younes is currently employed by Defendant Hilton as Vice President of Development for the Middle East.

36.    Leah Corradino ("Corradino") is a citizen of the State of California, with her principal residence in Beverly Hills, California.  Until November 2008, Corradino was the Marketing Manager of the W San Diego Hotel.  Upon information and belief, Corradino has been employed by Defendant Hilton as Brand Marketing Manager, Waldorf Astoria & Waldorf Astoria Collection since approximately November 2008.

37.    Susan Manrao ("Manrao") is a citizen of the State of California, with her principal residence in Los Altos, California.  Until August 2008, Manrao was Senior Manager, Interior Style & Design Standards for Starwood's Luxury Brands Group.  Upon information and belief, Manrao has been employed by Defendant Hilton as Senior Director of Design since approximately September 2008.

### THE FACTS

**The Development and Protection of
Starwood's W and Luxury Brands**

38.    Starwood has assumed a leadership position in markets worldwide based on its superior global distribution, coupled with strong brands and brand recognition.  Starwood's lifestyle and luxury brands continue to capture market share from its competitors by aggressively cultivating new customers while maintaining loyalty among the world's most active travelers.  The strength of Starwood's brands is evidenced, in part, by the superior ratings received from its hotel guests and from industry publications.

39.     The hotel industry is highly competitive.  Competition, both for hotel guests and for owners, is generally based on quality and consistency of rooms, restaurant and meeting facilities and services, attractiveness of locations, availability of a global distribution system, price, the ability to earn and redeem loyalty program points and other factors.  History shows that Starwood competes favorably in these areas.

40.     Starwood and Hilton are direct, head-to-head competitors in the hotel and resort industry.  Because both Starwood and Hilton also serve as hotel operators and franchisors — that is, they manage and franchise hotels for hotel owners, through management or license agreements — their competitive position is enhanced by their ability to control costs and increase revenues, including the fees and other terms negotiated with hotel property owners.  Starwood competes favorably in these areas as well, maintaining its competitive edge in this area by protecting the confidentiality of the terms of its deals with hotel property owners.

41.     In the mid-1990s, Starwood's then-CEO Barry Sternlicht conceived of a new brand for Starwood, a brand that came to be known as W Hotels.  In December 1998, the first W Hotel opened in New York City.  Over the next five years, more than a dozen additional W Hotels opened throughout the country.  Through substantial investments of time and money, the W brand grew stronger and more defined, including through the development of proprietary training methods and materials designed to support and strengthen the brand and to give it a competitive advantage.  The W brand represents a unique, upscale hotel targeted to patrons interested in a hip, edgy and trend-conscious destination.  It is a model that many hotel competitors have sought to emulate, but that none have been able successfully to employ, let alone scale globally.  The failure of competitors to match Starwood's success in this area is attributable to

the unique means by which Starwood builds, maintains, operates and grows its brands, and to the steps Starwood takes to protect its methods.

42.    Recently, Starwood has also spent considerable resources repositioning and strengthening two other luxury brands, St. Regis and The Luxury Collection. As a result of Starwood's continuing efforts in growing its lifestyle and luxury brands and bridging the gaps between them in order to better capture the lifestyle and luxury travel market, W Hotels, St. Regis and The Luxury Collection together have become a model for branding and developing lifestyle and luxury hotels.

43.    Although the results of Starwood's efforts may be superficially visible, the failure of competitors to replicate the Starwood experience or success in their own properties is attributable to Starwood's proprietary methods of brand development, marketing and training, which methods Starwood has always maintained in strict confidence.

44.    In February 2003, Starwood hired Defendant Klein to be Vice President, Chief Marketing Officer for W Hotels. At the time of Klein's hiring, the W brand had already become the most successful and iconic new hotel and lifestyle brand in history, with some 20 hotels open or under construction. In May 2005, Klein was promoted by Starwood to the position of President, W Hotels Worldwide, in connection with which Klein signed a new set of employment agreements, including a "NON-SOLICITATION, CONFIDENTIALITY AND INTELLECTUAL PROPERTY AGREEMENT." True and complete copies of Klein's May 2005 employment agreements with Starwood are attached hereto as **Exhibit 1**. Over time, Klein was further promoted by Starwood to the position of President, Luxury Brands Group. As President of Starwood's Luxury Brands Group, Klein was responsible not only for the W Hotel group,

but also for Starwood's St. Regis and The Luxury Collection groups, and had access to the most confidential and competitively sensitive Starwood lifestyle and luxury brands information.

45.    Defendant Lalvani began work at Starwood in September 2004 as Vice President for W Development. In this role, he was expected to lead the expansion of W Hotels globally, launching the W Hotels brand in Europe, Africa and the Middle East. In October 2006, Lalvani was promoted to the position of Senior Vice President, W Development - Global, and subsequently was further promoted to Senior Vice President responsible for the development of all of Starwood's lifestyle and luxury brands, including W, St. Regis and The Luxury Collection. In October 2006, Lalvani signed a new set of employment agreements, including a "NON-SOLICITATION,    CONFIDENTIALITY    AND    INTELLECTUAL    PROPERTY AGREEMENT." True and complete copies of Lalvani's October 2006 employment agreements with Starwood are attached hereto as **Exhibit 2**. As Senior Vice President of Development for Starwood's Luxury Brands Group, Lalvani had access to the most confidential and competitively sensitive Starwood lifestyle and luxury brands information.

46.    Each of the additional interested persons identified in paragraphs 7 and 30-37 above is subject to similar confidentiality agreements in connection with their roles working within the Luxury Brands Group at Starwood, which provided that, upon termination of their employment with Starwood, they would return all Starwood confidential information and would not make or keep any copies, and that they would not disclose any Starwood confidential information to anyone. The agreements explicitly provide that each employee:

> "acknowledges that during the course of his/her employment with [Starwood], Employee will receive, and will have access to, 'Confidential Information' . . . of [Starwood] and that such information is a special, valuable and unique asset belonging to [Starwood] . . . All [Documents (broadly defined)] which from time to time may be in Employee's possession . . . relating, directly or indirectly, to the business of [Starwood] shall be and remain the property of [Starwood] and shall be delivered by Employee to [Starwood] immediately upon request, and in any event promptly upon termination of Employee's employment, and *Employee*

-17-

***shall not make or keep any copies or extracts of the Documents ... Employee shall not disclose to any third person any information concerning the business of [Starwood],*** including, without limitation, any trade secrets, customer lists and details of contracts with or requirements of customers, the identity of any owner of a managed hotel, information relating to any current, past or prospective management agreement or joint venture, information pertaining to business methods, sales plans, design plans and strategies, management organization, computer systems and software, operating policies or manuals . . . financial records or other financial, commercial, business or technical information relating to the company . . . ." (Emphasis added.)

47.    In addition, each such agreement (and every Starwood employee, including Defendants Klein and Lalvani) was explicitly subject to "all Starwood policies, procedures and directives as they currently exist or as they may be adopted or changed from time to time," which included Starwood's Code of Business Conduct.  Among other things, Starwood's Code of Business Conduct provides — under the heading "Protect Confidential Information" — that each employee:

"must protect and keep confidential all non-public information belonging to, in the possession of, or about our property owners, our property franchisees, our customers and us. . . . You must not share confidential information with friends, relatives or non-associates or discuss confidential matters in public places, such as elevators, airplanes or restaurants. . . . These obligations continue even after you leave the Company."

48.    Every Starwood employee is required to certify compliance with the Code of Business Conduct annually.  In doing so, Defendants Klein and Lalvani, and each of the additional interested persons identified above, also agreed not to:

"(a) take for yourself personally any opportunity that belongs to us or is discovered through the use of our property or information or your position; (b) use our property, information or position for personal gain; or (c) compete with us."

49.    Furthermore, Defendants Klein and Lalvani, and each of the additional interested persons identified above, also acknowledged that "[a]nything you create or conceive as a Company employee or contractor are works made for hire . . . ."

50.    The confidentiality provisions with which Starwood requires all employees — including Defendants Klein and Lalvani, and each of the additional interested persons

-18-

identified above — to comply are essential to maintaining Starwood's distinctive and competitive position in the hotel industry.

51.    The explicit confidentiality provisions reflected in the individual employment agreements and in Starwood's Code of Business Conduct are bolstered by other precautions taken within Starwood to protect its confidential and proprietary information. Data and other materials are maintained on secure servers and hard drives, for which access is limited to particular groups of employees within the company. Remote access is permitted only upon proper certification of an employee's Starwood-issued computer through a password-protected remote access system. Employees may not access Starwood's systems through computers that are not properly certificated by Starwood's information technology staff. Nor are employees permitted to forward confidential materials to outside systems, including their own homes or personal e-mail accounts. In this way, Starwood seeks to protect the propriety of its confidential information and to ensure that its secrets remain secret.

52.    Defendants Klein and Lalvani, however, flaunted not only their fiduciary and contractual obligations to Starwood, but Starwood company policy and good faith, by organizing and effecting a wholesale download of Starwood Confidential Information for use by their new employer, Defendant Hilton. They did this in concert with others surreptitiously while under contract to Starwood without Starwood's knowledge or consent.

**Klein's Recruitment by Hilton & Breach**
**of His Obligations to Starwood**

53.    In 2007, the Blackstone private equity group acquired Hilton for over $20 billion in a top-of-the-market, highly leveraged transaction. As reported in the hospitality press, "With Blackstone having paid a super-premium price for Hilton, [CEO Christopher Nassetta] will be under intense pressure to deliver immediate results." Hilton began actively to seek ways

to expand and refocus its luxury brands, and to compete more directly with W and Starwood's luxury brands. Because of its highly leveraged financial condition, as financial markets deteriorated, time was of the essence to Hilton to enter the lifestyle brand segment and to refocus, launch and expand its luxury brands. As reported in the hospitality press, Christopher Nassetta, Hilton's President and Chief Executive Officer, "was very committed to the horizon line" and Hilton's brand development team worked in "a compressed time frame."

54.     In February 2008, Nassetta began recruiting Defendant Klein to join Hilton.

55.     Almost immediately after beginning discussions with Nassetta, Klein secretly misused his position as President of Starwood's Luxury Brands Group to request confidential Starwood information from Starwood employees, which Klein then forwarded to a personal e-mail account. In addition, Klein brought a personal laptop computer into Starwood's offices and had it loaded with confidential Starwood information. Upon information and belief, Klein took still more confidential materials home with him in the form of hard-copy documents.

56.     The information taken by Klein prior to his departure for Hilton included, among other things, such information as the terms being offered to hotel owners on Starwood deals, detailed information relating to brand performance metrics, detailed information about deals in the Luxury Brands Group "pipeline", and detailed presentations outlining Starwood's branding strategy. Much of this information would have served no business purpose for any project Klein was then directly involved in at Starwood, but would be immensely useful to Hilton, or anyone else looking to build or strengthen brands capable of competing with Starwood's luxury and lifestyle brands. Much of this confidential information has not yet been returned to Starwood.

57.     Such forwarding of confidential information to non-Starwood servers was forbidden by Starwood policies designed to preserve the confidentiality of its information. Starwood policy required that any access to Starwood materials from outside Starwood premises be accomplished through use of strictly controlled "virtual private network" (or "VPN") remote access procedures. Through use of this secure remote access procedure, Starwood employees are able to work remotely on any documents on the Starwood system that they are authorized and have a business need to access. Under no circumstances was Starwood's confidential information to be forwarded to employees' personal e-mail accounts, and the availability of Starwood's VPN obviated any legitimate need to do so.

58.     In addition to forwarding Starwood Confidential Information to his personal e-mail account, or taking it with him on a personal laptop computer, while he was under agreement to join Hilton and before he left Starwood, Klein also asked his personal assistant and others who were unaware that Klein soon would be leaving Starwood to work for a competitor to undertake a massive (and expensive) project to digitally archive thousands of "tear sheet" images collected and compiled into meaningful collections over years. These compilations formed the basis for much of the branding and design work completed for the W and luxury brands, and were the property of Starwood. The "tear sheet" compilations were years in the making and were integral to enabling Klein and other Starwood employees to bring Starwood's lifestyle and luxury brands to life. After having the Starwood tear sheet compilations digitally imaged, Klein arranged for the images to be sent to his personal e-mail account, where he was able to include them among the materials he brought to Hilton to assist Hilton in developing new Hilton brand identities, leveraging the techniques and tools taken from Starwood.

59.     On May 16, 2008, unbeknownst to Starwood, Klein signed an employ-ment agreement with Hilton (Klein's "Hilton-Klein Employment Agreement"), and faxed it to Hilton from Starwood's New York City offices.  Klein did not inform Starwood that he had signed an employment agreement with a direct competitor, Hilton

60.     Three days after the date of his signature on his Hilton-Klein Employment Agreement, on May 19, 2008, Klein informed senior executives at Starwood that he was resign-ing from the Company.  Klein still did not inform Starwood that he already had a signed em-ployment agreement with one of Starwood's direct competitors, Hilton.  Nor did Klein cease re-questing Starwood Confidential Information from his staff, or forwarding such material to his personal e-mail account, in preparation for his departure to Hilton.  Instead, Klein continued to purloin Starwood Confidential Information — including updated designer lists, copies of Star-wood's Global Architecture and Design Review Process, The Luxury Collection's "Brand Book", and other proprietary materials that were closely guarded by Starwood but that would be useful to Hilton in developing its new Denizen brand, revamping its existing luxury brands and competing with Starwood.

61.     With the signed Hilton-Klein Employment Agreement in hand, and de-spite having already improperly ensured continuing access to Starwood Confidential Informa-tion, over the next ten days Klein (i) began shipping boxes to Hilton and (ii) negotiated the terms of a separation agreement with Starwood.  At the same time, Klein continued to meet and com-municate with representatives of Blackstone (including John Ceriale and Jonathan Gray) to dis-cuss his move to Hilton.

62.     On May 29, 2008, Klein shipped three boxes weighing 150 pounds di-rectly to Hilton's executive offices in Beverly Hills, California.

63.    Unaware that Klein had already signed an employment agreement with Hilton two weeks earlier, or that he was already taking a large amount of Starwood Confidential Information home and sending materials to Hilton, on May 30, 2008, Starwood agreed with Klein on the terms of a separation agreement.  A true and complete copy of Klein's separation agreement is attached hereto as **Exhibit 3**.  Klein's separation agreement did not contain a covenant against competition, and did not prohibit Klein from going to work for a competitor.  It did, however, prohibit Klein from soliciting any Starwood management-level employees to join him, and explicitly prohibited Klein from using or disclosing any Starwood confidential information, including trade secret information, that he obtained during his employment with Starwood.  In his separation agreement Klein "acknowledges that he has had access to [Starwood] Confidential Information" and he "agrees not to disclose, communicate or divulge to, or use for the direct or indirect benefit of, any person (including [Klein]), firm, association or other entity (other than [Starwood] or its affiliates) any Confidential Information."

64.    For the purpose of fraudulently inducing Starwood to pay him a substantial severance (over $600,000), Klein made a number of knowingly false representations to Starwood, among which were his representation that he had returned and was not retaining any Starwood confidential materials.  In his separation agreement Klein falsely states:

> "[Klein] hereby represents and agrees that on or before [May 30, 2008]: (i) [Klein] has returned or will return to [Starwood], and has not retained or will not retain originals or any copies of all documents, records or materials of any kind, whether written or electronically created or stored, which contain, relate to or refer to any Confidential Information ('Confidential Materials'); and (ii) [Klein] has not disclosed and will not disclose any Confidential Information or Confidential Materials to any person or entity without the express written authorization of an authorized officer of [Starwood]."

These representations by Klein were materially false and known by him to be materially false when made.  Klein knowingly made these materially false statements to Starwood for the pur-

-23-

pose of defrauding Starwood into paying Klein a large severance payment to which Klein, as a result of his wrongful conduct, otherwise was not entitled.

65.     In consideration for his contractual undertakings in the separation agreement, including his separate agreement that he would not use or disclose any Starwood confidential information, Klein was paid a substantial severance that he obtained by intentionally misleading Starwood as to the nature of his commitment to a competitor and as to his intentions to comply with its non-disclosure provisions, and to which he was not therefore entitled.  Klein improperly used the information that he stole from Starwood for the benefit of Hilton, and Hilton has been unjustly enriched thereby.

**Lalvani's Recruitment by Hilton &
Breach of His Obligations to Starwood**

66.     Parallel to Nassetta's recruitment of Klein, in March 2008 Steven Goldman, now President of Global Development & Real Estate at Hilton, began recruiting Lalvani to join Hilton.  Goldman wrote Lalvani: "you're the first guy on my list."  Goldman informed Lalvani: "Worst thing that happens is they find out you are talking to me and pay you a shit load of money to stay and you owe me drinks for life."

67.     Lalvani pursued Goldman's overtures and, on or about March 9, 2008, in contravention of his fiduciary and contractual obligations to Starwood, Lalvani wrote to Goldman following up on their communications: "Other idea is bring over the core W team which has created an enormous amount of value and is very loyal to me to build a new brand for you guys. Not sure your appetite but I know I could make that happen as well."

68.     As it turns out, Hilton had a big appetite for Starwood know-how.  Much like Klein did following his conversations with Nassetta, following his discussions with Gold-

man and while he was still a Starwood employee, Lalvani began gathering up a large volume of confidential Starwood information, which he shipped from his office to his home.

69.     On or about May 20, 2008, Christopher Kochuba, Vice President of Development Planning & Design management of Starwood's Luxury Brands Group announced his resignation from Starwood.  In an e-mail the same day responding to an inquiry if he knew of Kochuba leaving, Klein stated: "of course we knew."

70.     On May 29, 2008, Lalvani informed Starwood that he was resigning.  On the morning of the same day, Lalvani and Kochuba exchanged e-mails in which Kochuba referred to the departures of Klein, Lalvani and himself to Hilton stating: "Like a triple play!  Congratulations." and Lalvani responded "Absolutely . . . It's been quite a ride!  See you on the West Coast."

71.     Starwood had no idea that Lalvani had stolen its Confidential Information and was working in concert with others who were also looting Starwood's confidential files.  Because Lalvani's notice of resignation was unexpected, Starwood asked Lalvani to work another two weeks, until June 14, so that there could be an orderly transition of his work to others.  Starwood trusted Lalvani to be honest and to honor his employment commitments.  Starwood's trust was misplaced as Lalvani used the additional time and continued access to further loot Starwood's confidential files for the benefit of Hilton.

72.     On June 2, 2008, the first business day following Klein's resignation from Starwood and just two days after Lalvani gave notice of his resignation, Hilton announced that Klein and Lalvani would be joining Hilton, Klein as Hilton's Global Head of Luxury & Lifestyle Brands and Lalvani as Hilton's Global Head of Luxury & Lifestyle Brand Development.

-25-

73.    On June 14, 2008, Lalvani's employment with Starwood ended. He immediately began work as Hilton's Global Head of Luxury & Lifestyle Brand Development.

74.    Unbeknownst to Starwood and without Starwood's consent, but true to his promise to Hilton to help re-create Starwood's branding and development group at Hilton, between March 9, 2008 and June 14, 2008, Lalvani secretly downloaded dozens of files containing Starwood Confidential Information to a personal USB drive, and took the materials with him for use in developing and marketing both Hilton's new Denizen brand and its luxury brands. The materials stolen by Lalvani are of the most confidential and sensitive nature, and include detailed analyses of negotiating strategies developed through years of experience and in consultation with Starwood paid consultants, along with Project Approval Requests (or "PARs") setting forth in detail the actual terms of recently negotiated deals with key property owners, and proprietary and closely-held contact lists for property owners and franchisees. Lalvani's theft of these materials is in clear contravention of his fiduciary and contractual obligations to Starwood. Since joining Hilton, Lalvani has been held out by Hilton and Klein as the individual "who does development on the [Hilton] team." Klein has said that developing Denizen in "a compressed time frame" was a "Herculean" task. In fact, in the development of Denizen Lalvani improperly used the information that he stole from Starwood for the benefit of Hilton, and Hilton has been unjustly enriched thereby.

**Klein and Lalvani Take Starwood Employees
and Confidential Materials to Hilton**

75.    The eight additional interested persons identified in paragraphs 7 and 30-37 above were recruited by Hilton, Klein and/or Lalvani to leave Starwood to join Hilton.

76.    Believing Klein to have breached the non-solicitation provisions of his contract with Starwood, but unaware of any other misconduct by Klein, Lalvani or other former

employees, in November 2008 Starwood initiated an arbitration against Klein.  The only issue raised in the arbitration was whether Klein had violated his contract not to solicit Starwood management-level employees to join him at Hilton.  An arbitrator has yet to be appointed and no proceedings have occurred in the arbitration.

77.    In November 2008, still unaware of the wholesale theft of Starwood Confidential Information by Klein, Lalvani and others working in concert with them, Starwood sent letters to Klein and Hilton, requesting that they preserve all relevant documents in connection with the pending arbitration.  True and complete copies of Starwood's non-spoliation letters are attached hereto as **Exhibits 4 & 5**.

78.    Klein has never responded to Starwood's letter.  It took Hilton almost three months to respond.  Then, by letter dated February 5, 2009 from Richard M. Lucas, Hilton's Executive Vice President, General Counsel and Corporate Secretary, to Kenneth S. Siegel, Starwood's Chief Administrative Officer and General Counsel, Hilton delivered to Starwood eight large boxes containing among other things highly confidential Starwood computer and paper records.  A true and complete copy of Hilton's letter is attached hereto as **Exhibit 6**.

79.    Hilton's February 5, 2009 letter states in part:

"[Y]ou requested that Hilton Hotels Corp. preserve all potentially responsive documents and information in our possession, custody and control.  In the process of implementing a litigation hold of such materials, we learned that Ross [Klein] had certain materials that he developed or obtained while working for Starwood. . . .  Based on a cursory review of these documents by counsel, it appears that at least some of the materials might be the type that Ross's separation agreement with Starwood requires him to return to Starwood.  With the concurrence of Ross and his attorneys, we are returning them to you."

The letter went on to state:

"After learning about the materials that Ross [Klein] had, Hilton's Legal Department . . . also inquired whether other Hilton employees who formerly worked for Starwood had similar materials, and we determined that some of them also brought to Hilton documents or materials that they developed or acquired while they worked for Starwood."

-27-

The letter concluded by stating:

> "Enclosed with this letter are the materials we have collected, along with some additional materials that certain of the former Starwood employees had at home."

80.    The ongoing effort to determine just what had been downloaded from Starwood's computer systems has taken considerable time and resources; the full extent of how the information may have been used or manipulated by Hilton and the individual defendants is not yet fully known, but will become fully known through discovery in this action. What is already known is that on the computer drives returned to Starwood by Hilton are over 100,000 files downloaded from Starwood computers — a massive amount of information.. Virtually every category of documents and information defined as Confidential Information in the Starwood employment agreements of Klein, Lalvani and the other Starwood employees recruited to join Hilton is contained in the materials found at Hilton and in the homes of former Starwood employees now working in management for Hilton.

81.    Among the many materials taken to Hilton by Klein, Lalvani and the other interested persons recruited by them are:

(a)    Strategic Plans (or "Strat Plans"), setting forth in detail Starwood's forward-looking strategies and areas of strategic opportunities for the W, St. Regis and The Luxury Collection brands out through 2010, explicitly labeled "Strictly Confidential". Access to such strategic plans was limited to a select group of senior Starwood executives, and, if not kept confidential, would provide a competitor such as Hilton with the means to exploit Starwood's opportunities and competitive advantages.

(b)    Detailed "gap" analyses analyzing the market and other areas not being met by Starwood's luxury brands and ways in which Starwood would seek to fill those gaps and strengthen each of its luxury brands. Such analysis was maintained in strict confidence within a select group of Starwood executives, and would provide a competitor such as Hilton with valuable competitive advantages in developing and re-positioning its own luxury brands.

(c)    A "Development Toolkit" for residential developments (labeled, like many of the materials, "Proprietary & Confidential"), providing step-by-step instructions for launching a branded residential development.

(d)    "Brand in a Box" modules for the W brand, providing detailed, step-by-step operational instructions on how to take a brand from conception to hotel opening.

-28-

The information contained in the modules would help a competitor such as Hilton shave months, if not years, off of launching a new competitive hotel brand, or on instituting operational improvements for its existing brands.

(e)    Luxury Brands Group "Brand Bibles," providing a full and detailed guide to the brands that can serve as a short cut to developing a new brand. Such "Brand Bibles" were closely held, with access provided only to necessary employees and select owners or developers subject to a strict Non-Disclosure Agreement.

(f)    Detailed marketing plans specific to Starwood's brands plans setting forth specific marketing details.

(g)    Comprehensive brand immersion presentations and brand guidelines, both operational and design-oriented, including the complete set of proprietary design genres and signature elements for W and St. Regis hotels, that offer a map to recreating each of Starwood's luxury brands. Such materials would be particularly useful to a competitor such as Hilton that is not known as being a design-driven company or possessing lifestyle brands. As with other Starwood materials that were made available to assist owners in opening Starwood-branded properties, such materials were subject to strict Non-Disclosure Agreements.

(h)    Specific plans outlining Starwood's confidential plans to introduce a "restro-lounge" concept in its W Hotels. Such a plan had been in development at Starwood for some 18 months, and represented a unique solution to a common boutique hotel problem: how to incorporate dining into lobby bar spaces. The "restro-lounge" concept reflected in the Starwood Confidential Information — but kept confidential before stolen by the Defendants — has already been touted by Klein in his public statements describing Hilton's new Denizen brand.

(i)    Proprietary demographic, psychographic and other research commissioned by Starwood from third party professionals and used by Starwood to help develop branding, marketing, development and operational strategy.

(j)    Detailed, step-by-step proprietary personnel training materials developed and refined by Starwood over a number of years and at substantial cost. Starwood's proprietary training system for its W Hotels, the detailed methods of which were previously unknown outside of Starwood, was recognized in the industry as unique and based on its own internal research and development efforts. Access to these materials would permit competitors such as Hilton to substantially and quickly improve its training methods and compete within a key area of hotel guest concern at Starwood's expense.

(k)    Deal term negotiation worksheets and notes on "W Development strategy for 2007 and beyond", setting forth in detail Starwood's negotiation strategies with Owners ranked by "importance to Starwood" for numerous deal terms, including: Contract Terms, Placement Programs, Performance Tests, Termination on Sale, Residential Fees, Technical Services Fees, Financing Related Provisions, Investment Requirements, and Legal Issues. These materials were clearly viewed as having current competitive value to Lalvani and Hilton, and were downloaded by Lalvani to a USB drive and, upon information and belief, accessed by Lalvani and Hilton prior to their return to Starwood.

(l)    Site-specific "Project Approval Requests" ("PARs") and letters of intent, which set out in detail the actual costs, fee structures, termination provisions, radius re-

strictions and other highly sensitive and competitively useful information. The PARs stolen by Lalvani pertain to Starwood properties and targeted properties around the world, including many of the same markets for which Hilton has just recently announced an intention to open new properties.

(m)    "Property Improvement Plans" ("PIPs") for how to create "the Ultimate W Experience" in conversion properties, providing step-by-step details for how to convert a hotel property to a W branded hotel. As Klein and Lalvani would appreciate, the Property Improvement Plan would be immensely useful to a competitor such as Hilton that has stated its intention to launch its new Denizen brand through conversion of existing properties. Indeed, among the documents returned by Hilton is a draft "Property Improvement and Reprogramming Plan" proposing the conversion of a New Orleans property to a "New Hilton Lifestyle Brand." The Proposal, dated September 3, 2008, was authored by former Starwood employee Christopher Kochuba, and copies the format, text and content of the misappropriated Starwood Property Improvement Plans.

(n)    Complete contact lists for all Luxury Brands Group owners, developers and designers, maintained not by the individual defendants but confidentially by Starwood on a centralized basis. Lalvani requested electronic versions of these lists prior to his departure, and subsequently downloaded them, with other materials to a USB drive and took the Starwood-owned contacts with him to Hilton.

82.    As Klein and Lalvani were well aware, the information in the highly-proprietary and confidential PARs, negotiation worksheets and in the closely-held contact lists could be used by Hilton to undercut or exploit Starwood's terms and poach deals or undermine Starwood's existing or future relationships with property owners. In fact, representatives of Hilton — including Nassetta, Goldman, Klein and Lalvani — already have been approaching owners and franchisees of properties under contract with Starwood and are using Starwood's playbook in competing for those properties.

83.    Recognizing the highly sensitive, proprietary and competitively advantageous nature of much of the materials generated in the course of an employee's work, including the types of materials described above, Starwood requires each employee to acknowledge, upon employment [and yearly thereafter], that they will "protect and keep confidential all non-public information belonging to, in the possession of, or about . . . [Starwood]" and will not share such information "even after [they] leave the Company." As set forth above, each of the individual

defendants agreed to keep Starwood information confidential when they signed their employment agreements.

84.     Strict confidentiality was also required of any property owners or potential property owners who were permitted access to the Starwood Confidential Information. For example, copies of the "W Interior Guidelines" manual taken to Hilton — which provides detailed guidelines to the design, construction and operational elements required for a property to receive the W imprimatur, provides on its cover, that the manual

> "AND ALL MATERIALS, PROCEDURES AND SYSTEMS HEREIN CONTAINED OR DEPICTED HAVE BEEN DEVELOPED BY AND ARE THE SOLE AND EXCLUSIVE PROPERTY OF [STARWOOD] . . . THE CONTENTS CONTAIN PROPRIETARY TRADE SECRETS THAT ARE THE PRIVATE AND CONFIDENTIAL PROPERTY OF STARWOOD OR ITS AFFILIATES. UNAUTHORIZED USE, DISCLOSURE, OR REPRODUCTION OF ANY MATERIAL CONTAINED IN THIS MANUAL IS EXPRESSLY PROHIBITED. THE W INTERIOR GUIDELINES ARE TO BE RETURNED IMMEDIATELY UPON THE TERMINATION OF ANY RELATIONSHIP OR AGREEMENT GIVING USER AUTHORIZATION TO POSSESS OR USE SUCH INFORMATION OR MATERIALS. . . . ANY THREATENED BREACH OF UNAUTHORIZED OR ILLEGAL USE SHALL SUBJECT THE USER TO ALL REMEDIES, BOTH LEGAL AND EQUITABLE, AVAILABLE TO STARWOOD."

85.     Klein and Lalvani breached their obligations to Starwood by obtaining copies of Starwood Confidential Information prior to, or in some instances, after, their departure from Starwood and taking that information for use at and for the benefit of Hilton.

86.     Starwood has subsequently learned that not long after he entered discussions with Hilton, Klein began requesting highly sensitive and confidential internal Starwood documents and information, and forwarding those documents and information to his personal e-mail account. Upon information and belief, it was not Klein's practice to do so previously. Nor did he have any legitimate business need for the information at the time he requested it. The information was gathered and assembled by Klein so that he could secretly take it to Hilton for the

benefit and unjust enrichment of Hilton. Part of the cost of brand development is speed to market. Klein stole Starwood know-how to benefit Hilton, to whom time was of the essence.

87.     Upon information and belief, the additional interested persons identified in paragraphs 7 and 30-37 above, in concert with Hilton, Klein and Lalvani, also requested and obtained highly sensitive and confidential internal Starwood documents and information and had such materials sent outside of Starwood.

88.     Klein, Lalvani and others working in concert with them, copied Starwood Confidential Information to USB flash drives, CDs, DVDs and/or other electronic media, all in violation of their employment agreements with Starwood and in violation of their fiduciary duties. Klein, Lalvani and others working in concert with them, had Starwood Confidential Information sent to them, either by forwarding files to personal e-mail accounts or by taking hard copy materials with them. They wrongfully used Starwood's confidential information for the benefit of Hilton and Hilton has been unjustly enriched thereby.

89.     The highly confidential and proprietary Starwood information and documentation that Hilton had in its possession provides a step-by-step playbook for creating a lifestyle or luxury brand; implementing the related development strategy; marketing the brand; and putting it to work on the ground. Starwood expended vast resources to develop this virtual playbook over the course of many years. Its theft by Klein, Lalvani and others working in concert with them who left Starwood for Hilton — and its obvious use by Hilton in the development and launch of a new hotel brand and in the recently announced repositioning of Hilton's luxury portfolio — is the clearest case imaginable of corporate espionage, theft of trade secrets, unfair competition and computer fraud.

**Hilton Uses Starwood's Confidential
Information to Develop Hilton's Own Brands**

90.    Hilton and the individual defendants on Hilton's behalf did not merely take the Starwood Confidential Information and put them aside. Although the full extent of Hilton's use of Starwood's materials cannot be determined until discovery is completed, it is readily apparent that Hilton, Klein and Lalvani, and others working in concert with them, have been steadily mining the Starwood Confidential Information.

91.    For example, no sooner had Hilton's letter and the eight boxes of Starwood Confidential Information arrived, when, on February 9, 2009, Hilton publicly confirmed that — with Klein and Lalvani at the helm — Hilton would launch on March 10, 2009 (at a press conference associated with the International Hotel Investment Forum (the "IHIF") in Berlin, Germany) a new global "lifestyle" hotel line, code-named "Project Global21". Hilton openly declared its direction:

> "'Project Global21 is a junction where business meets pleasure forever redefining how guests stay and play. Our hotels will be born modern through smart design, cultural character and sensitive service delivery -- ever enhancing how guests live now and how guest will live in the future,' said Ross Klein, global head, luxury & lifestyle brands, Hilton Family of Hotels. 'Together, with the Hilton Prestige Portfolio, Project Global21 will add to the balance of global connectivity with local destination flavor, offering travelers a wealth of authentic and unique experiences around the globe.... Hilton will deliver a captivating journey through the world of the new brand enlightened with the next evolution in hospitality.... We invite all IHIF attendees to join us for this unforgettable evening.'"

92.    Developing and launching a new hotel brand is a process that requires considerable investments of time and money. Even for the most experienced companies, it typically takes three to five years to develop, launch and build-out a new hotel brand and open a newly branded hotel. The more upscale and refined the brand, the longer it takes.

93.    But on March 10, 2009, just nine months after Klein and Lalvani joined Hilton, Hilton launched a new lifestyle brand — "Denizen" — at the IHIF industry symposium

-33-

in Berlin. Denizen was developed by means of corporate espionage and the theft of highly confidential and proprietary Starwood information. Even the name "Denizen" and Hilton's reference to its development of a Denizen "restro-lounge" concept are knockoffs of confidential Starwood materials referring to a W concept christened a "zen den" and planning a "restro-lounge" concept within W hotels.

94.    The hospitality press has subsequently observed that Denizen is "cut from the same cloth as W":

> "Hilton announced their latest brand, Denizen, here in Berlin this morning. Denizen will be Hilton's entry into the 'lifestyle brand' category pioneered by Starwood Hotels' W brand. Not coincidentally, Denizen will be led by former W boss Ross Klein. . . . Denizen sounds to be cut from the same cloth as W in many respects . . . ."

95.    As reported in the hospitality press:

> "Industry analysts have been anticipating Hilton's expansion into new trendy brands since it recruited two Starwood Hotels executives last year who specialize in luxury properties.
>
> "Ross Klein, one of [the] chief designers of Denizen, was hired as global head of luxury and lifestyle brands, and Amar Lalvani was tapped to be Hilton's global head of luxury and lifestyle development. The two executives worked on the development of W, Starwood's boutique brand that inspired other competing chains with modern design and hip lobby lounges."

96.    As another industry reporter put it, in talking about Denizen's "'brand DNA', you can't help but think of W Hotels."

97.    Unless Defendants Hilton, Klein and Lalvani, and all those working in concert with them, are enjoined from using in any way, directly or indirectly, Starwood's highly confidential and proprietary information and trade secrets, Starwood will suffer irreparable injury. In each of the agreements signed by Klein and Lalvani with Starwood, it is agreed that any breach of their agreements in respect of the Confidential Information identified therein (and among what they took to Hilton):

"may cause [Starwood] irreparable harm for which there is no adequate remedy at law, and as a result of this, [Starwood] will be entitled to the issuance by a court of competent jurisdiction of an injunction, restraining order or other equitable relief in favor of [Starwood], without the necessity of posting a bond, restraining [Klein, Lalvani and the other interested persons] from committing or continuing to commit any such violation."

98.   The harm to Starwood is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm.  Hilton recently has announced that it is currently in "active negotiation" with developers regarding the expansion of its luxury and lifestyle brands.  Hilton, through Klein, has publicly stated that it intends to open the first Denizen hotels by the end of 2009 or early 2010.  Hilton, through Younes, has said that, although Denizen was just launched, Hilton is already in negotiation with 20 developers.  Klein has said that he expects Hilton to announce signed contracts to open Denizen hotels "within 30 days."

99.   That Starwood's highly successful W lifestyle brand and luxury hotel group has inspired and invited competition is to be expected.  Hilton has been especially clear in its desire to mimic Starwood's successful branding and re-positioning of its luxury properties.  As Hilton has described it:

"A designated team of brands within the Hilton Family of Hotels, Hilton's Luxury and Lifestyle brands offer global choices to the modern traveler.  Each brand within the portfolio has a distinct personality - combined, they illustrate Hilton's ongoing commitment to meeting the needs of a changing global consumer in the expanding luxury market.  Encompassing Denizen Hotels, Conrad Hotels and Resorts, Waldorf Astoria and Waldorf Astoria Collection hotels, the Hilton Luxury and Lifestyle brands blend cultured and timeless traditions with modern indigenous settings, providing luxury experiences for modern business and leisure travelers alike."

100.   But here Hilton, Klein and Lalvani, and others working in concert with them, have engaged in corporate espionage and the theft of highly confidential and proprietary Starwood information and trade secrets in breach of (or aiding the breach of) contractual and fi-

duciary duties in order to expedite Hilton's entry or expansion into new hotel markets, and substantially reduce its costs and risks of doing so.

101.  Klein has admitted in the press that the only investment that Hilton has made in Denizen has been in the "intellectual" component of the brand. That intelligence, however, was stolen from Starwood in the form of the explicit brand development, marketing, and negotiating tools created through years of investment of tens of millions of dollars and countless employee hours by Starwood. That investment by Starwood, which Starwood took extensive steps to try to protect, has now gone to enriching Hilton in its efforts unfairly to compete with Starwood.

102.  Klein's and Lalvani's employment agreements with Starwood carve out and exclude from any arbitration all Claims involving the alleged taking, use or disclosure of trade secrets and similar confidential or proprietary information. Klein's separation agreement also carves out of and excludes from the release provided by Starwood to Klein: (i) any obligation of Klein pursuant to Klein's NON-SOLICITATION, CONFIDENTIALITY AND INTELLECTUAL PROPERTY AGREEMENT; (ii) any act by Klein during his employment that would constitute fraud or embezzlement; or (iii) any actions, claims or demands related to actions or omissions occurring after May 30, 2008. By this action, Starwood seeks equitable relief and money damages. Klein's employment and separation agreements each acknowledge that Starwood shall be entitled to an injunction, restraining order, or such other equitable relief (without the necessity of posting a bond) in a court of law restraining Klein from committing or continuing to commit any violation of the confidentiality provisions of his employment and separation agreements.

-36-

103.   By this action, Starwood seeks equitable relief and money damages. The employment agreements entered into by Klein and Lalvani, and by the other interested persons, expressly provide that Starwood shall be entitled to an injunction, restraining order, or such other equitable relief (without the necessity of posting a bond) in a court of law restraining each of them from committing or continuing to commit any violation of the confidentiality provisions of their employment agreements.

104.   Plaintiff Starwood has no adequate remedy at law.

## AS AND FOR A FIRST CLAIM FOR RELIEF
### (Breach of Contract — Klein)

105.   Plaintiff repeats and realleges each and every allegation set forth in paragraphs one through 104 as though fully set forth herein.

106.   As a condition of his employment with Starwood, Defendant Klein signed and agreed to be bound by the terms of a NON-SOLICITATION, CONFIDENTIALITY AND INTELLECTUAL PROPERTY AGREEMENT.

107.   At all relevant times, Plaintiff Starwood performed its duties with respect to the NON-SOLICITATION, CONFIDENTIALITY AND INTELLECTUAL PROPERTY AGREEMENT entered into by Defendant Klein.

108.   Defendant Klein has breached and continues to breach his obligations to maintain the confidentiality of Starwood's highly confidential and proprietary information under the NON-SOLICITATION, CONFIDENTIALITY AND INTELLECTUAL PROPERTY AGREEMENT.

109.   In addition, as a condition of his severance from Starwood, Defendant Klein signed and agreed to be bound by the terms of his separation agreement.

110.    At all relevant times, Plaintiff Starwood performed its duties with respect to Defendant Klein under Klein's separation agreement.

111.    Defendant Klein has breached and continues to breach his obligations to maintain the confidentiality of Starwood's highly confidential and proprietary information under the separation agreement.

112.    As a direct and proximate result of the wrongful conduct by Defendant Klein, Plaintiff Starwood has suffered and continues to suffer irreparable injury.

113.    As a direct and proximate result of the wrongful conduct by Defendant Klein, Plaintiff Starwood has suffered and continues to suffer substantial money damages.

## AS AND FOR A SECOND CLAIM FOR RELIEF
### (Breach of Contract — Lalvani)

114.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs one through 113 as though fully set forth herein.

115.    As a condition of his employment with Starwood, Defendant Lalvani signed and agreed to be bound by the terms of a NON-SOLICITATION, CONFIDENTIALITY AND INTELLECTUAL PROPERTY AGREEMENT.

116.    At all relevant times, Plaintiff Starwood performed its duties with respect to the NON-SOLICITATION, CONFIDENTIALITY AND INTELLECTUAL PROPERTY AGREEMENT entered into by Defendant Lalvani.

117.    Defendant Lalvani has breached and continue to breach his obligations to maintain the confidentiality of Starwood's highly confidential and proprietary information under the NON-SOLICITATION, CONFIDENTIALITY AND INTELLECTUAL PROPERTY AGREEMENT.

118.   As a direct and proximate result of the wrongful conduct by Defendant Lalvani, Plaintiff Starwood has suffered and continues to suffer irreparable injury.

119.   As a direct and proximate result of the wrongful conduct by Defendant Lalvani, Plaintiff Starwood has suffered and continues to suffer substantial money damages.

## AS AND FOR A THIRD CLAIM FOR RELIEF
### (Inducing Breaches of Contracts; and
### Tortious Interference With Contractual Relations — Hilton)

120.   Plaintiff repeats and realleges each and every allegation set forth in paragraphs one through 119 as though fully set forth herein.

121.   Defendant Hilton knew of Klein's and Lalvani's contractual obligations to Starwood.

122.   By its wrongful actions, Defendant Hilton intentionally induced Klein and Lalvani to breach their contracts with Starwood and has tortiously interfered with Starwood's contractual relations with Klein and Lalvani.

123.   As a direct and proximate result of Defendant Hilton's wrongful conduct, Plaintiff Starwood has suffered and continues to suffer irreparable injury.

124.   As a direct and proximate result of Defendant Hilton's wrongful conduct, Defendant Hilton has been unjustly enriched and Plaintiff Starwood has suffered and continues to suffer substantial money damages.

## AS AND FOR A FOURTH CLAIM FOR RELIEF
### (Fraud — Klein)
### (Aiding and Abetting Fraud — Hilton and Lalvani)

125.   Plaintiff repeats and realleges each and every allegation set forth in paragraphs one through 124 as though fully set forth herein.

126.    At the time Starwood and Klein entered into the separation agreement, Defendant Klein acknowledged that he had access to Starwood Confidential Information.  Klein represented to Starwood that he had returned or would return all such information to Starwood by May 30, 2008, and that he had not retained and would not retain originals or any copies of documents, records or materials of any kind, whether written or electronically created or stored, which contain, relate to or refer to any Confidential Information belonging to Starwood.  Klein also represented that he would not use or disclose any Starwood Confidential Information. These representations were collateral to and separate from the obligations that Klein was under by virtue of his then-existing employment agreement with Starwood.

127.    At the time that Klein made these and other representations to Starwood, they were false and Klein knew them to be false.  At the time that Klein made these and other representations he was already copying Starwood Confidential Information onto his personal computer, he was already emailing Starwood Confidential Information to his personal e-mail account, he was already taking Starwood Confidential Information home, and he was already shipping boxes directly to Hilton's executive offices in Beverly Hills, California — all without the authorization or agreement of Starwood.

128.    Klein lied to Starwood and made knowingly false representations in order to induce Starwood into entering into the separation agreement and paying Klein over $600,000 in severance payments to which, as a result of his wrongful conduct, he was not otherwise entitled, as well as to conceal the fact that Klein was already stealing Starwood Confidential Information to be used for the benefit of Hilton.

129.    Klein's representations that he would not take, use or disclose any Starwood Confidential Information were knowingly false when made and were made by Klein for the purpose of defrauding Starwood.

130.    Klein did not inform Starwood that, two weeks before Klein signed his separation agreement with Starwood, Klein had already signed an employment agreement with Defendant Hilton and that, in concert with Lalvani, Klein had already knowingly and intentionally taken Starwood Confidential Information in contravention of Starwood policy and his existing fiduciary and contractual obligations with the intention of providing it to and using it for the benefit of Hilton.  Hilton and Lalvani were aware of and knowingly aided and abetted Klein's fraud.

131.    Starwood relied on Klein's representations that he would not take, use or disclose Starwood confidential information when Starwood entered into the separation agreement and agreed to pay Klein over $600,000 in severance payments.

132.    Klein has fraudulently obtained Starwood Confidential Information for the unjust enrichment of himself, Lalvani and Hilton.  Lalvani, who also looted Starwood's files, and Hilton, for whose benefit the information was stolen, were aware of Klein's false statements to Starwood.

133.    As a direct and proximate result of the wrongful conduct of Defendants Hilton, Klein and Lalvani, Defendants have been unjustly enriched and Plaintiff Starwood has suffered and continues to suffer money damages.

## AS AND FOR A FIFTH CLAIM FOR RELIEF
### (Misappropriation of Trade Secrets — Hilton, Klein and Lalvani)

134.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs one through 133 as though fully set forth herein.

135.   By their wrongful actions, Defendants Klein and Lalvani have knowingly misappropriated and used Starwood trade secrets in breach of their agreements, confidential relationships and fiduciary duties to Starwood.

136.   By its wrongful actions, including discovery of Starwood's trade secrets through improper means, Defendant Hilton has knowingly misappropriated and used, or aided and abetted the misappropriation and misuse of, Starwood trade secrets.

137.   As a direct and proximate result of the wrongful conduct of Defendants Hilton, Klein and Lalvani, Plaintiff Starwood has suffered and continues to suffer irreparable injury.

138.   As a direct and proximate result of the wrongful conduct of Defendants Hilton, Klein and Lalvani, Defendants have been unjustly enriched and Plaintiff Starwood has suffered and continues to suffer money damages.

## AS AND FOR A SIXTH CLAIM FOR RELIEF
### (Unfair Competition — Hilton, Klein and Lalvani)

139.   Plaintiff repeats and realleges each and every allegation set forth in paragraphs one through 138 as though fully set forth herein.

140.   By their wrongful actions, Defendants Hilton, Klein and Lalvani have knowingly misappropriated confidential and proprietary information for use in Hilton's business and have engaged in unfair competition with Starwood.

141.   As a direct and proximate result of the wrongful conduct of Defendants Hilton, Klein and Lalvani, Plaintiff Starwood has suffered and continues to suffer irreparable injury.

142.   As a direct and proximate result of the wrongful conduct of Defendants Hilton, Klein and Lalvani, Defendants have been unjustly enriched and Plaintiff Starwood has suffered and continues to suffer money damages.

## AS AND FOR A SEVENTH CLAIM FOR RELIEF
### (Theft/Conversion — Hilton, Klein and Lalvani)

143.   Plaintiff repeats and realleges each and every allegation set forth in paragraphs one through 142 as though fully set forth herein.

144.   By their wrongful actions, Defendants have intentionally stolen and converted Starwood confidential and proprietary information and trade secrets to the exclusion of Starwood's rights.

145.   As a direct and proximate result of the wrongful conduct of Defendants Hilton, Klein and Lalvani, Plaintiff Starwood has suffered and continues to suffer irreparable injury.

146.   As a direct and proximate result of the wrongful conduct of Defendants Hilton, Klein and Lalvani, Plaintiff Starwood has suffered and continues to suffer money damages.

## AS AND FOR A EIGHTH CLAIM FOR RELIEF
### (Breaches of Fiduciary Duty — Klein and Lalvani)

147.   Plaintiff repeats and realleges each and every allegation set forth in paragraphs one through 146 as though fully set forth herein.

148.   As management-level employees entrusted with confidential and proprietary information and trade secrets, Defendants Klein and Lalvani each owed at all relevant times fiduciary duties to Plaintiff Starwood.

-43-

149.   Defendants Klein and Lalvani (and perhaps others) each breached that duty by surreptitiously stealing Starwood's confidential and proprietary information and trade secrets through improper means and by making or intending to make improper use of that information and those secrets for purposes contrary to Starwood's interests.

150.   As a direct and proximate result of the wrongful conduct of Defendants Klein and Lalvani, Plaintiff Starwood has suffered and continues to suffer irreparable injury.

151.   As a direct and proximate result of the wrongful conduct of Defendants Klein and Lalvani, Plaintiff Starwood has suffered and continues to suffer money damages.

## AS AND FOR A NINTH CLAIM FOR RELIEF
### (Aiding and Abetting Breaches of Fiduciary Duty — Hilton)

152.   Plaintiff repeats and realleges each and every allegation set forth in paragraphs one through 151 as though fully set forth herein.

153.   Defendant Hilton knew of the fiduciary duties owed to Starwood by Defendants Klein and Lalvani.

154.   By its wrongful actions, Defendant Hilton knowingly induced and participated in Klein's and Lalvani's breaches of their fiduciary obligations to Starwood.

155.   As a direct and proximate result of Defendant Hilton's wrongful conduct, Plaintiff Starwood has suffered and continues to suffer irreparable injury.

156.   As a direct and proximate result of Defendant Hilton's wrongful conduct, Plaintiff Starwood has suffered and continues to suffer money damages.

## AS AND FOR AN TENTH CLAIM FOR RELIEF
### (Unjust Enrichment — Hilton, Klein and Lalvani)

157.   Plaintiff repeats and realleges each and every allegation set forth in paragraphs one through 156 as though fully set forth herein.

158.    By their wrongful actions, Defendants Hilton, Klein and Lalvani have been unjustly enriched at Starwood's expense.

159.    It is against equity and good conscience to permit Defendants to retain the benefits derived from their wrongful conduct.

160.    As a direct and proximate result of the wrongful conduct of Defendants Hilton, Klein and Lalvani, Plaintiff Starwood has suffered and continues to suffer irreparable injury.

161.    As a direct and proximate result of the wrongful conduct of Defendants Hilton, Klein and Lalvani, Plaintiff Starwood has suffered and continues to suffer money damages.

## AS AND FOR A ELEVENTH CLAIM FOR RELIEF
### (Violation of Computer Fraud and Abuse Act — Hilton, Klein and Lalvani)

162.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs one through 161 as though fully set forth herein.

163.    Starwood's computers and computer systems are "protected computers" under the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030(e)(2).

164.    By their wrongful actions, Defendants Klein and Lalvani (and others working under their direction and at their express instruction) intentionally accessed Starwood's protected computer system, without authorization and/or in excess of authorized access, and thereby obtained information from Starwood's protected computer system.

165.    By their wrongful actions, Defendants Klein and Lalvani knowingly and with intent to defraud, accessed Starwood's protected computer system, without authorization and/or in excess of authorized access.