**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STARWOOD HOTELS & RESORTS WORLDWIDE, INC., <br><br> Plaintiff, <br><br> *- against -* <br><br> HILTON HOTELS CORPORATION N/K/A HILTON WORLDWIDE, ROSS KLEIN AND AMAR LALVANI, <br><br> Defendants. | No.  09 Civ. 3862 (SCR) <br><br> **AMENDED AND** <br> **SUPPLEMENTAL COMPLAINT** |

Plaintiff Starwood Hotels & Resorts Worldwide, Inc. ("Starwood" or "Plaintiff"), by its undersigned counsel, as and for its Amended and Supplemental Complaint against Defendants Hilton Hotels Corporation, n/k/a Hilton Worldwide ("Hilton"), Ross Klein ("Klein") and Amar Lalvani ("Lalvani") alleges as follows:

## TABLE OF CONTENTS

| | |
|---|---|
| THE NATURE OF THIS LAWSUIT, THE PRELIMINARY INJUNCTION AND PROCEEDINGS TO DATE....................................................................... | 3 |
| INTRODUCTION....................................................................................... | 8 |
| Summary of Hilton's Wrongful Conduct............................................. | 8 |
| The Knowledge of Hilton's Chief Executive Officer (Christopher Nassetta) and Hilton's President of Global Development and Real Estate (Steven Goldman).... | 9 |
| The Volume and Sensitivity of Starwood Confidential Information Stolen by Hilton................................................................................................ | 17 |
| Hilton's Use of Starwood Confidential Information Across All of Hilton's Luxury and Lifestyle Brands, Including Its Waldorf Astoria Collection.................... | 21 |
| Dozens of Hilton Executives, Including at Least Five Members of Hilton's Executive Committee, are Involved in Hilton's Wrongdoing.............................. | 24 |
| SUMMARY OF THE RELIEF TO WHICH STARWOOD IS ENTITLED.............. | 28 |
| SUBJECT MATTER JURISDICTION...................................................... | 31 |

| Section | Page |
|---|---|
| PERSONAL JURISDICTION AND VENUE | 32 |
| THE PARTIES | 32 |
| PERSONS OF INTEREST | 34 |
| ADDITIONAL PERSONS OF INTEREST | 36 |
| THE FACTS | 37 |
| How Starwood Came to Learn of Hilton's Wrongdoing | 37 |
| Hilton's Initial Efforts to Mislead Starwood | 38 |
| The Ongoing Grand Jury Investigation of Hilton | 40 |
| Hilton's Half-Measured Reaction to Its Wrongdoing | 41 |
| Hilton's Exploitation of Starwood Confidential Information | 43 |
| The Development and Protection of Starwood's W and Luxury Brands | 45 |
| Hilton's Recruitment of Klein and Klein's Breach of His Obligations to Starwood | 50 |
| Hilton's Recruitment of Lalvani and Lalvani's Breach of His Obligations to Starwood | 55 |
| The Unraveling of Hilton's Wrongful Conduct | 59 |
| Hilton Uses Starwood Confidential Information to Develop New Brands and to Reposition All of Hilton's Existing Luxury and Lifestyle Brands | 66 |
| FIRST CLAIM FOR RELIEF: Breach of Contract (Klein) | 73 |
| SECOND CLAIM FOR RELIEF: Breach of Contract (Lalvani) | 74 |
| THIRD CLAIM FOR RELIEF: Inducing Breach of Contract; Tortious Interference With Contractual Relations (All Defendants) | 75 |
| FOURTH CLAIM FOR RELIEF: Fraud; Aiding and Abetting Fraud (All Defendants) | 76 |
| FIFTH CLAIM FOR RELIEF: Misappropriation of Trade Secrets (All Defendants) | 78 |
| SIXTH CLAIM FOR RELIEF: | 79 |

| | |
|---|---|
|     Unfair Competition (All Defendants).................................................................. | |
| SEVENTH CLAIM FOR RELIEF:<br>    Theft /Conversion (All Defendants)...................................................... | 79 |
| EIGHTH CLAIM FOR RELIEF:<br>    Breach of Fiduciary Duty (Klein And Lalvani)...................................................... | 80 |
| NINTH CLAIM FOR RELIEF:<br>    Aiding and Abetting Breach of Fiduciary Duty (Hilton).................................... | 81 |
| TENTH CLAIM FOR RELIEF:<br>    Unjust Enrichment (All Defendants)................................................... | 81 |
| ELEVENTH CLAIM FOR RELIEF:<br>    Violation of Computer Fraud and Abuse Act (All Defendants)......................... | 82 |
| THE WANTONNESS OF DEFENDANTS' WRONGFUL CONDUCT................... | 83 |
| PRAYER FOR RELIEF............................................................................................ | 84 |

## THE NATURE OF THIS LAWSUIT, THE PRELIMINARY INJUNCTION AND PROCEEDINGS TO DATE

1.      Starwood and Hilton are direct, head-to-head competitors.

2.      Starwood is one of the world's largest hotel and leisure companies. Starwood conducts its hotel and leisure business both directly and through subsidiaries.  Starwood's brand names include:  St. Regis, The Luxury Collection, W Hotels, Westin, Le Méridien, Sheraton, Four Points, aloft and Element.

3.      Hilton owns, operates and franchises hotels, resorts and spas throughout the United States and throughout the world.  Hilton's brand names include:  Waldorf Astoria, Waldorf Astoria Collection, Prestige Portfolio, Conrad Hotels and Resorts, Denizen Hotels, DoubleTree, Embassy Suites, Hilton Garden Inn, Hampton, Homewood Suites, Home2Suites, Hilton Grand Vacations and Hilton.

4.      On October 24, 2007, the Blackstone Group, a private equity firm, completed the acquisition of Hilton.  Blackstone paid over $20 billion in a top-of-the-market, highly leveraged buyout.

5.      Five days later, Blackstone Senior Managing Director Jonathan Gray announced the hiring of Christopher Nassetta ("Nassetta") as President and Chief Executive Officer of Hilton.  Gray stated:  "I've known Chris personally for 15 years and have worked successfully side-by-side with him in the past."  Nassetta stated:  "I also look forward to working with Blackstone, who I know from experience will be a terrific strategic partner for Hilton going forward."  The press reported:  "With Blackstone having paid a super-premium price for Hilton, Nassetta will be under intense pressure to deliver immediate results."

6.      But "intense pressure" — whether from Blackstone or otherwise — is no excuse for corporate espionage, and it is no excuse for the massive theft and widescale use of confidential and proprietary Starwood information and/or trade secrets engaged in by Defendants Hilton, Klein and Lalvani.

7.      In May and June 2008, Hilton induced Defendants Klein and Lalvani to leave Starwood and come to work for Hilton.

8.      In November 2008, five months before this lawsuit was originally filed, Hilton's President and Chief Executive Officer, Christopher Nassetta, received a letter from a Hilton executive whistleblower stating that:

> "Numerous manuals, detailed plans, budgets, marketing systems, building specifications and other proprietary documents from Starwood were brought to Hilton by Mr. [Ross] Klein.  Mr. Klein put some of these highly proprietary documents on Hilton's internal computer server, and instructed Hilton personnel to use these proprietary Starwood documents as a detailed plan for them to follow to develop and modify Hilton's luxury and lifestyle brands.  It is my understanding that Starwood invested millions of dollars in the development and implementation of these plans.  I cannot imag-

> ine that they authorized Hilton or [Ross Klein] to use the Starwood proprietary infor-
> mation to unfairly compete with Starwood.  It is my understanding that most of these
> documents were labeled 'strictly confidential' and stamped with the 'St. Regis', 'W'
> and 'The Luxury Collection' logos."

The letter was written on behalf of the Vice President of Sales and Marketing for Hilton's

Conrad Hotels, and stated that the concerned Hilton Vice President believed "Hilton had ob-

tained possession of and was using proprietary marketing and financial information belonging

to Starwood, to develop and promote Hilton's luxury and lifestyle brands" and that she had

"report[ed] her concerns to her supervisor."

       9.    But this clearest of warnings fell on deaf ears because Hilton's senior

management was already aware of the rampant wrongdoing of Defendants Klein and Lalvani,

and had induced Klein and Lalvani to breach their contracts with Starwood.  Hilton, Klein and

Lalvani, and others working in concert with them, stole hundreds of thousands of electronic

files and documents constituting confidential and proprietary Starwood information and/or

trade secrets (collectively, "Starwood Confidential Information") for use by Hilton across all

of Hilton's luxury and lifestyle brands in direct competition with Starwood.

       10.    As detailed below, it was not until months later that Hilton first in-

formed Starwood in a letter dated February 5, 2009 that Starwood Confidential Information

had been found at Hilton and at the homes of Hilton employees.  However, Hilton's letter to

Starwood was calculated more to mislead than disclose because it failed to mention:  (i) that

Nassetta had been informed of the theft and extensive use of Starwood Confidential Informa-

tion months earlier; (ii) that Hilton had not returned everything and still was in possession of

hundreds of thousands of pages of Starwood Confidential Information; (iii) that Hilton's

wrongful use of Starwood Confidential Information had not ceased but was in fact continuing

and accelerating; (iv) that Hilton executives had already distributed Starwood Confidential Information within Hilton for use across all of Hilton's luxury and lifestyle brands to compete directly with Starwood; and (v) that Hilton's wrongdoing was known to and condoned by dozens of Hilton's executives (including at least five of the ten members of Hilton's Executive Committee, its most senior executives).

11.     In March 2009, Nassetta and Defendants Klein and Lalvani announced Hilton's launch of a new lifestyle brand named "Denizen," knowing that Denizen had been developed through the wrongful use of Starwood Confidential Information.  Nassetta, Klein and Lalvani also knew that Hilton was continuing wrongfully to use Starwood Confidential Information to develop, market and reposition its other luxury and lifestyle brands in direct competition with Starwood.

12.     This lawsuit was commenced on April 16, 2009.

13.     Just seven days later, on April 23, 2009, for good cause shown the Court entered a Preliminary Injunction ("Preliminary Injunction") ordering, among other things, that Defendant Hilton return to Starwood any and all Starwood Confidential Information in its possession, custody or control, wherever located, and enjoining Hilton, Klein, Lalvani and their respective officers, agents, servants, attorneys and employees, and all other persons who are in active concert or participation with them (including, without limitation, designers, architects, consultants and advisors) from knowingly using, directly or indirectly in any way, any Starwood Confidential Information, including any information derived therefrom.  For good cause shown, on July 22, 2009, the Court ordered:  "The Preliminary Injunction shall, in its entirety, remain in full force and effect throughout this litigation."

14.     Despite the fact that in its February 2009 correspondence Hilton had purported to return all Starwood Confidential Information, following the Court's entry of the Preliminary Injunction Hilton has delivered to Starwood hundreds of thousands of pages of documents and computer files retrieved from Hilton offices and the homes of Hilton employees around the world, and there is no end in sight.  Deliveries of documents pursuant to the Preliminary Injunction continue, and documents were received as recently as yesterday, nearly a year later.

15.     This mountain of undisputed evidence found within Hilton includes e-mails to, from and internally among Hilton senior management, and demonstrates beyond doubt:

(i)     that Hilton's senior management personally induced and used Starwood employees to serve as corporate spies within Starwood to provide Hilton with real-time information about Starwood's confidential development plans and business opportunities;

(ii)     that Hilton, Klein and Lalvani attempted to replicate Starwood's confidential and proprietary luxury and lifestyle branding expertise by inducing individuals with varied experience to breach their contractual and fiduciary obligations to Starwood and by the theft of a large variety of confidential documents and electronic information.

(iii)     that Defendants Klein and Lalvani and others working with them stole for Hilton hundreds of thousands of electronic and hard-copy Starwood files, including files containing some of Starwood's most competitively sensitive information;

(iv)     that Hilton used the stolen Starwood Confidential Information across all of Hilton's luxury and lifestyle brands, including without limitation Hilton's Waldorf Astoria Collection, Hilton's Prestige Portfolio, Hilton's Conrad Hotels and Hilton's Denizen Hotels brands; in the development of new brands and promotional media; and in the rebranding and repositioning of existing brands in direct competition with Starwood; and

(v)     that Hilton management was aware of and tried to cover up Hilton's wrongful conduct.

7

16.     As detailed below, at least 44 Hilton executives were personally in-volved in or aware of and condoned Hilton's wrongdoing.  Five of them sit on Hilton's Ex-ecutive Committee, its most senior management.  Whether viewed

    (i)     in terms of the staggering volume of information stolen (hundreds of thousands of pages of paper and electronic documents), or

    (ii)    in terms of the commercial sensitivity of what was taken (some of Starwood's most confidential and secret information), or

    (iii)   in terms of who at Hilton was involved in or aware of Hilton's wrongdoing (virtually Hilton's entire senior management), or

    (iv)   in terms of the breadth of wrongful conduct (infecting all of Hilton's luxury and lifestyle brands including Hilton's Waldorf Astoria Collection, Hilton's Prestige Portfolio, Hilton's Conrad Hotels, and Hilton's Denizen Hotels),

this case is extraordinary, and presents the clearest imaginable case of corporate espionage, theft of trade secrets, unfair competition and computer fraud.  Hilton continues to use Star-wood Confidential Information and/or information derived directly or indirectly from Star-wood Confidential Information across its luxury and lifestyle brands, and is in contempt of the Preliminary Injunction.  Hilton's conduct is outrageous.

## INTRODUCTION

### Summary of Hilton's Wrongful Conduct

17.     E-mails between Hilton executives just weeks after Defendant Klein's arrival at Hilton speak of having Klein and his team work "ASAP on Hiltonizing" Starwood Confidential Information "and sharing it with the Exec Group ASAP."

18.     Dozens of Hilton executives, including at least five of the ten members of Hilton's Executive Committee, were aware of Hilton's wrongful possession and use of Starwood Confidential Information, and condoned it.

19.     Hilton employees using Starwood Confidential Information were urged to keep it to a closed group, while others, in their own words, "scrubbed" images to remove Starwood identifiers from the stolen information so that Starwood Confidential Information could be more freely routed within Hilton for use in the repositioning of Hilton's luxury and lifestyle brands.

20.     Starwood Confidential Information stolen by Defendant Lalvani was uploaded to Hilton's shared drive so that it could be more easily accessed by Hilton executives across all of Hilton's luxury and lifestyle brands, and indeed the entire company.

21.     Hilton's misconduct is pervasive and widespread and at the senior-most levels of the Hilton organization.

22.     At this point, all of Hilton's luxury and lifestyle brands, including, without limitation, Hilton's Waldorf Astoria Collection, Hilton's Prestige Portfolio, Hilton's Conrad Hotels and Hilton's Denizen Hotels, are infected by Hilton's theft and wrongful use of Starwood Confidential Information.

**The Knowledge of Hilton's Chief Executive Officer (Christopher Nassetta) and Hilton's President of Global Development and Real Estate (Steven Goldman)**

23.     In March 2008, just a few months after he joined Hilton, Nassetta announced Hilton's hiring of Steven R. Goldman ("Goldman") as President, Global Development and Real Estate, stating:  "I am thrilled to welcome Steve [Goldman] to Hilton at what is a very exciting time in the company's history.  Since I joined the company three months ago, I have become even more convinced of the tremendous opportunity we have to drive the company's growth, particularly internationally, to create the global leader in our industry."

24.     Within a month of his arrival at Hilton, Goldman forwarded two confidential Starwood documents to John Dent, Senior Vice President and Assistant General Counsel of Hilton's Development Group by e-mail: (i) a confidential form of Starwood's License Agreement; and (ii) a confidential form of Starwood's Operating Agreement.  The terms of Starwood's License Agreements and Operating Agreements with owners of Starwood hotels are confidential and competitively sensitive.

25.     Nassetta was not an absentee chief executive.  Nassetta was personally involved in efforts to develop the high-end of Hilton's business in the luxury and lifestyle space.  Nassetta said as much in a May 2008 interview about his "First 120 Days at Hilton":

"At [the] high end of the business there is no question we have work to do.  We have the beginning of a strategy above the Hilton brand with Conrad and The Waldorf Astoria=Collection.  It is in its infancy and we have a significant amount of work to do . . . .  There is work to be done in accelerating growth at the high end of the business.  There are a number of ways to accelerate growth. . . .  A space we are not in that I have personally been spending a lot of time on is the boutique or lifestyle space. . . .  We are hard at work and moving very quickly to develop a powerful concept in the lifestyle space.  We should be ready to announce something in the next 90 to 120 days."

26.     Nassetta was very committed to, and was personally spending a lot of his time on, accelerating growth at the high end of the business, and set about a scheme to accelerate the growth of Hilton's luxury and lifestyle brands in a very compressed time frame.

27.     The cornerstone of Hilton's plan involved putting in place upscale branding and development expertise.  At the time, Nassetta was already personally recruiting Defendant Ross Klein to join Hilton.  At the time, Goldman was already personally recruiting Defendant Amar Lalvani to join Hilton.

28.     Hilton, Nassetta and Goldman knew that as President and Senior Vice President of Starwood's Luxury Brands Group, Defendants Klein and Lalvani had access to

the forward-looking strategic development plans approved at Starwood's highest level for the marketing, growth and development, worldwide, of Starwood's luxury and lifestyle hotel brands.

29.     Hilton, Nassetta and Goldman knew that Klein and Lalvani were intimately involved in and aware of the strategy and planned future development of Starwood's luxury and lifestyle hotel brands:  St. Regis, W Hotels and The Luxury Collection.

30.     Hilton, Nassetta and Goldman also knew that both Klein and Lalvani had written agreements with Starwood that required Klein and Lalvani to protect and safeguard the confidentiality of the Starwood Confidential Information to which they had access.

31.     Hilton, Nassetta and Goldman induced both Klein and Lalvani to breach their contractual and fiduciary obligations to Starwood.

32.     As Defendant Klein has publicly stated, Hilton President and Chief Executive Officer Chris Nassetta gave him a "Herculean" task:

> "Going back to the capital, Chris [Nassetta] was very committed to the horizon line. It would have been much easier to put it in a box and let it sit on the shelf for a while . . . . When [my development partner Amar Lalvani and I] worked with the [Hilton] executive committee, we thought that learning, the opportunity and the window all meant that it is worth it to use these times as the litmus test . . . . It wasn't a rush.  It was just a compressed time frame. . . .  Part of the cost is also speed to market. . . .  In addition, Chris [Nassetta] made a huge commitment from the Hilton engine as well."

33.     In trying to achieve "speed to market," with Hilton's knowledge and assistance, Defendants Klein and Lalvani induced several Starwood employees to breach their contractual and fiduciary obligations to Starwood and together they stole a mountain of highly confidential information from Starwood and openly used it within Hilton in the development,

branding, redevelopment, rebranding and repositioning of Hilton's luxury and lifestyle brands in direct competition with Starwood.

34.     The seriousness of the wrongdoing engaged in by Hilton was not lost on those within Hilton who witnessed Hilton's possession and use of Starwood Confidential Information.  In November 2008, an executive whistle-blower within Hilton had a letter sent to Nassetta regarding Hilton's rampant wrongdoing.  But these clearest of warnings directly to Hilton's senior-most management about Hilton's wrongful possession and use of Starwood Confidential Information "to develop and promote Hilton's luxury and lifestyle brands" and "to develop and modify Hilton's luxury and lifestyle brands" fell on deaf ears.

35.     It was Nassetta who, just months earlier, had personally recruited Defendant Klein to leave his position as President of Starwood's Luxury Brands Group and join Hilton as Global Head of Hilton's Luxury & Lifestyle Brands.  Once at Hilton, Klein reported directly to Nassetta.

36.     It was Hilton's President of Global Development and Real Estate, Steven Goldman, who, just months earlier, had personally recruited Defendant Lalvani to leave his position as Senior Vice President of Starwood's Luxury Brands Group and join Hilton as Global Head of Luxury & Lifestyle Brand Development.   After joining Hilton, Defendant Lalvani reported to Goldman.

37.     Nassetta and Goldman were successful in their personal efforts to recruit Klein and Lalvani, and in June 2008 Hilton announced its hiring of Defendants Klein and Lalvani, and described their portfolios of responsibility:

> "These new hires will help advance Hilton's strategic goal of further developing its presence in the luxury and lifestyle sectors. . . .  At Hilton, Mr. Klein will oversee the company's global luxury and lifestyle brand portfolio, including Waldorf=Astoria,

the Waldorf=Astoria Collection and Conrad, and will spearhead the company's entry into the lifestyle segment.  Mr. Lalvani will lead the global development of Hilton's luxury and lifestyle segments."

38.     Nassetta and Goldman were aware of Klein's and Lalvani's theft of Starwood Confidential Information and, despite the clearest notice of Hilton's rampant wrongdoing, Nassetta and Goldman, together with Defendants Klein and Lalvani, continued to spearhead the development of a new Hilton lifestyle brand and the repositioning of Hilton's other luxury and lifestyle brands.

39.     In March 2009, Nassetta personally announced the worldwide launch of Hilton's Denizen Hotels Brand, stating:  "While we continue to operate in a challenging macro economic environment, the addition of Denizen Hotels demonstrates our commitment to continuing to invest in our long-term growth."

40.     The Denizen Hotels brand was wrongfully developed through the use of stolen Starwood Confidential Information.

41.     In announcing its hiring of Defendant Klein, Hilton failed to disclose that, while still at Starwood, Defendant Klein misused his position as President of Starwood's Luxury Brands Group to gather up large volumes of Starwood Confidential Information that he took home, had loaded on a personal laptop computer and/or forwarded to a personal e-mail account, and that he then took to Hilton.  Klein took so much Starwood Confidential Information to Hilton that, in response to his repeated requests to have additional information sent to his personal e-mail account, he was informed:  "I am going to have to burn a disc of the rest of them.  The file sizes are way too big to email."

42.     After Klein joined Hilton as the senior executive in charge of Hilton's luxury and lifestyle brands, Klein used Starwood employees as corporate spies to provide Hil-

ton with even more Starwood Confidential Information concerning Starwood's ongoing business plans.  Aware that doing so was a violation of their obligations to Starwood, they communicated secretly by personal e-mail accounts, stating to each other, for example:  "fyi, I do not ck this email from work so it is ok to send stuff on."

43.   As Hilton's Global Head of Luxury & Lifestyle Brands, Klein openly used Starwood Confidential Information within Hilton across all of Hilton's luxury and lifestyle brands — including Hilton's Waldorf Astoria Collection, Hilton's Prestige Portfolio, Hilton's Conrad Hotels, and Hilton's Denizen Hotels.  Nassetta was aware of Klein's wrongdoing.

44.   In announcing its hiring of Defendant Lalvani, Hilton failed to disclose that Steven Goldman, Hilton's President of Global Development and Real Estate, used Defendant Lalvani as a corporate spy for Hilton inside Starwood.  In this role, while still employed by Starwood Lalvani willingly provided competitively sensitive confidential information related to Starwood's business and development opportunities directly to Goldman.  For example, on May 15, 2008, Lalvani sent a report that Lalvani had written earlier that day to Starwood's President of Global Development concerning a recent meeting with a hotel developer about potential Starwood deals to his personal e-mail account.  Minutes later, Lalvani forwarded the report from his personal account directly to Goldman at Hilton.  On May 28, 2008, Lalvani forwarded — first to his personal e-mail account and then directly to Goldman at Hilton — correspondence between Starwood's Vice President of Development for the Asia Pacific region and a developer who was interested in opening a W branded hotel in Thailand. In his e-mail to Goldman, Lalvani presented the Starwood opportunity as one that Hilton should seize:  "Here's an interesting one. . . .  I have good connections with the owner.  Lets

discuss protocol during my transition on deals like this so we don't miss them but also dealing with the fact we don't have a lifestyle offering yet.  This is going to be fun!!"

45.     In anticipation of his new role in developing lifestyle offerings for Hilton, Lalvani misused his position as Senior Vice President of Starwood's Luxury Brands Group by gathering up large volumes of Starwood Confidential Information that he took home, had loaded on a personal laptop computer and/or forwarded to a personal e-mail account, and then took to Hilton.  Lalvani stole Starwood Deal Log Reports containing highly sensitive information about every deal in Starwood's worldwide pipeline, as well as many other highly confidential and competitively sensitive documents.  After he joined Hilton as Global Head of Luxury & Lifestyle Brand Development, Lalvani disseminated Starwood Confidential Information within Hilton and used it across Hilton's luxury and lifestyle brands.

46.     After he joined Hilton, Lalvani solicited and obtained additional Starwood Confidential Information from those with whom he had worked at Starwood and used Starwood Confidential Information for Hilton's benefit.  For example, Lalvani contacted Starwood employee Christopher Kochuba (whom he later recruited to Hilton) and asked Kochuba to send him "all of [Starwood's] process maps, critical path, programs, designer lists, and other materials."  Lalvani was clear about his reasons for needing this information at Hilton, stating:  "I didn't bring a copy of that stuff and would be great to have."  When Kochuba responded that he would send the Starwood Confidential Information requested, Lalvani forwarded Kochuba's response to Goldman, stating:  "Also, per the below, I am getting a bunch of the documents and templates we used to use at Starwood so that should be helpful."  Hilton's President of Global Development and Real Estate knew what Lalvani was doing, and condoned it.

15

47.     Hilton publicly announced that Lalvani would "lead the global development of Hilton's luxury and lifestyle segments," but did not disclose that while he was still employed at Starwood Defendant Lalvani informed Goldman:  "Other idea is bring over [to Hilton] the core W team which has created an enormous amount of value and is very loyal to me to build a new brand for you guys.  Not sure your appetite but I know I could make that happen as well."

48.     With the assistance of Klein and Lalvani, Hilton cherry-picked a group of Starwood employees with a cross section of luxury and lifestyle brand experience.  Immediately upon their arrival at Hilton, Klein and Lalvani set to work putting their treasure trove of stolen Starwood Confidential Information to use to expeditiously develop that "new brand" for Hilton:  the Denizen Hotel brand.

49.     Goldman was personally aware of Lalvani's theft of Starwood Confidential Information and the improper use by Hilton of Starwood Confidential Information across Hilton's luxury and lifestyle brands, including Hilton's Waldorf Astoria Collection, Hilton's Prestige Portfolio, Hilton's Conrad Hotels, and Hilton's Denizen Hotel brands, and not only condoned it but complimented Lalvani on the incorporation of Starwood Confidential Information into Hilton development materials.

50.     Nassetta was also aware of and did nothing to stop Hilton's continued use of Starwood Confidential Information across all of Hilton's luxury and lifestyle brands — including without limitation Hilton's Waldorf Astoria Collection, Prestige Portfolio, Conrad Hotels and Denizen Hotels.  Both Nassetta and Goldman personally participated with Defendants Klein and Lalvani in presentations to Starwood owners using Starwood Confidential Information to compete head-to-head with Starwood.

16

51. Five months after Nassetta was personally informed in writing of Hilton's wrongful possession and use of Starwood Confidential Information "to develop and promote Hilton's luxury and lifestyle brands," Nassetta, Goldman, Klein and Lalvani trumpeted at an international hospitality convention the worldwide launch of Hilton's Denizen Hotels brand. As Nassetta, Goldman, Klein and Lalvani — and by extension, Hilton — well knew, the Denizen Hotels brand was developed in record time through the theft and wrongful use of Starwood Confidential Information.

52. Denizen Hotels was not shut down until the Court entered the Preliminary Injunction in this case.

**The Volume and Sensitivity of Starwood Confidential Information Stolen by Hilton**

53. This is not a case where a few employees took with them to a new job a few confidential mementos of a prior career. Pursuant to the Preliminary Injunction, to date Hilton has delivered to Starwood hundreds of thousands of pages of documents and computer files retrieved from Hilton offices and the homes of Hilton employees around the world. Hilton continues to disgorge information pursuant to the Preliminary Injunction. The volume of confidential and proprietary information of a direct competitor stolen by Hilton is staggering, and may be unprecedented.

54. The Starwood Confidential Information retrieved from Hilton offices and the homes of Hilton employees around the world pursuant to the Court's Preliminary Injunction includes some of Starwood's most competitively sensitive information:

- **Starwood's Forward-Looking Strategic Development Plans**, containing Starwood's highly confidential and proprietary current and prospective strategies for the development of its W, St. Regis and The Luxury Collection brands, including the W Hotels Worldwide Strategic Brand Plans for 2007-2009 and 2008-2010; the St. Regis Strategic Brand Plan for 2008-2010; The Luxury Collection Strategic Brand Plan for 2008-2010 and The Luxury Brands Group 3 Year Stra-

tegic Plan for 2009-2011.  These brand plans were created for Starwood's Senior Leadership Team and the brand leaders, and were stored on a limited access, password-protected drive.

- **Starwood's Principal Term Prioritization Worksheets**, containing Starwood's highly confidential and proprietary current and prospective negotiation and pricing strategies with owners ranked by importance to Starwood for numerous deal terms, including performance tests, termination on sale provisions, residential fees, technical services fees, financing-related provisions, investment requirements, legal issues and many other terms.  Distribution of the Principal Term Prioritization Worksheets was limited even within Starwood, and the files were stored on a limited access, password-protected drive.

- **Starwood's Detailed "Gap" Analyses**, analyzing the market and other areas not being met by Starwood's luxury brands and ways in which Starwood would seek to fill those gaps and strengthen each of its luxury brands.  Distribution of these materials was limited even within Starwood, and the files were stored on a limited access, password-protected drive.

- **Starwood's Property Improvement Plan** templates for how to create "the Ultimate W Experience" in conversion properties, providing step-by-step details for how to convert a hotel property to a W branded hotel.  Distribution of Property Improvement Plans was limited even within Starwood, and the files were stored on a limited access, password-protected drive.  They are available to owners or developers only as needed and subject to strict confidentiality and non-disclosure agreements.

- **Starwood's confidential computer files** containing the names, addresses and other non-public information for its Luxury Brands Group owners, developers and designers compiled by Starwood.  Distribution of these files was limited even within Starwood, and the files were stored on a limited access, password-protected drive.

- **Recent presentations to Starwood's executive leadership team** containing current and prospective financial, branding and marketing information for Starwood's luxury and lifestyle brands.  Distribution of these files was limited even within Starwood, and the files were stored on a limited access, password-protected drive.

- **Starwood's site-specific Project Approval Requests**, which set out in detail the costs, fee structures, termination provisions and other highly sensitive and competitively useful information for Starwood properties and targeted properties worldwide.  Distribution of these files was limited even within Starwood, and the files were stored on a limited access, password-protected drive.

- **Confidential and proprietary marketing and demographic studies**, confidential to Starwood and used by Starwood in its global marketing and development plans, for which Starwood paid third parties over $1,000,000.  Distribution of these files was limited even within Starwood, and stored on a limited access, password-protected drive.  Indeed, many of these materials were stored on the individual hard drive of Starwood's Vice President of Global Market Research,

and were distributed only on a limited, as-needed basis to members of Star-wood's branding and marketing teams.

- **Starwood's Residential Guidelines**, containing Starwood's strategies and pro-prietary toolkits for developing residential properties within the W and St. Regis brands. These guidelines were stored on a password-protected database, and provided only to certain owners and developers who entered into strict confiden-tiality and non-disclosure agreements with Starwood.

- **Starwood's W Hotels "Brand in a Box" modules and training materials**, containing Starwood's proprietary training, operational materials and procedures for opening a new lifestyle hotel, as well as materials for promotional strategies and detailed guidelines on how to launch a new brand. The "Brand in a Box" modules were never distributed beyond the small number of individuals working on their preparation.

- **Starwood's Luxury Brands Group "Brand Bibles," brand handbooks, brand immersion materials, and brand marketing plans,** containing detailed plans for current and prospective branding, marketing, development and expan-sion of Starwood's leading luxury and lifestyle brands, including the complete set of proprietary design genres and signature elements for W and St. Regis. Many of these elements were not unveiled by Starwood until well into 2009, or have not yet been unveiled. Distribution of these materials was limited even within Starwood, and the files were stored on a limited access, password-protected drive.

- **Starwood's Deal Log Reports**, containing in detail the contact information and deal negotiation status of every Starwood real estate opportunity. Distribution of these files was limited even within Starwood, and the files were stored on a lim-ited access, password-protected drive.

- **Starwood's Financial Reports,** containing closely-held, property-specific in-formation. These materials were distributed only to a handful of the most senior leaders of Starwood's brands.

- **Starwood's Brand Standards,** containing every element a branded property is required to possess or implement, and the price associated with each element. These documents were provided only to owners and developers who entered into strict confidentiality and non-disclosure agreements with Starwood.

- **Starwood's Guest Satisfaction and Meeting Planner Satisfaction Reports,** containing confidential data indicating the strengths and weaknesses of particu-lar properties. These materials were stored on the individual hard drive of Star-wood's Vice President of Global Market Research, and were distributed only on a limited, as-needed basis to members of Starwood's branding and marketing teams.

     55.    Virtually every category of documents and information defined as

"Confidential Information" in the employment agreements that Defendants Klein and Lalvani

(and each of the Persons of Interest (defined below)) signed with Starwood is contained in the materials found at Hilton and in the homes of Hilton employees.  These materials were developed through tens of thousands of hours of trial and error by Starwood, at an investment of many millions of dollars.  They provide a step-by-step guide to developing and launching a new hotel brand from conception to opening, to strengthening and repositioning existing luxury brands and to competing unfairly with Starwood.  Quite literally, the materials include Starwood's blueprints for building a "Brand in a Box," creating a lifestyle brand, negotiating with owners and developers, implementing the related development strategy, marketing lifestyle brands, and putting it all to work on the ground, including operating materials and proprietary brand-centric training manuals.

56.    The Starwood Confidential Information found at Hilton is a veritable mother lode of computer and hard-copy confidential information that has been created or commissioned by Starwood at great expense in connection with the development and promotion of Starwood's luxury and lifestyle hotel brands, including St. Regis, W and The Luxury Collection.  It was maintained in confidence while at Starwood, and further protected through the use of strict confidentiality and non-disclosure agreements with Starwood employees and anyone else who may need access to the information.  The material contains current and prospective information, and consists of highly confidential and proprietary business plans, cost and fee structures and other trade secrets.  It includes highly sensitive and competitively useful information for Starwood properties and targeted properties around the world that can be used by Hilton to undercut or outperform Starwood in competitive markets.

57.    This information provides Hilton with the means to bring a competitive hotel brand to market and to reposition and re-launch its existing luxury and lifestyle brands

expeditiously and without expending many tens of millions of dollars and many years on development, thereby avoiding the inevitable and costly trial and error and delay along the way. Instead, Hilton has exploited the time and tens of millions of dollars that were invested by Starwood to create these materials, unjustly enriching itself thereby.

**Hilton's Use of Starwood Confidential Information Across All of Hilton's Luxury and Lifestyle Brands, Including Its Waldorf Astoria Collection**

58.     The stolen Starwood Confidential Information was not kept secret by former Starwood employees for their own use so they could look good to their new employer. Within days after Defendants Klein and Lalvani arrived at Hilton, Starwood Confidential Information was routed around Hilton worldwide, to employees across all of Hilton's luxury and lifestyle brands and across offices and continents.

59.     Starwood Confidential Information was uploaded by Hilton employees onto Hilton's shared computer drive so that it could be more easily accessed by Hilton employees involved in the development and marketing of Hilton's luxury and lifestyle brands, and by employees throughout the entire company.

60.     Within days of his arrival at Hilton, Lalvani was distributing Confidential Starwood Information across Hilton's luxury and lifestyle brands, including to, among others, Pretha Mani, Senior Director of Brand Growth for Hilton's luxury and lifestyle brands.

61.     Hilton's wrongful use of Starwood Confidential Information was not limited to the record-fast development of Hilton's Denizen Hotels brand. Starwood Confidential Information was used by Hilton "to develop and promote Hilton's luxury and lifestyle brands" and "to develop and modify Hilton's luxury and lifestyle brands" — *i.e.*, in the re-

branding and repositioning of all of Hilton's luxury and lifestyle brands — including Hilton's Waldorf Astoria Collection, Hilton's Prestige Portfolio, and Hilton's Conrad Hotels brands.

62.    Ed Russo, Senior Director of Brand Management for Hilton's Waldorf Astoria Collection, sent an internal Hilton e-mail to Defendant Klein just weeks after Klein's arrival at Hilton, stating:  "So, I am veraciously [sic] reading these St Regis and W Residential Development Kits.  The writing style is superb and the content is quite relevant."

63.    In discussing Hilton's "new build critical path," internal Hilton e-mails between Bruce Sneller, Hilton's Director of New Hotels and Transitions, and Richard Wolfman, Hilton's Senior Director of Lifestyle Brand Development, reflect: "In case you got through all those checklists — here is one more I managed to get from Starwood.  Clearly, Ross is used to this format."  Checklists and templates developed by Starwood to force rigorous thought were the result of years of developmental experience.  The fact that Hilton lacked such tools shows how far behind Starwood Hilton is in the evolution of luxury and lifestyle brands.

64.    Hilton executives sought immediately to utilize the analytical thinking set forth in the stolen Starwood Confidential Information.  Thus, in an e-mail just days after Klein joined Hilton, Antoon Hollants Van Loocke, Hilton's Director of Brand Standards for Hilton's Conrad Hotels brand, reported to his "Brand Team":  "Dear all, Please find attached a first attempt to complete Ross Klein's (Starwood sourced) GAP Analysis."

65.    Hilton employees urgently sought out and used Starwood Confidential Information stolen by Defendant Amar Lalvani across Hilton's luxury and lifestyle brands.  Thus, in seeking out certain confidential Starwood strategic development materials "from Amar's discs," Pretha Mani, Hilton's Senior Director of Luxury and Lifestyle Brand Growth

for Hilton's Luxury and Lifestyle Brands, asked Robin Swierk, Hilton's Senior Coordinator

of Brand Performance for Hilton's Conrad Hotels:

> "[W]ere you able to retrieve that strategic development list of cities/countries from
> Amar's discs?  Maybe you sent it and I missed it?  We now need it urgently.  Could
> you send to me or show me where to search?"

In response, Swierk informed Mani:

> "I asked Joy to put all of those documents on the s: drive so they are all located in
> s:HPP/HPP Development/W docs."

       66.     Hilton employees worked as fast as they could to "Hiltonize" the Star-

wood Confidential Information and to share it with Hilton's Executive Group "ASAP."  In-

deed, within weeks of Klein's arrival at Hilton, Richard E. Mignault, Hilton's Vice President

of Human Resources & Administration, e-mailed Klein about Starwood Confidential Informa-

tion relating to general manager profiles for Starwood's W and St. Regis brands, stating:

> "Further to our discussions earlier today, I think we need to have your team work
> with you ASAP on Hiltonizing this and sharing it with the Exec Group ASAP.  In
> particular, I think we need to immediately deal with your 'Brand' involvement in the
> appointment of GMs around the globe."

       67.     At this point, the integration of Starwood Confidential Information into

Hilton's systems is pervasive, and all of Hilton's luxury and lifestyle brands have been in-

fected by Hilton's wrongful use of Starwood Confidential Information.  This includes Hilton's

Waldorf Astoria Collection, Hilton's Prestige Portfolio and Hilton's Conrad Hotels brand.

Given the broad distribution of Starwood Confidential Information throughout the Hilton or-

ganization, it is impossible without full and complete discovery to know the full extent of Hil-

ton's use of Starwood Confidential Information or the extent to which other Hilton brands

may also have improperly used Starwood's materials.

**Dozens of Hilton Executives, Including at Least Five Members of**
**Hilton's Executive Committee, are Involved in Hilton's Wrongdoing**

68.     Hilton's wrongful possession and use of Starwood Confidential Information was known to literally dozens of executives within the Hilton organization.  These executives in turn knew it was wrong for Hilton to possess and use Starwood Confidential Information, and they tried to cover it up.

69.     For example, in June 2008, Hilton's Vice President of Human Resources & Administration, Richard E. Mignault, received Starwood Confidential Information directly from Ross Klein.  Mignault forwarded these materials to Hilton's Senior Vice President of Organizational Development & Chief Learning Officer, Martin C. Lowery, and cautioned, "[t]hink that we need to be careful about sending 'Starwood' branded stuff into the wider audience.  I can take this up in my call with Ross tomorrow and ask him if he plans on distilling this into a Hilton Prestige Portfolio document for internal review/discussion."  Lowery responded:  "Absolutely agree . . . once Ross has his HPP version he needs to be the one to broach this with Ian, Joe and the other Area Presidents."

70.     Molly McKenzie-Swarts, Hilton's Executive Vice President of Human Resources, and a member of Hilton's Executive Committee, was copied on these e-mails cautioning "that we need to be careful about sending 'Starwood' branded stuff into the wider audience" and "distilling" Starwood Confidential Information into a "Hilton  . . . document for internal review/discussion."  There is no indication that McKenzie-Swarts voiced any objection to Hilton's possession and continued use of Starwood Confidential Information.

24

71.    In November 2008, Heon Hahm, Hilton's Director of Recruitment, e-mailed Susan Manrao (who had served as Defendant Klein's spy within Starwood until he brought her over to Hilton):

> "Hi Susan. Jen shared the attached documents that you sent her as a sample of the types of projects the stylist would be working on. I'm concerned that these are all Starwood documents so I hope you are not sharing them with candidates as concept documents or distributing or utilizing internally either. Please confirm. Thanks so much!!"

72.    Manrao simply arranged for the Starwood documents to be, in Hilton's words, "scrubbed" so that the "images" identifying them as Starwood documents would be deleted. Having "scrubbed images" to remove Starwood identifiers from the Starwood Confidential Information, Hilton continued to use the Starwood Confidential Information across all of its luxury and lifestyle brands. Despite recognizing that Hilton should not have or use Starwood's proprietary materials, Hilton did not notify Starwood of its possession of the materials or return the materials to Starwood until several months later. And Hilton did not cease using Starwood Confidential Information.

73.    Indeed, Hilton's highest ranking officers, Nassetta and Goldman, both members of Hilton's Executive Committee, personally accompanied Defendants Klein and Lalvani on prospecting visits to Starwood owners at which they used Starwood Confidential Information to compete head-to-head with Starwood. Nassetta and Goldman knew of Hilton's possession and use of Starwood Confidential Information and nevertheless personally participated in the launch of Hilton's Denizen Hotels brand, developed with stolen Starwood Confidential Information. There is no indication that either Nassetta or Goldman voiced any objection to Hilton's possession and continued use of Starwood Confidential Information.

74.     Richard M. Lucas, Hilton's Executive Vice President, General Counsel, Corporate Secretary, and a member of Hilton's Executive Committee, knew of Hilton's possession and use of Starwood Confidential Information.  Lucas's February 5, 2009 letter to Starwood is materially false and misleading, and thereafter Hilton continued to possess and use Starwood Confidential Information.  There is no indication that Lucas voiced any objection to Hilton's possession and continued use of Starwood Confidential Information.

75.     Kevin Jacobs, Hilton's Senior Vice President for Corporate Strategy and another member of Hilton's Executive Committee, asked Klein to be sure to share Starwood Confidential Information with Rob Palleschi, head of Hilton's Doubletree brand, and with Jim Holthouser, head of Hilton's Embassy Suites brand.  There is no indication that Jacobs voiced any objection to Hilton's possession and continued use of Starwood Confidential Information.

76.     The information that Hilton was forced by the Court's Preliminary Injunction to provide demonstrates that at least the following 44 members of Hilton's management — five of whom sit on Hilton's ten-member Executive Committee — sent, received or were copied on correspondence transmitting Starwood Confidential Information within Hilton, or were personally aware of Hilton's possession and use of it.

| Name | Position with Hilton |
| --- | --- |
| Christopher Nassetta | President and Chief Executive Officer; member of Hilton's Executive Committee |
| Steven Goldman | President of Global Development & Real Estate; member of Hilton's Executive Committee |
| Richard M. Lucas | Executive Vice President, General Counsel, Corporate Secretary; member of Hilton's Executive Committee |
| Molly McKenzie- | Executive Vice President of Human Resources; member of Hil- |

| | |
|---|---|
| Swarts | ton's Executive Committee |
| Kevin Jacobs | Senior Vice President, Corporate Strategy; member of Hilton's Executive Committee |
| John Dent | Senior Vice President and Senior Counsel of Hilton's Real Estate and Development Group |
| Martin Lowery | Senior Vice President of Organizational Development and Chief Learning Officer |
| Richard Blamey | Senior Vice President of Brand Management, Conrad [UK office] |
| Ross Klein | Global Head of Luxury & Lifestyle Brands; former member of Hilton's Executive Management Team |
| Amar Lalvani | Global Head of Luxury & Lifestyle Brand Development |
| Rob Palleschi | Head of Hilton's Doubletree brand |
| Jim Holthouser | Head of Hilton's Embassy Suites brand |
| Christopher Kochuba | Vice President, Planning and Programming of Global Luxury and Lifestyle Brands |
| Jeff Darnell | Vice President of Brand Operations |
| Elie Younes | Vice President of Development (Middle East) |
| Richard Mignault | Vice President of Human Resources and Administration |
| Roberta Rinker-Ludloff | Vice President of Sales and Marketing, Conrad |
| Susan Manrao | Senior Director of Design and Brand Experience |
| Erin Green | Senior Development Director, Luxury and Lifestyle (Europe and Asia) |
| Erin Shaffer | Senior Director, Communications and Partnerships |
| Pretha Mani | Senior Director of Brand Growth, Luxury and Lifestyle Brands |
| John Padwick | Senior Director of Luxury E-Commerce Strategies |
| Julie Wagner | Senior Director, Marketing and Advertising, Luxury and Lifestyle Brands |
| Robyn Swierk | Senior Coordinator of Brand Performance, Conrad Hotels |
| Edward Russo | Senior Director of Brand Management, Waldorf Astoria Collection |
| Stephanie Toller | Senior Director of Guest Experience |
| Richard Wolfman | Senior Director, Lifestyle Brand Development |
| Tracy Curry | Senior Director, Human Resources |
| Marisa Szem | Senior Director, Luxury Brands Training |

27

| Shaynan Garrioch | Director, Human Resources |
|---|---|
| Heon Hahm | Director of Recruitment |
| Antoon Hollants Van Loocke | Director of Brand Standards, Conrad Hotels |
| Carroll Hutchings | Director of Brand Marketing, Conrad Hotels |
| Karen Kennedy | Director of Brand Performance, Conrad Hotels (Singapore) |
| Bruce Sneller | Director of New Hotels and Transitions |
| Bill Paxton | Director of Facilities |
| Oshy Phillips | Senior Manager of Brand Communications, Luxury and Lifestyle Brands (United Kingdom) |
| Nicola Piggott | Senior Manager of Brand Communications, Americas |
| Laurence Markham | Senior Brand Marketing Manager at Conrad Hotels & Resorts |
| Ngan Le | Senior Manager, Graphics and Identity |
| Stephanie Heer | Brand Marketing Manager, Conrad Hotels |
| Leah Corradino | Brand Marketing Manager, Waldorf Astoria and Waldorf Astoria Collection |
| Ashley Atkins | Senior Coordinator, Luxury & Lifestyle Brands |
| Mat Domaradzki | Development Coordinator, Luxury and Lifestyle Brands |

77.     The actions and the failures to act in the service of Hilton of the 44 individuals identified in the immediately preceding paragraph are the actions and failures of Hilton, for which Hilton is fully responsible.

**<u>SUMMARY OF THE RELIEF TO WHICH STARWOOD IS ENTITLED</u>**

78.     The volume of Starwood Confidential Information retrieved to date from Hilton offices around the world and from the homes of Hilton employees is enormous and may be unprecedented.  Despite the volume returned to date, however, defendants Hilton, Klein and Lalvani have yet to fully disgorge what they and others at their urging and request stole from Starwood and brought to Hilton.

28

79.     Hilton's wrongful use of Starwood Confidential Information cuts across and infects all of Hilton's luxury and lifestyle brands — including Hilton's Waldorf Astoria Collection, Hilton's Prestige Portfolio, Hilton's Conrad Hotels and Hilton's Denizen Hotels brands — and was known to and encouraged by Hilton's most senior management with the participation of dozens of members of Hilton's management.  Hilton's wrongful use may infect other Hilton brands as well.

80.     The Starwood Confidential Information found within Hilton offices and in the homes of Hilton management-level employees around the world has unjustly enriched Hilton and has provided Hilton with an unfair competitive advantage across all luxury and lifestyle brands gained at Starwood's direct and substantial expense.

81.     Starwood is entitled to a full panoply of legal and equitable relief against Hilton, Klein and Lalvani, including but not limited to:

(i)      appropriate behavior modification through preliminary and permanent injunctive relief;

(ii)     Court appointment of one or more "monitors" to assure Hilton's compliance with all injunctions and Hilton's non-use, directly, indirectly or derivatively of any Starwood Confidential Information or information derived therefrom;

(iii)    euthanizing Hilton's terminally infected Denizen Hotels brand;

(iv)    purging Starwood Confidential Information and all information derived from Starwood Confidential Information from Hilton's luxury and lifestyle brands — including Hilton's Waldorf Astoria Collection, Hilton's Prestige Portfolio and Hilton's Conrad Hotels brands, and the websites promoting them;

(v)     imposing a "penalty box" or "time out" enjoining for an appropriate time period any further development of Hilton's luxury and lifestyle brands to compensate Starwood for Hilton's unjust enrichment from its wrongful use of Starwood Confidential Information across all of Hilton's luxury and lifestyle brands;

(vi)    corrective disclosure to property owners of Hilton's wrongdoing;

29

(vii)   appropriate compensatory money damages;

(viii)  appropriate punitive damages; and

(ix)    finding Defendants in civil and/or criminal contempt of the Preliminary Injunction and awarding such relief as the Court deems appropriate.

82.    Defendants, and their respective officers, agents, servants, employees, and attorneys, and all other persons who are in active concert or participation with them (including, without limitation, designers, architects, consultants and advisors), should be:

(i)     preliminarily and permanently enjoined from using or benefiting from, directly or indirectly, the use of Starwood's highly confidential, proprietary and trade secret information, including without limitation the Starwood Confidential Information;

(ii)    ordered immediately to return all Starwood Confidential Information in their possession, custody or control, wherever located;

(iii)   ordered to purge all Starwood Confidential Information and all information derived directly or indirectly from Starwood Confidential Information from all Hilton information and material, including websites;

(iv)    ordered immediately to destroy and to certify under oath the complete destruction of all materials derived in any way directly or indirectly in whole or in part from any Starwood Confidential Information;

(v)     ordered immediately to destroy and to certify under oath the complete destruction of all documents and information relating to the promotion and roll-out of Hilton's Denizen Hotel brand — thus requiring Hilton to start over without the benefit of any Starwood Confidential Information;

(vi)    ordered to make appropriate corrective disclosure to property owners and industry professionals of Hilton's wrongdoing;

and Defendant Hilton should be:

(vii)   ordered immediately to engage, at Hilton's expense, one or more "monitors" acceptable to the Court and to Starwood who shall be empowered by the Court to investigate and report Hilton's compliance with all injunctions and Hilton's non-use, either directly or indirectly, of Starwood Confidential Information;

(viii)  ordered immediately to provide a detailed accounting of and impose a constructive trust on all revenues derived and all expenses saved by Hilton across all of Hilton's luxury and lifestyle brands worldwide, and any other brands infected by Starwood materials, from Hilton's wrongful use of Starwood Confidential Information;

(ix)    enjoined for a reasonable time from any expansion of Hilton's luxury and life-style brands (*e.g.*, Waldorf Astoria Collection, Prestige Portfolio and Conrad Hotels) and any other brands that were infected with Starwood Confidential Information;

(x)     enjoined for a reasonable time from pursuing any hotel owners, developers and investors for hotel properties in the locations identified in the Starwood Confidential Information as targeted for Starwood properties;

(xi)    enjoined for a reasonable time from negotiating with owners, developers, investors and any other persons with whom Starwood has current management contracts;

and Defendants Hilton, Klein and Lalvani should be:

(xii)   ordered to disgorge all unjust enrichment as a result of their taking and use of Starwood Confidential Information;

(xiii)  ordered, jointly and severally, to pay Starwood compensatory damages in an amount to be proven at trial;

(xiv)   ordered to pay Starwood punitive damages in the maximum amount permitted by law; and

(xv)    ordered to provide Starwood with such other and further relief as the Court deems just and proper.

## SUBJECT MATTER JURISDICTION

83.    Subject matter jurisdiction in this Court exists under 28 U.S.C. § 1332. There is complete diversity of citizenship between Plaintiff and all Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

84.    Subject matter jurisdiction in this Court also exists under 28 U.S.C. § 1331, as the Eleventh Claim For Relief arises under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.  Subject matter jurisdiction over the First through Tenth Claims For Relief also exists pursuant to 28 U.S.C. § 1367 because those claims for relief are so related to the Eleventh Claim For Relief as to form part of the same case or controversy.

## PERSONAL JURISDICTION AND VENUE

85.    Personal jurisdiction over all Defendants is appropriate under New York's long arm statute, C.P.L.R. § 302.

86.    In addition, Defendants Klein and Lalvani each are subject to a "NON-SOLICITATION, CONFIDENTIALITY AND INTELLECTUAL PROPERTY AGREEMENT" with Starwood in which each of them irrevocably and unconditionally submits to the exclusive jurisdiction of this Court.

87.    Venue in this Court is appropriate under 28 U.S.C. § 1391(a)(2).

88.    In addition, Defendants Klein and Lalvani each are subject to a "NON-SOLICITATION, CONFIDENTIALITY AND INTELLECTUAL PROPERTY AGREEMENT" with Starwood in which each of them irrevocably waives any objection to the laying of venue in this Court, including any objection that suit in this Court is inconvenient.  Their respective employment agreements with Starwood are expressly governed by the laws of New York, without regard to the principles of conflicts of laws, and provide that any action seeking equitable relief for violation of the confidentiality provisions thereof may be commenced in this Court.

## THE PARTIES

89.    Plaintiff Starwood is organized under the laws of the State of Maryland and has its principal place of business at 1111 Westchester Avenue, White Plains, New York 10604.  Starwood is one of the world's largest hotel and leisure companies.  Starwood conducts its hotel and leisure business both directly and through subsidiaries.  Starwood's brand names include:  St. Regis, The Luxury Collection, W Hotels, Westin, Le Méridien, Sheraton, Four Points, aloft and Element.

32

90.     Defendant Hilton is organized under the laws of the State of Delaware and has its principal place of business at 7930 Jones Branch Drive, McLean, Virginia 22102. At the time this action was commenced, Hilton's principal place of business was in Los Angeles, California.  Hilton owns, operates and franchises hotels, resorts and spas throughout the United States and throughout the world.  Hilton's brand names include:  Waldorf-Astoria, The Waldorf Astoria Collection, The Prestige Portfolio, Conrad Hotels and Resorts, Denizen Hotels,  DoubleTree,  Embassy  Suites,  Hilton  Garden  Inn,  Hampton,  Homewood  Suites, Home2Suites, Hilton Grand Vacations and Hilton.

91.     Defendant Klein is a citizen of the State of California, with his principal residence in Los Angeles, California.  Until June 2008, Klein was President of Starwood's Luxury Brands Group, and was responsible not only for the W Hotel group, but also for the St. Regis and The Luxury Collection brands of Starwood Hotels.  On or about May 16, 2008, Klein signed an employment agreement with Defendant Hilton.  In June 2008, Hilton announced Klein's employment as Global Head of Hilton's Luxury & Lifestyle Brands.  After this lawsuit was filed, Hilton announced that it had placed Klein on "paid administrative leave."

92.     Defendant Lalvani is a citizen of the State of California, with his principal residence in Pacific Palisades, California.  Until June 2008, Lalvani was Senior Vice President of Starwood's Luxury Brands Group, and was responsible for the development of Starwood's luxury and lifestyle brands, including W Hotels, St. Regis and The Luxury Collection brands.  In June 2008, Hilton announced Lalvani's employment as Global Head of Hilton's Luxury & Lifestyle Brand Development.  After this lawsuit was filed, Hilton announced that it had placed Lalvani on "paid administrative leave."

**PERSONS OF INTEREST**

93.     Susan Manrao ("Manrao") is a citizen of the State of California, with her principal residence in Los Altos, California.  Until August 2008, Manrao was Senior Manager, Interior Style & Design Standards for Starwood's Luxury Brands Group.  In September 2008, Manrao became employed by Defendant Hilton as Senior Director of Design, working in the Hilton group headed by Defendant Klein.  While still at Starwood, Manrao served as a spy for Klein and/or Lalvani, feeding them Starwood Confidential Information.  After she joined Hilton, Manrao used and disseminated Starwood Confidential Information within Hilton for Hilton's benefit.  After this lawsuit was filed, Hilton placed Manrao on "paid administrative leave."

94.     Christopher Kochuba ("Kochuba") is a citizen of the State of California, with his principal residence in San Francisco, California.  Until May 2008, Kochuba was Vice President, Development Planning & Design Management for Starwood's Luxury Brands Group.  In June 2008, Kochuba became employed by Defendant Hilton as Vice President, Planning and Programming, Global Luxury and Lifestyle Brands, working in the group headed by Defendant Klein.  While still at Starwood, Kochuba served as a spy for Klein and/or Lalvani, feeding them Starwood Confidential Information.  After he joined Hilton, Kochuba used and disseminated Starwood Confidential Information within Hilton for Hilton's benefit.  After this lawsuit was filed, Hilton placed Kochuba on "paid administrative leave."

95.     Erin Shaffer ("Shaffer") is a citizen of the State of California, with her principal residence in Los Angeles, California.  Until August 2008, Shaffer was Senior Manager, Brand Marketing for Starwood's Luxury Brands Group.  In August 2008, Shaffer became employed by Defendant Hilton as Senior Director, Communications and Partnerships,

34

working in the group headed by Defendant Klein.  After this lawsuit was filed, Hilton placed

Shaffer on "paid administrative leave."

96.    Jeff Darnell ("Darnell") is a citizen of the State of California, with his

principal residence in Westlake Village, California.  Until October 2008, Darnell was the

General Manager of the W Hotel Los Angeles.  In October 2008, Darnell became employed

by Defendant Hilton as Vice President, Brand Operations, working in the group headed by

Defendant Klein.  After this lawsuit was filed, Hilton placed Darnell on "paid administrative

leave."

97.    Stephanie Heer ("Heer") is a citizen of the State of California, with her

principal residence in Los Angeles, California.  Until November 2008, Heer was the Market-

ing Manager of the W Hotel Los Angeles.  In November 2008, Heer became employed by

Defendant Hilton as Brand Marketing Manager, Conrad Hotels, working in the group headed

by Defendant Klein.  After this lawsuit was filed, Hilton placed Heer on "paid administrative

leave."

98.    Erin Green ("Green"), until December 2008, was Director of W Devel-

opment for the Europe, Africa and Middle East (EAME) region of Starwood.  In 2008, Green

became employed by Defendant Hilton as Senior Development Director, Luxury and Life-

style for Europe and Africa, working in the group headed by Defendant Lalvani.  After this

lawsuit was filed, Hilton placed Green on "paid administrative leave."

99.    Elie Younes ("Younes"), until December 2008, was Senior Director of

Acquisitions & Development for the Europe, Africa and Middle East (EAME) region of

Starwood.  In 2008, Younes became employed by Defendant Hilton as Vice President of De-

velopment for the Middle East, working in the group headed by Defendant Lalvani.  After this lawsuit was filed, Hilton placed Younes on "paid administrative leave."

100.    Leah Corradino ("Corradino") is a citizen of the State of California, with her principal residence in Beverly Hills, California.  Until November 2008, Corradino was the Marketing Manager of the W Hotel San Diego.  In November 2008, Corradino became employed by Defendant Hilton as Brand Marketing Manager, Waldorf Astoria & Waldorf Astoria Collection, working in the group headed by Defendant Klein.  After this lawsuit was filed, Hilton announced that it had placed Corradino on "paid administrative leave."

101.    Manrao, Kochuba, Shaffer, Darnell, Heer, Green, Younes and Corradino are collectively referred to herein as "Persons of Interest."  The actions and inactions of these Persons of Interest in the service of Hilton are attributed to Hilton, and Hilton is fully responsible for them.

### ADDITIONAL PERSONS OF INTEREST

102.    Christopher Nassetta ("Nassetta") serves as Hilton's President and Chief Executive Officer, and is a member of Hilton's Executive Committee.  Nassetta personally recruited Defendant Klein to leave Starwood and join Hilton.

103.    Steven Goldman ("Goldman") joined Hilton in March 2008 as President, Global Development & Real Estate.  Goldman served as Hilton's President of Global Development & Real Estate, and was a member of Hilton's Executive Committee.  Goldman personally recruited Defendant Lalvani to leave Starwood and join Hilton.

104.    Richard M. Lucas ("Lucas") joined Hilton as Executive Vice President and General Counsel in June 2008.  Lucas served as Hilton's General Counsel during the relevant period, and is a member of Hilton's Executive Committee.

105.    Molly McKenzie-Swarts ("McKenzie-Swarts") was appointed Executive Vice President, Human Resources & Diversity in February 2007.  McKenzie-Swarts has been employed at Hilton for over 20 years, served as Hilton's Executive Vice President of Human Resources during the relevant period, and was a member of Hilton's Executive Committee.

106.    Kevin Jacobs ("Jacobs") joined Hilton as Senior Vice President, Corporate Strategy in June 2008.  Jacobs served as Hilton's Senior Vice President for Corporate Strategy during the relevant period, and is a member of Hilton's Executive Committee.

107.    Nassetta, Goldman, Lucas, McKenzie-Swarts and Jacobs are collectively referred to as "Additional Persons of Interest."

108.    Prior to the commencement of this action, among others, each of the Additional Persons of Interest was personally aware of Hilton's possession and use of Starwood Confidential Information in connection with the development, promotion, modification and repositioning of Hilton's luxury and lifestyle brands.

109.    As five of the ten members of Hilton's highest ranking governance committee, the actions and failures to act of the Additional Persons of Interest in the service of Hilton are attributed to Hilton, and Hilton is fully responsible for them.

## THE FACTS

### How Starwood Came to Learn of Hilton's Wrongdoing

110.    Klein's employment and separation agreements with Starwood provided in part that Klein would not solicit Starwood employees to leave their Starwood employment.  After Klein joined Hilton, Klein, among others at Hilton, recruited additional Starwood employees to join Hilton.  These included one or more of the Persons of Interest.

111.     In light of the continued solicitation of Starwood employees, in November 2008 Starwood commenced an arbitration against Klein based on violation of the non-solicitation provisions of his employment contract and his separation agreement with Starwood.  In connection with the arbitration, Starwood wrote letters to Hilton and Klein asking them to preserve all information relevant to the arbitration.  At the time, Starwood had no idea that Klein, and others working in concert with him and with Hilton, had looted Starwood's computer and paper files and had stolen Starwood Confidential Information for use by Hilton.

112.     The unauthorized accessing of Starwood's computer systems and files and the theft of Starwood's highly confidential and competitively sensitive business plans and other confidential and proprietary information were unknown to Starwood until February 2009, when Hilton delivered to Starwood eight large boxes of computer hard drives, zip drives, thumb drives and paper records containing massive quantities of highly confidential and proprietary Starwood files.  On the computer drives returned by Hilton are over 100,000 files downloaded from Starwood's computer systems and files containing Starwood Confidential Information.

113.     In the February 2009 transmittal letter accompanying Hilton's delivery of this volume of highly confidential material to Starwood, Hilton's General Counsel, Richard M. Lucas, stated: "In the process of implementing a litigation hold of such materials [in connection with the Klein arbitration], we learned that Ross [Klein and] . . . other Hilton employees who formerly worked for Starwood" had "brought to Hilton documents or materials that they developed or acquired while they worked for Starwood."  Lucas stated: "We also are taking steps to ensure that no such materials remain at Hilton."

**Hilton's Initial Efforts to Mislead Starwood**

114.    Lucas's letter was materially false and grossly misleading, and Lucas knew it.

115.    First, Lucas failed to inform Starwood that months earlier — and before Starwood sent any letters asking that information relevant to the Klein arbitration be preserved — Hilton's President and Chief Executive Officer, Christopher Nassetta, had been personally informed in writing by a Hilton executive whistleblower that "Hilton had obtained possession of and was using proprietary marketing and financial information belonging to Starwood, to develop and promote Hilton's luxury and lifestyle brands."  Lucas was aware of the whistleblower's letter and the fact that the statements contained therein about Hilton's wrongful possession and use of Starwood Confidential Information were true.

116.    Second, any investigation conducted by Hilton and any steps taken to ensure that no Starwood Confidential Information remained at Hilton were sham.  In the months after Lucas's letter — and only because it was ordered to do so by the Preliminary Injunction — Hilton delivered hundreds of thousands of pages of electronic files and documents, gathered from Hilton offices around the world and the homes of Hilton employees, comprising and referring to Starwood Confidential Information.  A great deal of this information had not been forwarded in the boxes that accompanied Lucas's letter and was pried out of Hilton only because of the Preliminary Injunction.

117.    Third, Hilton's wrongful use of Starwood Confidential Information secretly continued and accelerated even after Lucas's February 2009 letter.  Despite knowing that Klein and Lalvani, and other former Starwood employees, had stolen a huge amount of Starwood Confidential Information from Starwood and were using Starwood Confidential Information at Hilton in connection with the development and repositioning of Hilton's luxury

and lifestyle brands, Hilton continued to employ Klein and Lalvani, and continued to hold Klein and Lalvani out to the public as Hilton's luxury and lifestyle brand leaders.  After Lucas's letter, Klein and Lalvani accompanied Nassetta and Goldman as Hilton representatives in meetings with owners and developers who were in contractual relationships with Starwood at which the four of them pitched deals for Hilton using Starwood's playbook.  After Lucas's letter, Klein and Lalvani spearheaded Hilton's development of a new lifestyle brand known as Hilton's Denizen Hotels brand through the use of Starwood Confidential Information.  Despite knowing that its Denizen Hotels brand had been developed through the wrongful use of Starwood Confidential Information, a month after Lucas's February 2009 letter informing Starwood that proprietary materials had been found within Hilton, Hilton announced the worldwide launch of its Denizen Hotels brand at an international hospitality conference.

118.   Despite knowing that Klein and Lalvani, and other former Starwood employees, had stolen huge volumes of Starwood Confidential Information from Starwood and were using that Starwood Confidential Information at Hilton in connection with the development and repositioning of Hilton's luxury and lifestyle brands, after the initial Complaint in this action was filed on April 16, 2009, Hilton announced that it "believes this lawsuit is without merit and will vigorously defend itself" and that it "fully intend[s] to move forward on the development of [its] newest brand, Denizen Hotels."

119.   Hilton's bluster and bravado about this lawsuit being "without merit" was baseless and lasted less than a week.

**The Ongoing Grand Jury Investigation of Hilton**

120.   On April 21, 2009, Hilton announced that it had received a grand jury subpoena from the United States Attorney's Office for the Southern District of New York re-

questing documents relating to Hilton's employment of former Starwood employees and the Starwood Confidential Information that Hilton returned to Starwood in February 2009.

121.    Klein, Lalvani, the Persons of Interest and other current and former Hilton executives are now represented by counsel.

122.    It is expected that they will purport to invoke rights under the Fifth Amendment and will refuse to testify.

**Hilton's Half-Measured Reaction to Its Wrongdoing**

123.    After its receipt of the grand jury subpoena, Hilton knew that it could no longer keep secret its corporate wrongdoing.  But in reacting to the situation that it was in, Hilton took a series of half-measures, each calculated to hide Hilton's wrongful conduct.

124.    In the summer of 2008, Hilton announced the hiring of Klein and Lalvani with great fanfare.  After this lawsuit was filed in April 2009, Hilton announced that it had placed Defendants Klein, Lalvani and the members of its luxury & lifestyle brands group on "paid" administrative leave.  But Hilton has been silent as to their current employment status.  The Hilton luxury & lifestyle brands group headed by Defendants Klein and Lalvani is infected by Hilton's theft and wrongful use of Starwood Confidential Information, and should be permanently disbanded.

125.    Hilton announced the worldwide launch of Denizen with great fanfare. After this lawsuit was filed in April 2009, Hilton announced that it had temporarily suspended development of its Denizen Hotels brand.  But Hilton has been silent as to whether it will ever be resuscitated.  The Denizen Hotels brand is terminally infected by Hilton's theft and wrongful use of Starwood Confidential Information, and should be euthanized.

126.     Hilton announced the hiring of Steven Goldman with great fanfare in 2008.  Despite his personal role in using Defendant Lalvani as a corporate spy and in the theft and wrongful use of Starwood Confidential Information, Goldman remained in his position as Hilton's President of Global Development and Real Estate for five months after the filing of this lawsuit in April 2009, after which he took a "paid" leave of absence.  But Hilton has never announced Goldman's termination, despite knowing that Goldman was very much personally involved in the wrongdoing described herein.

127.     Hilton has announced no action at all with respect to dozens of other Hilton executives who solicited confidential Starwood Confidential Information and/or were aware that Hilton was using it, including without limitation the Hilton executives listed in the chart above.

128.     Hilton has announced no action at all with respect to the members of Hilton's Executive Committee who were personally aware of Hilton's possession and wrongful use of Starwood Confidential Information, and who either did nothing about it or affirmatively condoned it.

129.     The Hilton luxury & lifestyle brands — including Hilton's Waldorf Astoria Collection, Hilton's Prestige Portfolio and Hilton's Conrad Hotels brands — are all infected by Hilton's wrongful use of Starwood Confidential Information, and injunctive relief as prayed for herein is warranted.  Hilton knows this.  But Hilton has not announced any action to address its wrongful use of Starwood Confidential Information in Hilton's Waldorf Astoria Collection, Hilton's Prestige Portfolio and Hilton's Conrad Hotels brands.

130.     And Hilton continues wrongfully to use Starwood Confidential Information in head-to-head competition with Starwood.

**Hilton's Exploitation of Starwood Confidential Information**

131.    Hilton's wrongful exploitation of the stolen Starwood Confidential In-
formation is obvious.  On March 10, 2009, just nine months after Klein and Lalvani left Star-
wood for Hilton, Hilton launched its new brand under the name "Denizen."

132.    Klein has represented to the hospitality press that the process to de-
velop Denizen started in "June 2008, started June 10."

133.    Klein has stated that the development of Denizen was done in "a com-
pressed time frame."

134.    The similarities of the ostensibly Klein-developed Denizen concept to
Starwood brands did not go unnoticed.

135.    The hospitality press in attendance at Hilton's March 10, 2009 launch
of Denizen reported that Denizen is "cut from the same cloth as W in many respects" and that
in terms of "'brand DNA' you can't help but think of W Hotels."

136.    Generally, even for the most experienced hotel operators and develop-
ers, it takes years to develop a new luxury or lifestyle brand.  As Klein has stated:  "Part of the
cost is also speed to market."  The theft of Starwood Confidential Information by Klein and
Lalvani, and others working with them, and its wrongful use by Hilton in, among other uses,
developing and launching a new upscale hotel brand in record time (months, not years), is the
clearest imaginable case of corporate espionage, theft of trade secrets and unfair competition
perpetrated by, among other means, computer fraud.

137.    Starwood is in active negotiation with third parties regarding the ex-
pansion of its luxury and lifestyle brands.  The status of every deal in Starwood's pipeline was
contained in Deal Log Reports that Lalvani e-mailed to his personal e-mail account after he

was recruited by Goldman but prior to his leaving Starwood.  These Deal Log Reports contain the contact information for hotel owners seeking Starwood brands, the status of the negotiations between Starwood and the potential owners, the degree to which Starwood considered the deal a priority, and other detailed information about each development opportunity.  Other confidential Starwood information detailing negotiations in Starwood's pipeline as well as negotiation tactics with owners was contained in the Starwood materials found at Hilton.

138.    There is no doubt that Hilton has used and intends to further wrongfully use the Starwood Confidential Information misappropriated by Klein, Lalvani and the others working in concert with them to Hilton's own competitive advantage.  In addition to Hilton's stealing of W's brand DNA to launch Denizen, prior to the suspension of the Denizen brand, former Starwood employees stated in press interviews that although Denizen was just launched, Hilton was in negotiation with 20 developers and expected to open its first Denizen Hotel by year's end.  Nassetta, Goldman, Klein and Lalvani approached owners and franchisees of properties under contract with Starwood and were using Starwood's playbook in competing for those properties.

139.    It is reported that Hilton is in "[a]ctive development negotiations . . . for resorts and destinations in key cities throughout the globe" with developers regarding the expansion of its luxury and lifestyle brands (sometimes referred to as Hilton's "Luxury & Lifestyle portfolio" or the "Prestige Portfolio").  In January 2009, Hilton announced that it entered into franchise license agreements for three hotels that were previously Starwood properties — Hilton Hotel Tahiti, which was previously operated as Sheraton Hotel Tahiti; Hilton Moorea Lagoon Resort & Spa, which was previously the Sheraton Moorea; and Hilton

Bora Bora Nui Resort & Spa, which was previously the Bora Bora Nui Resort & Spa under Starwood's Luxury Collection.

**The Development and Protection of Starwood's W and Luxury Brands**

140.   Starwood has assumed a leadership position in markets worldwide based on its superior global distribution, coupled with strong brands and brand recognition. Starwood's luxury and lifestyle brands continue to capture market share from its competitors by aggressively cultivating new customers while maintaining loyalty among the world's most active travelers.  The strength of Starwood's brands is evidenced, in part, by the superior ratings received from its hotel guests and from industry publications.

141.   The hotel industry is highly competitive.  Competition, both for hotel guests and for owners, is generally based on strength of brand, quality and consistency of rooms, restaurant and meeting facilities and services, attractiveness of locations, availability of a global distribution system, price, the ability to earn and redeem loyalty program points and other factors.  History shows that Starwood competes favorably in these areas.

142.   Starwood and Hilton are direct, head-to-head competitors in the hotel and resort industry.  Because both Starwood and Hilton also serve as hotel operators and franchisors — that is, they manage and franchise hotels for hotel owners, through management or license agreements — their competitive position is enhanced by their ability to control costs and increase revenues, including the fees and other terms negotiated with hotel property owners.  Starwood competes favorably in these areas as well, maintaining its competitive edge in this area by protecting the confidentiality of the terms of its deals with hotel property owners.

143.   In the mid-1990s, Starwood's then-CEO Barry Sternlicht conceived of a new brand for Starwood, a brand that came to be known as W Hotels.  In December 1998,

the first W Hotel opened in New York City.  Over the next five years, more than a dozen ad-

ditional W Hotels opened throughout the country.  Through substantial investments of time

and money, the W brand grew stronger and more defined, including through the development

of proprietary training methods and materials designed to support and strengthen the brand

and to give it a competitive advantage.  The W brand represents a unique, upscale hotel tar-

geted to patrons interested in a hip, edgy and trend-conscious destination.  It is a model that

many hotel competitors have sought to emulate, but that none have been able successfully to

employ, let alone scale globally.  The failure of competitors to match Starwood's success in

this area is attributable to the unique means by which Starwood builds, maintains, operates

and grows its brands, and to the steps Starwood takes to protect its methods.

144.    Recently, Starwood has also spent considerable resources repositioning

and strengthening two other luxury brands, St. Regis and The Luxury Collection.  As a result

of Starwood's continuing efforts in growing its luxury and lifestyle brands and bridging the

gaps between them in order to better capture the luxury and lifestyle travel market, W Hotels,

St. Regis and The Luxury Collection together have become a model for branding and devel-

oping luxury and lifestyle hotels.

145.    Although the results of Starwood's efforts may be superficially visible

to hotel visitors, the failure of competitors to replicate the Starwood experience or success in

their own properties is attributable to Starwood's proprietary methods of brand development,

marketing and training, which methods Starwood has always maintained in strict confidence.

146.    In February 2003, Starwood hired Defendant Klein to be Vice Presi-

dent, Chief Marketing Officer for W Hotels.  At the time of Klein's hiring, the W brand had

already become the most successful and iconic new hotel and lifestyle brand in history, with

some 20 hotels open or under construction.  In May 2005, Klein was promoted by Starwood to the position of President, W Hotels Worldwide, in connection with which Klein signed a new set of employment agreements, including a "NON-SOLICITATION, CONFIDENTIALITY AND INTELLECTUAL PROPERTY AGREEMENT."  True and complete copies of Klein's May 2005 employment agreements with Starwood are attached hereto as **Exhibit 1**.  Over time, Klein was further promoted by Starwood to the position of President, Luxury Brands Group.  As President of Starwood's Luxury Brands Group, Klein was responsible not only for the W Hotel group, but also for Starwood's St. Regis and The Luxury Collection groups, and had access to the most confidential and competitively sensitive Starwood luxury and lifestyle brands information.

147.    Defendant Lalvani began work at Starwood in September 2004 as Vice President for W Development.  In this role, he was expected to lead the expansion of W Hotels globally, launching the W Hotels brand in Europe, Africa and the Middle East.  In October 2006, Lalvani was promoted to the position of Senior Vice President, W Development — Global, and subsequently was further promoted to Senior Vice President responsible for the development of all of Starwood's luxury and lifestyle brands, including W, St. Regis and The Luxury Collection.  In October 2006, Lalvani signed a new set of employment agreements, including a "NON-SOLICITATION, CONFIDENTIALITY AND INTELLECTUAL PROPERTY AGREEMENT."  True and complete copies of Lalvani's October 2006 employment agreements with Starwood are attached hereto as **Exhibit 2**.  As Senior Vice President of Development for Starwood's Luxury Brands Group, Lalvani had access to the most confidential and competitively sensitive Starwood luxury and lifestyle brands information.

148.    Each of the Persons of Interest is subject to similar confidentiality agreements in connection with their roles working within the Luxury Brands Group at Starwood, which provided that, upon termination of their employment with Starwood, they would return all Starwood Confidential Information and would not make or keep any copies, and that they would not disclose any Starwood Confidential Information to anyone.  The agreements explicitly provide that each employee:

> "acknowledges that during the course of his/her employment with [Starwood], Employee will receive, and will have access to, 'Confidential Information' . . . of [Starwood] and that such information is a special, valuable and unique asset belonging to [Starwood] . . . .  All [Documents (broadly defined)] which from time to time may be in Employee's possession . . . relating, directly or indirectly, to the business of [Starwood] shall be and remain the property of [Starwood] and shall be delivered by Employee to [Starwood] immediately upon request, and in any event promptly upon termination of Employee's employment, and ***Employee shall not make or keep any copies or extracts of the Documents. . . . Employee shall not disclose to any third person any information concerning the business of [Starwood]***, including, without limitation, any trade secrets, customer lists and details of contracts with or requirements of customers, the identity of any owner of a managed hotel, information relating to any current, past or prospective management agreement or joint venture, information pertaining to business methods, sales plans, design plans and strategies, management organization, computer systems and software, operating policies or manuals, . . . financial records or other financial, commercial, business or technical information relating to [Starwood] . . . ."  (Emphasis added.)

149.    Hilton knew that Defendants Klein and Lalvani, and each of the Persons of Interest, had agreements with Starwood requiring each of them to honor and safeguard Starwood Confidential Information.  Hilton induced Klein and Lalvani and the Persons of Interest to breach their agreements with Starwood.

150.    In addition, each such agreement (and every Starwood employee, including Defendants Klein and Lalvani and each of the Persons of Interest) was explicitly subject to "all Starwood policies, procedures and directives as they currently exist or as they may be adopted or changed from time to time," which included Starwood's Code of Business Con-

duct.   Among other things, Starwood's Code of Business Conduct provides — under the

heading "Protect Confidential Information" — that each employee:

> "must protect and keep confidential all non-public information belonging to, in the possession of, or about our property owners, our property franchisees, our customers and us. . . . You must not share confidential information with friends, relatives or non-associates or discuss confidential matters in public places, such as elevators, airplanes or restaurants. . . . These obligations continue even after you leave the Company."

151.   Every Starwood employee is required to certify compliance with the

Code of Business Conduct annually.  In doing so, Defendants Klein and Lalvani, and each of

the Persons of Interest, also agreed not to:

> "(a) take for yourself personally any opportunity that belongs to us or is discovered through the use of our property or information or your position; (b) use our property, information or position for personal gain; or (c) compete with us."

152.   Furthermore, Defendants Klein and Lalvani, and each of the Persons of

Interest, also acknowledged that "[a]nything you create or conceive as a Company employee

or contractor are works made for hire . . . ."

153.   The confidentiality provisions with which Starwood requires all em-

ployees — including Defendants Klein and Lalvani, and each of the Persons of Interest — to

comply are essential to maintaining Starwood's distinctive and competitive position in the

hotel industry.

154.   The explicit confidentiality provisions reflected in the individual em-

ployment agreements and in Starwood's Code of Business Conduct are bolstered by other pre-

cautions taken within Starwood to protect its confidential and proprietary information.  Data

and other materials are maintained on secure servers and hard drives, for which access is lim-

ited to particular groups of employees within the company.  Remote access is permitted only

upon proper certification of an employee's Starwood-issued computer through a password-

protected remote access system.  Employees may not access Starwood's systems through computers that are not properly certificated by Starwood's information technology staff.  Nor are employees permitted to forward confidential materials to outside systems, including their own homes or personal e-mail accounts.  In this way, among others, Starwood seeks to protect the propriety of its confidential information and to ensure that its secrets remain secret.

155.    Defendants Klein and Lalvani, and each of the Persons of Interest, flaunted not only their fiduciary and contractual obligations to Starwood, but Starwood company policy and good faith, by organizing and effecting a wholesale download of Starwood Confidential Information for use by their new employer, Defendant Hilton.  They did this in concert with others surreptitiously while under contract to Starwood without Starwood's knowledge or consent.  Lalvani and Manrao further breached their fiduciary and contractual obligations to Starwood by acting as corporate spies while employed at Starwood by providing high-level Hilton executives with Starwood Confidential Information.

**Hilton's Recruitment of Klein and Klein's Breach of His Obligations to Starwood**

156.    In 2007, the Blackstone private equity group acquired Hilton for over $20 billion in a top-of-the-market, highly leveraged transaction.  As reported in the hospitality press, "With Blackstone having paid a super-premium price for Hilton, [CEO Christopher] Nassetta will be under intense pressure to deliver immediate results."

157.    Hilton began actively to seek ways to expand and refocus its luxury brands, and to compete more directly with W and Starwood's luxury brands.  Because of its highly leveraged financial condition, as financial markets deteriorated, time was of the essence to Hilton to enter the lifestyle brand segment and to refocus, launch and expand its luxury brands.  As reported in the hospitality press, Christopher Nassetta, Hilton's President and

Chief Executive Officer, "was very committed to the horizon line" and Hilton's brand development team worked in "a compressed time frame."

158.    In February 2008, Nassetta began recruiting Defendant Klein to join Hilton.  Almost immediately after beginning discussions with Nassetta, Klein secretly misused his position as President of Starwood's Luxury Brands Group to request Starwood Confidential Information from Starwood employees, which Klein then forwarded to a personal e-mail account.  Once Klein was assigned a Hilton e-mail account, he then forwarded the Starwood materials he had secreted from his personal e-mail account to his Hilton e-mail account. In addition, Klein brought a personal laptop computer into Starwood's offices and had it loaded with Starwood Confidential Information.  Upon information and belief, Klein took still more Starwood Confidential Information home with him in the form of hard-copy documents.

159.    The information taken by Klein prior to his departure for Hilton included, among other things, such information as the terms being offered to hotel owners on Starwood deals, detailed information relating to brand performance metrics, detailed information about deals in the Luxury Brands Group "pipeline" and detailed presentations outlining Starwood's branding strategy.  Much of this information would have served no business purpose for any project Klein was then directly involved in at Starwood, but would be immensely useful to Hilton, or anyone else looking to build or strengthen brands capable of competing with Starwood's luxury and lifestyle brands.  Not all of the Starwood Confidential Information stolen by Klein and Lalvani for Hilton's benefit has been returned.

160.    Such forwarding of confidential information to non-Starwood servers was forbidden by Starwood policies designed to preserve the confidentiality of its information.  Starwood policy required that any access to Starwood materials from outside Starwood

premises be accomplished through use of strictly controlled "virtual private network" (or "VPN") remote access procedures.  Through use of this secure remote access procedure, Starwood employees are able to work remotely on any documents on the Starwood system that they are authorized and have a business need to access.  Under no circumstances was Starwood Confidential Information to be forwarded to employees' personal e-mail accounts, and the availability of Starwood's VPN obviated any legitimate need to do so.

161.    In addition to forwarding Starwood Confidential Information to his personal e-mail account, or taking it with him on a personal laptop computer, while he was under agreement to join Hilton and before he left Starwood, Klein also asked his personal assistant and others who were unaware that Klein soon would be leaving Starwood to work for a competitor to undertake a massive (and expensive) project to digitally archive thousands of "tear sheet" images collected and compiled into meaningful collections over years.  These compilations were used in the branding and design work completed for the W and Starwood's other luxury brands, and were the property of Starwood.  The "tear sheet" compilations were years in the making and helped enable Klein and other Starwood employees to bring Starwood's luxury and lifestyle brands to life.  After having the Starwood tear sheet compilations digitally imaged, Klein arranged for the images to be sent to his personal e-mail account, where he was able to include them among the materials he brought to Hilton to assist Hilton in developing new Hilton brand identities, leveraging the techniques and tools taken from Starwood.

162.    On May 16, 2008, unbeknownst to Starwood, Klein signed an employment agreement with Hilton (Klein's "Hilton-Klein Employment Agreement"), and faxed it to Hilton from Starwood's New York City offices.  Klein did not inform Starwood that he had signed an employment agreement with a direct competitor, Hilton.

163.    Three days after the date of his signature on his Hilton-Klein Employ-
ment Agreement, on May 19, 2008, Klein informed senior executives at Starwood that he was
resigning from the company.  Klein still did not inform Starwood that he already had a signed
employment agreement with one of Starwood's direct competitors, Hilton.  Nor did Klein
cease requesting Starwood Information from his staff, or forwarding such material to his per-
sonal e-mail account, in preparation for his departure to Hilton.  Instead, Klein continued to
steal Starwood Confidential Information — including updated designer lists, copies of Star-
wood's Global Architecture and Design Review Process, The Luxury Collection's "Brand
Book" and other proprietary materials that were closely guarded by Starwood —  that would
be useful to Hilton in developing its new Denizen brand, revamping its existing luxury brands
and competing with Starwood.

164.    With the signed Hilton-Klein Employment Agreement in hand, and de-
spite having already improperly ensured continuing access to Starwood Information, over the
next ten days Klein (i) began shipping boxes to Hilton, and (ii) negotiated the terms of a sepa-
ration agreement with Starwood.

165.    On May 29, 2008, Klein shipped three boxes weighing 150 pounds di-
rectly to Hilton's executive offices in Beverly Hills, California.

166.    Unaware that Klein had already signed an employment agreement with
Hilton two weeks earlier, or that he was already taking a large amount of Starwood Confiden-
tial Information home and sending materials to Hilton, on May 30, 2008, Starwood agreed
with Klein on the terms of a separation agreement.  A true and complete copy of Klein's
Separation Agreement is attached hereto as **Exhibit 3**.  Klein's separation agreement did not
contain a covenant against competition, and did not prohibit Klein from going to work for a

competitor.  It did, however, prohibit Klein from soliciting any Starwood management-level employees to join him, and explicitly prohibited Klein from using or disclosing any Starwood confidential information, including trade secret information, that he obtained during his employment with Starwood.  In his separation agreement Klein "acknowledges that he has had access to [Starwood] Confidential Information" and he "agrees not to disclose, communicate or divulge to, or use for the direct or indirect benefit of, any person (including [Klein]), firm, association or other entity (other than [Starwood] or its affiliates) any Confidential Information."

   167. For the purpose of fraudulently inducing Starwood to pay him a substantial cash severance (over $600,000), and accelerating the vesting of certain equity, among other benefits, Klein made a number of knowingly false representations to Starwood, among which were his representation that he had returned and was not retaining any Starwood confidential materials.  In his separation agreement Klein falsely states:

> "[Klein] hereby represents and agrees that on or before [May 30, 2008]: (i) [Klein] has returned or will return to [Starwood], and has not retained or will not retain originals or any copies of all documents, records or materials of any kind, whether written or electronically created or stored, which contain, relate to or refer to any Confidential Information ('Confidential Materials'); and (ii) [Klein] has not disclosed and will not disclose any Confidential Information or Confidential Materials to any person or entity without the express written authorization of an authorized officer of [Starwood]."

These representations by Klein were materially false and known by him to be materially false when made.  Klein knowingly made these materially false statements to Starwood for the purpose of defrauding Starwood into paying Klein a large severance payment to which Klein, as a result of his wrongful conduct, otherwise was not entitled.

168.    In consideration for his contractual undertakings in the separation agreement, including his separate agreement that he would not use or disclose any Starwood Information, Klein was paid a substantial severance that he obtained by intentionally misleading Starwood as to the nature of his commitment to a competitor and as to his intentions to comply with its non-disclosure provisions, and to which he was not therefore entitled.  Klein improperly used the information that he stole from Starwood for the benefit of Hilton, and Hilton has been unjustly enriched thereby.

169.    After he left Starwood and took up employment at Hilton, by letter from Starwood dated August 26, 2008, Klein was reminded of his

"obligations not to disclose or use [Starwood's] Confidential Information (as defined in [Klein's Separation] Agreement).  You remain responsible for safeguarding such Confidential Information and for any damages that may result from your possession and/or use of such information." (**Exhibit 4**)

170.    Klein violated his contractual and fiduciary obligations to Starwood. Klein did not safeguard the Starwood Confidential Information of which he was aware.  Klein disclosed and used Starwood Confidential Information for the benefit of Hilton.

**Hilton's Recruitment of Lalvani and Lalvani's Breach of His Obligations to Starwood**

171.    Parallel to Nassetta's recruitment of Klein, in March 2008 Steven Goldman, President of Global Development & Real Estate at Hilton, began recruiting Lalvani to join Hilton.  Goldman wrote Lalvani: "you're the first guy on my list."  Goldman informed Lalvani: "Worst thing that happens is they find out you are talking to me and pay you a shit load of money to stay and you owe me drinks for life."

172.    Lalvani pursued Goldman's overtures and, on or about March 9, 2008, in contravention of his fiduciary and contractual obligations to Starwood, Lalvani wrote to

55

Goldman following up on their communications: "Other idea is bring over the core W team which has created an enormous amount of value and is very loyal to me to build a new brand for you guys.  Not sure your appetite but I know I could make that happen as well."

173.   As it turns out, Hilton had a big appetite for Starwood know-how. Much like Klein did following his conversations with Nassetta, following his discussions with Goldman and while he was still a Starwood employee, Lalvani began gathering a large volume of confidential Starwood information, which he shipped from his office to his home.

174.   While still a Starwood employee, Lalvani began acting as a corporate spy for Hilton, feeding Goldman with competitively sensitive confidential information related to Starwood's business and development opportunities.  On or about May 15, 2008, while still employed by Starwood, Lalvani began providing Goldman with real time information regarding Starwood development opportunities.  Lalvani forwarded to Goldman an e-mail report he had written to Simon Turner, Starwood's President of Global Development, reporting on a recent meeting with a hotel developer concerning potential Starwood deals.  After sending his report to Turner, Lalvani forwarded the report first to his personal e-mail account and then to Goldman at Hilton, writing:  "Here's my note to Simon on my meeting this morning . . . . Will call you in a few."

175.   On or about May 28, 2008, Lalvani, in his role as a corporate spy, forwarded first to his personal e-mail, and then again to Goldman at Hilton, a series of correspondence between Starwood's Vice President of Development for the Asia Pacific region, and a developer interested in opening a W branded hotel in Thailand.  In his e-mail to Goldman, Lalvani presented the Starwood opportunity as one that Hilton should seize, writing: "Here's an interesting one . . . .  I have good connections with the owner.  Lets discuss proto-

col during my transition on deals like this so we don't miss them but also dealing with the fact we don't have a lifestyle offering yet.  This is going to be fun!!"

176.    After receiving Lalvani's e-mail correspondence, Goldman did not ask Lalvani to cease sending him Starwood information and did not reprimand Lalvani for sending the Starwood information.  Goldman took no steps to discourage Lalvani to stop feeding him information related to Starwood's business and development opportunities.  Instead, Goldman encouraged Lalvani to breach his non-solicitation agreement with Starwood, and responded to the e-mail by inquiring whether there might be a place within Hilton for a Starwood employee mentioned in Lalvani's correspondence, writing:  "What do you think about putting [him] in the Middle [E]ast to run development there?"

177.    On May 29, 2008, Lalvani informed Starwood that he was resigning.  On the morning of the same day, Lalvani and Kochuba exchanged e-mails in which Kochuba referred to the departures of Klein, Lalvani and himself to Hilton stating: "Like a triple play!  Congratulations!"  Lalvani responded: "Absolutely . . . .  It's been quite a ride!  See you on the West Coast."

178.    Starwood had no idea that Lalvani had stolen Starwood Information and was working in concert with others who were also looting Starwood's confidential files.  Starwood had no idea that Lalvani had become a corporate spy who was sending Goldman real-time information related to Starwood business deals.  Because Lalvani's notice of resignation was unexpected, Starwood asked Lalvani to work another two weeks, until June 14, so that there could be an orderly transition of his work to others.  Starwood trusted Lalvani to be honest and to honor his employment commitments.  Starwood's trust was misplaced as Lal-

vani used the additional time and continued access to further loot Starwood's confidential files for the benefit of Hilton.

179.    On June 2, 2008, the first business day following Klein's resignation from Starwood and just two days after Lalvani gave notice of his resignation, Hilton announced that Klein and Lalvani would be joining Hilton, Klein as Hilton's Global Head of Luxury & Lifestyle Brands and Lalvani as Hilton's Global Head of Luxury & Lifestyle Brand Development.

180.    On June 14, 2008, Lalvani's employment with Starwood ended.  He immediately began work as Hilton's Global Head of Luxury & Lifestyle Brand Development.

181.    Unbeknownst to Starwood and without Starwood's consent, but true to his promise to Hilton to help re-create Starwood's branding and development group at Hilton, between March 9, 2008 and June 14, 2008, Lalvani secretly downloaded files containing Starwood Confidential Information to a personal USB drive and forwarded Starwood Confidential Information to his personal e-mail address, and took the materials with him for use in developing and marketing both Hilton's new Denizen brand and its luxury brands.  The materials stolen by Lalvani are of the most confidential and sensitive nature, and include detailed analyses of negotiating strategies developed through years of experience and in consultation with Starwood paid consultants, along with Project Approval Requests (or "PARs") setting forth in detail the actual terms of recently negotiated deals with key property owners, proprietary and closely-held contact lists for property owners and franchisees, and Deal Log Reports identifying in detail the contact information and deal negotiation status of every then-current Starwood real estate opportunity.  Lalvani's theft of these materials is in clear contravention of his fiduciary and contractual obligations to Starwood.  Since joining Hilton, Lalvani has

been held out by Hilton and Klein as the individual "who does development on the [Hilton] team."  Klein has said that developing Denizen in "a compressed time frame" was a "Herculean" task.  In fact, in the development of Denizen, Lalvani improperly used the information that he stole from Starwood for the benefit of Hilton, and Hilton has been unjustly enriched thereby.

**The Unraveling of Hilton's Wrongful Conduct**

182.    The Persons of Interest were recruited by Hilton, Klein and/or Lalvani to join Hilton.  On or about May 20, 2008, Christopher Kochuba, Vice President of Development Planning & Design Management of Starwood's Luxury Brands Group announced his resignation from Starwood.  In an e-mail the same day responding to an inquiry if he knew of Kochuba leaving, Klein stated: "Of course we knew."

183.    Other Starwood employees were recruited by Hilton, Klein and/or Lalvani to leave Starwood to join Hilton, but they declined offers to join Hilton.

184.    Believing Klein to have breached the non-solicitation provisions of his contract with Starwood, but unaware of any other misconduct by Klein, Lalvani or other former employees, in November 2008 Starwood initiated an arbitration against Klein.  The only issue raised in the arbitration was whether Klein had violated his contract not to solicit Starwood management-level employees to join him at Hilton.  An arbitrator has yet to be appointed and no proceedings have occurred in the arbitration.

185.    In November 2008, still unaware of the wholesale theft of Starwood Confidential Information by Klein, Lalvani, and others working in concert with them, Starwood sent letters to Klein and Hilton, requesting that they preserve all relevant documents in

connection with the pending arbitration.   True and complete copies of Starwood's non-spoliation letters are attached hereto as **Exhibits  5 and 6**.

186.   It took Hilton almost three months to respond to Starwood's non-spoliation letter.  By letter dated February 5, 2009 from Richard M. Lucas, Hilton's Executive Vice President, General Counsel and Corporate Secretary, to Kenneth S. Siegel, Starwood's Chief Administrative Officer and General Counsel, Hilton delivered to Starwood eight large boxes containing, among other things, highly confidential Starwood computer and paper records.  A true and complete copy of Hilton's letter is attached hereto as **Exhibit 7**.

187.   Hilton's February 5, 2009 letter states in part:

"[Y]ou requested that Hilton Hotels Corp. preserve all potentially responsive documents and information in our possession, custody and control.  In the process of implementing a litigation hold of such materials, we learned that Ross [Klein] had certain materials that he developed or obtained while working for Starwood. . . .  Based on a cursory review of these documents by counsel, it appears that at least some of the materials might be the type that Ross's separation agreement with Starwood requires him to return to Starwood.  With the concurrence of Ross and his attorneys, we are returning them to you."

The Hilton letter went on to state:

"After learning about the materials that Ross [Klein] had, Hilton's Legal Department . . . also inquired whether other Hilton employees who formerly worked for Starwood had similar materials, and we determined that some of them also brought to Hilton documents or materials that they developed or acquired while they worked for Starwood."

The Hilton letter concluded by stating:

"Enclosed with this letter are the materials we have collected, along with some additional materials that certain of the former Starwood employees had at home."

188.   Klein's counsel, Ronald Nessim of Bird Marella, responded to Starwood's non-spoliation on February 9, 2009, just days after Hilton responded.   A true and complete copy of Nessim's letter is attached hereto as **Exhibit 8**.

189.   Nessim's February 9, 2009 letter states in part:

> "In connection with the litigation hold that Hilton implemented in connection with the pending arbitration proceeding against Ross Klein, we and Hilton became aware that Ross [Klein] had certain Starwood materials in his possession . . . . At least some of these materials might be the type that Ross' Separation Agreement with Starwood requires him to return to Starwood, and we agreed with Hilton that in abundance of caution, these documents should be returned . . . as well as other Starwood documents possessed either at Hilton or at home by other Starwood former employees now at Hilton . . . ."

Nessim's letter went on to state that Bird Marella was now representing the other former Starwood employees who were found in possession of Starwood materials.

190.    The letters to Starwood from Hilton and Nessim were not truthful.  Neither letter disclosed that earlier in November 2008 (before Starwood's non-spoliation letter) Hilton's President and Chief Executive Officer, Nassetta, had been informed by a Hilton executive that Klein had brought to Hilton a large volume of Starwood Confidential Information that he was using at Hilton "to develop and promote Hilton's luxury and lifestyle brands." Neither letter disclosed that its author was aware that Hilton possessed Starwood Confidential Information and had distributed it within Hilton's luxury and lifestyle brand executives.

191.    The ongoing effort by Starwood to determine just what had been downloaded from Starwood's computer systems has taken considerable time and resources; the full extent of how the information may have been used or manipulated by Hilton and the individual defendants is not yet fully known, but will become fully known through discovery in this action.  What is already known is that on the computer drives returned to Starwood by Hilton are over 100,000 files downloaded from Starwood computers — a massive amount of information.  Virtually every category of documents and information defined as Confidential Information in the Starwood employment agreements of Klein, Lalvani and the other Star-

wood employees recruited to join Hilton is contained in the materials found at Hilton and in the homes of former Starwood employees now working in management for Hilton.

       192.    Among the many materials taken to Hilton by Klein, Lalvani and the other interested persons recruited by them are:

(a)    Strategic Plans (or "Strat Plans"), setting forth in detail Starwood's forward-looking strategies and areas of strategic opportunities for the W, St. Regis and The Luxury Collection brands out through 2011, explicitly labeled "Strictly Confidential." Access to such strategic plans was limited to a select group of senior Starwood executives, and, if not kept confidential, would provide a competitor such as Hilton with the means to exploit Starwood's opportunities and competitive advantages.

(b)    Detailed "gap" analyses analyzing the market and other areas not being met by Starwood's luxury brands and ways in which Starwood would seek to fill those gaps and strengthen each of its luxury brands. Such analysis was maintained in strict confidence within a select group of Starwood executives, and would provide a competitor such as Hilton with valuable competitive advantages in developing and re-positioning its own luxury brands.

(c)    A "Development Toolkit" for residential developments (labeled, like many of the materials, "Proprietary & Confidential"), providing step-by-step instructions for launching a branded residential development.

(d)    "Brand in a Box" modules for the W brand, providing detailed, step-by-step operational instructions on how to take a brand from conception to hotel opening. The information contained in the modules would help a competitor such as Hilton shave months, if not years, off of launching a new competitive hotel brand, or on instituting operational improvements for its existing brands.

(e)    Luxury Brands Group "Brand Bibles," providing a full and detailed guide to the brands that can serve as a short cut to developing a new brand. Such "Brand Bibles" were closely held, with access provided only to necessary employees and select owners or developers subject to a strict Non-Disclosure Agreement.

(f)    Detailed marketing plans specific to Starwood's brands plans setting forth specific marketing details.

(g)    Comprehensive brand immersion presentations and brand guidelines, both operational and design-oriented, including the complete set of proprietary design genres and signature elements for W, The Luxury Collection and St. Regis hotels, that offer a map to recreating each of Starwood's luxury brands. Such materials would be particularly useful to a competitor such as Hilton that is not known as being a design-driven company or possessing lifestyle brands. As with other Starwood materials that were made available to assist owners in opening Starwood-branded properties, such materials were subject to strict Non-Disclosure Agreements.

(h)     Specific plans outlining Starwood's confidential plans to introduce a "restro-lounge" concept in its W Hotels. Such a plan had been in development at Starwood for some 18 months, and represented a unique solution to a common boutique hotel problem: how to incorporate dining into lobby bar spaces. The "restro-lounge" concept reflected in the Starwood Confidential Information — but kept confidential before stolen by the Defendants — was touted by Klein in his public statements describing Hilton's new Denizen brand.

(i)     Proprietary demographic, psychographic and other research commissioned by Starwood from third party professionals and used by Starwood to help develop branding, marketing, development and operational strategy.

(j)     Detailed, step-by-step proprietary personnel training materials developed and refined by Starwood over a number of years and at substantial cost. Starwood's proprietary training system for its W Hotels, the detailed methods of which were previously unknown outside of Starwood, was recognized in the industry as unique and based on its own internal research and development efforts. Access to these materials would permit competitors such as Hilton to substantially and quickly improve its training methods and compete within a key area of hotel guest concern at Starwood's expense.

(k)     Deal term negotiation worksheets and notes on "W Development strategy for 2007 and beyond," setting forth in detail Starwood's negotiation strategies with Owners ranked by "importance to Starwood" for numerous deal terms, including: Contract Terms, Placement Programs, Performance Tests, Termination on Sale, Residential Fees, Technical Services Fees, Financing Related Provisions, Investment Requirements, and Legal Issues. These materials were clearly viewed as having current competitive value to Lalvani and Hilton, and were downloaded by Lalvani to a USB drive and, upon information and belief, accessed by Lalvani and Hilton prior to their return to Starwood.

(l)     Site-specific "Project Approval Requests" ("PARs") and letters of intent, which set out in detail the actual costs, fee structures, termination provisions, radius restrictions and other highly sensitive and competitively useful information. The PARs stolen by Lalvani pertain to Starwood properties and targeted properties around the world, including many of the same markets for which Hilton has just recently announced an intention to open new properties.

(m)     "Property Improvement Plans" ("PIPs") for how to create "the Ultimate W Experience" in conversion properties, providing step-by-step details for how to convert a hotel property to a W branded hotel. As Klein and Lalvani would appreciate, the Property Improvement Plan would be immensely useful to a competitor such as Hilton that has stated its intention to launch its new Denizen brand through conversion of existing properties. Indeed, among the documents returned by Hilton is a draft "Property Improvement and Reprogramming Plan" proposing the conversion of a New Orleans property to a "New Hilton Lifestyle Brand." The Proposal, dated September 3, 2008, was authored by former Starwood employee Christopher Kochuba, and copies the format, text and content of the misappropriated Starwood Property Improvement Plans.

63

(n)     Detailed Deal Log Reports, (labeled Confidential and Proprietary), which contain in detail the contact information and deal negotiation status of every Starwood real estate opportunity.

(o)     Complete contact lists for all Luxury Brands Group owners, developers and designers, maintained not by the individual defendants but confidentially by Starwood on a centralized basis.  Lalvani requested electronic versions of these lists prior to his departure, and subsequently downloaded them, with other materials to a USB drive and took the Starwood-owned contacts with him to Hilton.

(p)     Financial Reports containing closely-held, property-specific financial results. These materials provide a hotel by hotel indication of how the brand is performing and how one could compete.

(q)     Brand Standards containing every element a branded property is required to possess or implement, and the price associated with each element.  These materials provide a handbook to developing every space in a hotel and normally take years to develop.

(r)     Starwood's Guest Satisfaction and Meeting Planner Satisfaction Reports containing confidential data indicating the strengths and weaknesses of particular properties.  This information is highly useful to competitors.

193.    As Klein and Lalvani were well aware, the information in the highly-proprietary and confidential PARs, negotiation worksheets, Deal Log reports and in the closely-held contact lists could be used by Hilton to undercut or exploit Starwood's terms and poach deals or undermine Starwood's existing or future relationships with property owners. In fact, representatives of Hilton — including Nassetta, Goldman, Klein and Lalvani — already have been approaching owners and franchisees of properties under contract with Starwood and are using Starwood's playbook in competing for those properties.  Hilton has already announced that at least three former Starwood properties are being re-branded as Hilton hotels.

194.    Recognizing the highly sensitive, proprietary and competitively advantageous nature of much of the materials generated in the course of an employee's work, including the types of materials described above, Starwood requires each employee to acknowledge, upon employment [and yearly thereafter], that they will "protect and keep confidential

all non-public information belonging to, in the possession of, or about . . . [Starwood]" and will not share such information "even after [they] leave the Company." As set forth above, each of the individual defendants agreed to keep Starwood Information confidential when they signed their employment agreements.

195.    Strict confidentiality was also required of any property owners or potential property owners who were permitted access to the Starwood Confidential Information. For example, copies of the "W Interior Guidelines" manual taken to Hilton — which provides detailed guidelines to the design, construction and operational elements required for a property to receive the W imprimatur, provides on its cover, that the manual

> "AND   ALL   MATERIALS,   PROCEDURES   AND   SYSTEMS   HEREIN
> CONTAINED OR DEPICTED HAVE BEEN DEVELOPED BY AND ARE THE
> SOLE AND EXCLUSIVE PROPERTY OF [STARWOOD] . . . THE CONTENTS
> CONTAIN PROPRIETARY TRADE SECRETS THAT ARE THE PRIVATE AND
> CONFIDENTIAL   PROPERTY   OF   STARWOOD   OR   ITS   AFFILIATES.
> UNAUTHORIZED  USE,  DISCLOSURE,  OR  REPRODUCTION  OF  ANY
> MATERIAL CONTAINED IN THIS MANUAL IS EXPRESSLY PROHIBITED.
> THE W INTERIOR GUIDELINES ARE TO BE RETURNED IMMEDIATELY
> UPON THE TERMINATION OF ANY RELATIONSHIP OR AGREEMENT
> GIVING   USER   AUTHORIZATION   TO   POSSESS   OR   USE   SUCH
> INFORMATION OR MATERIALS . . . .   ANY THREATENED BREACH OR
> UNAUTHORIZED OR ILLEGAL USE SHALL SUBJECT THE USER TO ALL
> REMEDIES, BOTH LEGAL AND EQUITABLE, AVAILABLE TO STARWOOD."

196.    Klein, Lalvani, the Persons of Interest, and others working in concert with them breached their obligations to Starwood by obtaining Starwood Confidential Information prior to, or in some instances, after, their departure from Starwood and taking that information for use at and for the benefit of Hilton. They wrongfully used Starwood Confidential Information for the benefit of Hilton and Hilton has been unjustly enriched thereby.

197.    The highly confidential and proprietary Starwood Confidential Information and documentation that Hilton has in its possession provides a step-by-step playbook for creating and expanding lifestyle or luxury brands; implementing the related development

strategy; marketing the brand; and putting it to work on the ground.  Starwood expended vast resources to develop this virtual playbook over the course of many years.  Its theft by Klein, Lalvani and others working in concert with them who left Starwood for Hilton — and its obvious use by Hilton in the development and launch of a new hotel brand and in the recent repositioning of Hilton's luxury and lifestyle portfolio — is the clearest case imaginable of corporate espionage, theft of trade secrets, unfair competition and computer fraud.

**Hilton Uses Starwood Confidential Information to Develop New Brands
and to Reposition All of Hilton's  Existing Luxury and Lifestyle Brands**

198.    Hilton and the individual defendants on Hilton's behalf did not merely take the Starwood Confidential Information and put it aside.  Although the full extent of Hilton's use of Starwood's materials cannot be determined without full and complete discovery, it is readily apparent that Hilton, Klein, Lalvani and others working in concert with them, have been steadily mining the Starwood Confidential Information.

199.    For example, no sooner had Hilton's letter and the eight boxes of Starwood Confidential Information arrived, when, on February 9, 2009, Hilton publicly confirmed that — with Klein and Lalvani at the helm — Hilton would launch on March 10, 2009 (at a press conference associated with the International Hotel Investment Forum (the "IHIF") in Berlin, Germany) a new global "lifestyle" hotel line, code-named "Project Global21."  Hilton openly declared its direction:

> "'Project Global21 is a junction where business meets pleasure forever redefining how guests stay and play.  Our hotels will be born modern through smart design, cultural character and sensitive service delivery — ever enhancing how guests live now and how guest[s] will live in the future,' said Ross Klein, global head, luxury & lifestyle brands, Hilton Family of Hotels. 'Together, with the Hilton Prestige Portfolio, Project Global21 will add to the balance of global connectivity with local destination flavor, offering travelers a wealth of authentic and unique experiences around the globe. . . .  Hilton will deliver a captivating journey through the world of the new

brand enlightened with the next evolution in hospitality . . . .  We invite all IHIF at-
tendees to join us for this unforgettable evening.'"

200.    Developing and launching a new hotel brand is a process that requires

considerable investments of time and money.  Even for the most experienced companies, it

typically takes three to five years to develop, launch and build-out a new hotel brand and open

a newly branded hotel.  The more upscale and refined the brand, the longer it takes.

201.    But on March 10, 2009, just nine months after Klein and Lalvani joined

Hilton, Hilton launched a new lifestyle brand — "Denizen" — at the IHIF industry sympo-

sium in Berlin.  Denizen was developed by means of corporate espionage and the theft of

highly confidential and proprietary Starwood Confidential Information.

202.    The hospitality press subsequently observed that Denizen was "cut

from the same cloth as W":

"Hilton announced their latest brand, Denizen, here in Berlin this morning.  Denizen
will be Hilton's [entry] into the 'lifestyle brand' category pioneered by Starwood Ho-
tels' W brand.  Not coincidentally, Denizen will be led by former W boss Ross
Klein. . . . Denizen sounds to be cut from the same cloth as W in many respects . . . ."

203.    As reported in the hospitality press:

"Industry analysts have been anticipating Hilton's expansion into new trendy brands
since it recruited two Starwood Hotels executives last year who specialize in luxury
properties.

"Ross Klein, one of [the] chief designers of Denizen, was hired as global head of lux-
ury and lifestyle brands, and Amar Lalvani was tapped to be Hilton's global head of
luxury and lifestyle brand development.  The two executives worked on the develop-
ment of W, Starwood's boutique brand that inspired other competing chains with
modern design and hip lobby lounges."

204.    As another industry reporter put it, in talking about Denizen's "'brand

DNA' you can't help but think of W Hotels."

205.    Utilization of Starwood Confidential Information was widespread

throughout the Hilton organization, and was not merely restricted to use by former Starwood

67

employees in the development of the Denizen brand.  Starwood branded materials were immediately routed around Hilton offices worldwide for use related to the development of Denizen as well as for use in the expansion and repositioning of other Hilton brands, including Hilton's Waldorf Astoria Collection, Hilton's Prestige Portfolio and Hilton's Conrad Hotels brands.  Furthermore, Starwood Confidential Information was shared with other Hilton employees, including high level executives, directors and managers, across brands and were sent to outside third parties.  For example,

    a.    In and around June 2008, a W Hotels-branded Gap Analysis was routed via e-mail among several executives in Hilton's luxury and lifestyle brands, including Richard Blamey, Senior Vice President of Brand Marketing for Hilton's Conrad Hotels brand; Carroll Hutchings, Director of Brand Marketing for Hilton's Conrad Hotels brand; Karen Kennedy, Director of Brand Performance for Hilton's Conrad Hotels brand; Roberta Rinker-Ludloff, Vice President of Sales and Marketing for Hilton's Conrad Hotels brand; Robyn Swierk, Senior Coordinator of Brand Performance for Hilton's Conrad Hotels brand; Julie Wagner, Senior Director of Marketing and Advertising for Hilton's Luxury and Lifestyle Brands; Pretha Mani, Senior Director of Brand Growth for Hilton's Luxury and Lifestyle Brands; Edward Russo, Senior Director of Brand Management for Hilton's Waldorf Astoria Collection; Stephanie Toller, Hilton's Senior Director of Guest Experience; and Antoon Hollants, Director of Brand Standards for Hilton's Conrad Hotels brand.  This Starwood document was then turned into a Gap Analysis for Hilton's luxury and lifestyle brands.

    b.    On or about July 7, 2008, a W-branded marketing plan presentation was faxed from a fax number assigned to Oshy Phillips, Senior Manager of Brand Communications for Hilton's Luxury and Lifestyle Brands, to Roberta Rinker-Ludloff, Vice President of Sales and Marketing for Hilton's Conrad Hotels brand.

    c.    On or about July 8, 2008, W-branded materials were e-mailed from Tawanna Benbow, Klein's assistant at Hilton, to Julie Wagner, Hilton's Senior Director for Luxury and Lifestyle Brands Marketing and Advertising, Edward Russo, Senior Director of Brand Management for Hilton's Waldorf Astoria Collection, Stephanie Toller, Hilton's Senior Director of Guest Experience, Roberta Rinker-Ludloff, Vice President of Sales and Marketing for Hilton's Conrad Hotels, and Richard Blamey, Senior Vice President of Brand Marketing for Hilton's Conrad brand.

    d.    On or about September 9, 2008, Kochuba sent Joy Gray, a member of Hilton's luxury and lifestyle brand development team, W Design Guidelines, which con-

tained a full page warning that the contents thereof were proprietary and confidential trade secrets belonging to Starwood.  Kochuba noted that he would be using the Starwood materials as a reference when he started writing design guidelines for Hilton brands.

e.   On or about September 23, 2008, and again on or about November 5, 2008, Manrao e-mailed Dianna Wong, of Dianna Wong Architecture, Starwood branded materials as "examples" of materials Klein wanted produced for Hilton's new lifestyle brand hotel.

f.   On or about October 19, 2008, Robyn Swierk, Hilton's Senior Coordinator of Brand Performance, e-mailed Starwood strategic development plans to Pretha Mani, Hilton's Senior Director of Luxury and Lifestyle Brand Growth.

g.   On or about November 25, 2008, Kochuba e-mailed Starwood's designer lists to Mat Domaradzki, Hilton's Luxury & Lifestyle Brand Development Coordinator, and directed Domaradzki to combine and edit the lists for use at Hilton.

206.   Not only were confidential Starwood materials freely distributed within Hilton among former Starwood employees and to Hilton executives across all of Hilton's luxury and lifestyle brands, Starwood materials were uploaded to Hilton's shared computer drive, giving Hilton employees quick and easy access to Starwood branded materials.

207.   Hilton employees relied extensively on the Starwood Confidential Information.  For example, in seeking out certain confidential Starwood strategic development materials "from Amar's discs," Pretha Mani, Hilton's Senior Director of Luxury and Lifestyle Brand Growth, reported that they "need[ed] [the Starwood materials] urgently."

208.   Hilton has recently launched a website and revealed other branding materials for its Waldorf Astoria Collection.  That website and those materials are infected with Starwood Confidential Information.

209.   Unless Defendants Hilton, Klein and Lalvani, and all those working in concert with them, are enjoined from using in any way, directly or indirectly, Starwood's highly confidential and proprietary information and trade secrets, Starwood will suffer irrepa-

rable injury.  In each of the agreements signed by Klein and Lalvani with Starwood, it is

agreed that any breach of their agreements in respect of the Starwood Confidential Informa-

tion identified therein (and among what they took to Hilton):

> "may cause [Starwood] irreparable harm for which there is no adequate remedy at
> law, and as a result of this, [Starwood] will be entitled to the issuance by a court of
> competent jurisdiction of an injunction, restraining order or other equitable relief in
> favor of [Starwood], without the necessity of posting a bond, restraining [Klein, Lal-
> vani and the other interested persons] from committing or continuing to commit any
> such violation."

210.    The harm to Starwood is neither remote nor speculative, but actual and

imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the

harm.  Hilton has announced that it is currently in "active negotiation" with developers re-

garding the expansion of its luxury and lifestyle brands.  Hilton has also announced that it en-

tered into franchise license agreements for three hotels that were previously Starwood proper-

ties — Hilton Hotel Tahiti, which was previously operated as Sheraton Hotel Tahiti; Hilton

Moorea Lagoon Resort & Spa, which was previously the Sheraton Moorea; and Hilton Bora

Bora Nui Resort & Spa, which was previously the Bora Bora Nui Resort & Spa under Star-

wood's Luxury Collection.  Included among the materials taken to Hilton was Starwood's

Property Improvement Plan outlining a plan to convert the Luxury Collection Bora Bora Nui

property to a W Hotel.  Hilton has repositioned its Waldorf Astoria Collection brand, and has

launched a website promoting this brand that is infected by Starwood Confidential Informa-

tion.  Hilton, through Klein, Lalvani, Nassetta and Goldman, has pitched deals for Hilton to

owners and developers who were in contractual relationships with Starwood using Starwood's

playbook.

211.    Furthermore, Hilton, through Klein, publicly stated prior to this lawsuit

that it intended to open the first Denizen hotels by the end of 2009 or early 2010.  Hilton,

through Younes, also announced that, although Denizen was just launched, Hilton was al-
ready in negotiation with 20 developers.  Klein stated that he expected Hilton to announce,
"within 30 days" of its launch, signed contracts to open Denizen hotels.  Even though Hilton
has since suspended the development of Denizen, absent action by a court, Hilton may rene-
gotiate or re-brand these deals under their Waldorf Astoria Collection, Prestige Portfolio,
Conrad Hotels, Hilton or other brands.

212.    That Starwood's highly successful W lifestyle brand and luxury hotel
group has inspired and invited competition is to be expected.  Hilton has been especially clear
in its desire to mimic Starwood's successful branding and re-positioning of its luxury proper-
ties.  As Hilton has described it:

> "A designated team of brands within the Hilton Family of Hotels, Hilton's Luxury
> and Lifestyle brands offer global choices to the modern traveler.  Each brand within
> the portfolio has a distinct personality — combined, they illustrate Hilton's ongoing
> commitment to meeting the needs of a changing global consumer in the expanding
> luxury market.  Encompassing Denizen Hotels, Conrad Hotels and Resorts, Waldorf
> Astoria and Waldorf Astoria Collection hotels, the Hilton Luxury and Lifestyle
> brands blend cultured and timeless traditions with modern indigenous settings, pro-
> viding luxury experiences for modern business and leisure travelers alike."

213.    But here Hilton, Klein, Lalvani, and others working in concert with
them, have engaged in corporate espionage and the theft of highly confidential and proprie-
tary Starwood information and trade secrets in breach of (or aiding the breach of) contractual
and fiduciary duties in order to expedite Hilton's entry or expansion into new hotel markets,
and substantially reduce its costs and risks of doing so.

214.    Klein has admitted in the press that the only investment that Hilton has
made in Denizen has been in the "intellectual" component of the brand.  That intelligence,
however, was stolen from Starwood in the form of the proprietary and explicit brand devel-
opment, marketing, and negotiating tools created through years of investment of tens of mil-

lions of dollars and countless employee hours by Starwood.  That investment by Starwood, which Starwood took extensive steps to try to protect, has now gone to enriching Hilton in its efforts unfairly to compete with Starwood.

215.    Klein's and Lalvani's employment agreements with Starwood carve out and exclude from any arbitration all claims involving the alleged taking, use or disclosure of trade secrets and similar confidential or proprietary information.  Klein's separation agreement also carves out and excludes from the release provided by Starwood to Klein:  (i) any obligation of Klein pursuant to Klein's NON-SOLICITATION, CONFIDENTIALITY AND INTELLECTUAL PROPERTY AGREEMENT; (ii) any act by Klein during his employment that would constitute fraud or embezzlement; or (iii) any actions, claims or demands related to actions or omissions occurring after May 30, 2008.  By this action, Starwood seeks equitable relief and money damages.  Klein's employment and separation agreements each acknowledge that Starwood shall be entitled to an injunction, restraining order, or such other equitable relief (without the necessity of posting a bond) in a court of law restraining Klein from committing or continuing to commit any violation of the confidentiality provisions of his employment and separation agreements.

216.    By this action, Starwood seeks equitable relief and money damages. The employment agreements entered into by Klein and Lalvani, and by the Persons of Interest, expressly provide that Starwood shall be entitled to an injunction, restraining order, or such other equitable relief (without the necessity of posting a bond) in a court of law restraining each of them from committing or continuing to commit any violation of the confidentiality provisions of their employment agreements.

217.    Plaintiff Starwood has no adequate remedy at law.

# FIRST CLAIM FOR RELIEF
## (Breach of Contract)
### (Klein)

218.   Plaintiff repeats and realleges each and every allegation set forth in paragraphs one through 217 as though fully set forth herein.

219.   As a condition of his employment with Starwood, Defendant Klein signed and agreed to be bound by the terms of a NON-SOLICITATION, CONFIDENTIALITY AND INTELLECTUAL PROPERTY AGREEMENT.

220.   At all relevant times, Plaintiff Starwood performed its duties with respect to the NON-SOLICITATION, CONFIDENTIALITY AND INTELLECTUAL PROPERTY AGREEMENT entered into by Defendant Klein.

221.   Defendant Klein has breached and continues to breach his obligations to maintain the confidentiality of Starwood's highly confidential and proprietary information under the NON-SOLICITATION, CONFIDENTIALITY AND INTELLECTUAL PROPERTY AGREEMENT.

222.   In addition, as a condition of his severance from Starwood, Defendant Klein signed and agreed to be bound by the terms of his separation agreement.

223.   At all relevant times, Plaintiff Starwood performed its duties with respect to Defendant Klein under Klein's separation agreement.

224.   Defendant Klein has breached and continues to breach his obligations to maintain the confidentiality of Starwood's highly confidential and proprietary information under the separation agreement.

225.    As a direct and proximate result of the wrongful conduct by Defendant Klein, Plaintiff Starwood has suffered and continues to suffer irreparable injury.

226.    As a direct and proximate result of the wrongful conduct by Defendant Klein, Plaintiff Starwood has suffered and continues to suffer substantial money damages.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract)
### (Lalvani)

227.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs one through 226 as though fully set forth herein.

228.    As a condition of his employment with Starwood, Defendant Lalvani signed and agreed to be bound by the terms of a NON-SOLICITATION, CONFIDENTIALITY AND INTELLECTUAL PROPERTY AGREEMENT.

229.    At all relevant times, Plaintiff Starwood performed its duties with respect to the NON-SOLICITATION, CONFIDENTIALITY AND INTELLECTUAL PROPERTY AGREEMENT entered into by Defendant Lalvani.

230.    Defendant Lalvani has breached and continues to breach his obligations to maintain the confidentiality of Starwood's highly confidential and proprietary information under the NON-SOLICITATION, CONFIDENTIALITY AND INTELLECTUAL PROPERTY AGREEMENT.

231.    As a direct and proximate result of the wrongful conduct by Defendant Lalvani, Plaintiff Starwood has suffered and continues to suffer irreparable injury.

232.    As a direct and proximate result of the wrongful conduct by Defendant Lalvani, Plaintiff Starwood has suffered and continues to suffer substantial money damages.

**THIRD CLAIM FOR RELIEF**

**(Inducing Breach of Contract; Tortious Interference With Contractual Relations)**
**(All Defendants)**

233.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs one through 232 as though fully set forth herein.

234.    Defendant Hilton knew of Klein's and Lalvani's contractual obligations to Starwood.  Defendant Hilton knew that both Klein and Lalvani had written agreements with Starwood requiring them to protect and safeguard the confidentiality of the Starwood Confidential Information to which they had access.

235.    By its wrongful actions, Defendant Hilton intentionally induced Klein and Lalvani to breach their contracts with Starwood.

236.    By its wrongful actions, Defendant Hilton tortiously interfered with Starwood's contractual relations with Klein and Lalvani.

237.    Defendants Klein and Lalvani knew of the Persons of Interest's contractual obligations to Starwood.  Defendants Klein and Lalvani knew that the Persons of Interest had written agreements with Starwood requiring them to protect and safeguard the confidentiality of the Starwood Confidential Information to which they had access.

238.    By their wrongful actions as Hilton executives, Defendants Klein and Lalvani and thus Defendant Hilton intentionally induced the Persons of Interest to breach their contracts with Starwood.

239.    By their wrongful actions as Hilton executives, Defendants Klein and Lalvani and thus Defendant Hilton tortiously interfered with Starwood's contractual relations with the Persons of Interest.

240.     As a direct and proximate result of the wrongful conduct of Defendants, Plaintiff Starwood has suffered and continues to suffer irreparable injury.

241.     As a direct and proximate result of their wrongful conduct, Defendants have been unjustly enriched, and Plaintiff Starwood has suffered and continues to suffer substantial money damages.

**FOURTH CLAIM FOR RELIEF**

**(Fraud; Aiding and Abetting Fraud)**

**(All Defendants)**

242.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs one through 241 as though fully set forth herein.

243.     At the time Starwood and Klein entered into the separation agreement, Defendant Klein acknowledged that he had access to Starwood Confidential Information. Klein represented to Starwood that he had returned or would return all such information to Starwood by May 30, 2008, and that he had not retained and would not retain originals or any copies of documents, records or materials of any kind, whether written or electronically created or stored, which contain, relate to or refer to any Starwood Confidential Information. Klein also represented that he would not use or disclose any Starwood Confidential Information. These representations were collateral to and separate from the obligations that Klein was under by virtue of his then-existing employment agreement with Starwood.

244.     At the time that Klein made these and other representations to Starwood, they were false and Klein knew them to be false. At the time that Klein made these and other representations he was already copying Starwood Confidential Information onto his personal computer, he was already e-mailing Starwood Confidential Information to his personal e-mail account, he was already taking Starwood Confidential Information home, and he

was already shipping boxes directly to Hilton's executive offices in Beverly Hills, California — all without the authorization or agreement of Starwood.

245.    Klein lied to Starwood and made knowingly false representations in order to induce Starwood into entering into the separation agreement and, among other benefits, paying Klein over $600,000 in cash severance payments to which, as a result of his wrongful conduct, he was not otherwise entitled, as well as to conceal the fact that Klein was already stealing Starwood Confidential Information to be used for the benefit of Hilton.

246.    Klein's representations that he would not take, use or disclose any Starwood Confidential Information were knowingly false when made and were made by Klein for the purpose of defrauding Starwood.

247.    Klein did not inform Starwood that, two weeks before Klein signed his separation agreement with Starwood, Klein had already signed an employment agreement with Defendant Hilton and that, in concert with Lalvani, and others, Klein had already knowingly and intentionally taken Starwood Confidential Information in contravention of Starwood policy and his existing fiduciary and contractual obligations with the intention of providing it to and using it for the benefit of Hilton.

248.    The President and Chief Executive Officer of Hilton had personally recruited Klein to join Hilton.  Members of Hilton's management were aware of Klein's wrongdoing.  Lalvani was aware of Klein's wrongdoing.  Hilton and Lalvani knowingly and substantially assisted Klein and aided and abetted Klein's fraud.

249.    Starwood justifiably relied on Klein's representations that he would not take, use or disclose Starwood Confidential Information when Starwood entered into the separation agreement and agreed to provide the benefits detailed in that agreement, including but

not limited to the payment to Klein of over $600,000 in cash severance payments and accelerated vesting of equity.

250.    Klein has fraudulently obtained Starwood Confidential Information for the unjust enrichment of Hilton, Lalvani and himself.  Lalvani, who also looted Starwood's files, and Hilton, for whose benefit the information was stolen, were aware of Klein's false statements to Starwood, and knowingly and substantially participated in Klein's wrongdoing. Members of Hilton management conspired with Klein and sought to cover up Klein's wrongdoing.

251.    As a direct and proximate result of their wrongful conduct, Defendants Hilton, Klein and Lalvani have been unjustly enriched and Plaintiff Starwood has suffered and continues to suffer money damages.

## FIFTH CLAIM FOR RELIEF
### (Misappropriation of Trade Secrets)
### (All Defendants)

252.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs one through 251 as though fully set forth herein.

253.    By their wrongful actions, Defendants have knowingly misappropriated and used Starwood trade secrets in breach of their agreements, confidential relationships and fiduciary duties to Starwood.

254.    By their wrongful actions, including discovery of Starwood's trade secrets through improper means, Defendants have knowingly misappropriated and used, or aided and abetted the misappropriation and misuse of, Starwood trade secrets.

255.    As a direct and proximate result of the wrongful conduct of Defendants, Plaintiff Starwood has suffered and continues to suffer irreparable injury.

256.    As a direct and proximate result of their wrongful conduct, Defendants have been unjustly enriched, and Plaintiff Starwood has suffered and continues to suffer money damages.

## SIXTH CLAIM FOR RELIEF
### (Unfair Competition)
### (All Defendants)

257.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs one through 256 as though fully set forth herein.

258.    By their wrongful actions, Defendants have knowingly misappropriated confidential and proprietary information for use in Hilton's business and have engaged in unfair competition with Starwood.

259.    As a direct and proximate result of the wrongful conduct of Defendants, Plaintiff Starwood has suffered and continues to suffer irreparable injury.

260.    As a direct and proximate result of their wrongful conduct, Defendants have been unjustly enriched, and Plaintiff Starwood has suffered and continues to suffer money damages.

## SEVENTH CLAIM FOR RELIEF
### (Theft/Conversion)
### (All Defendants)

261.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs one through 260 as though fully set forth herein.

262.     By their wrongful actions, Defendants have intentionally stolen and converted Starwood confidential and proprietary information and trade secrets to the exclusion of Starwood's rights.

263.     As a direct and proximate result of the wrongful conduct of Defendants, Plaintiff Starwood has suffered and continues to suffer irreparable injury.

264.     As a direct and proximate result of their wrongful conduct, Defendants have been unjustly enriched, and Plaintiff Starwood has suffered and continues to suffer money damages.

### EIGHTH CLAIM FOR RELIEF
### (Breaches of Fiduciary Duty)
### (Klein, Lalvani)

265.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs one through 264 as though fully set forth herein.

266.     As management-level employees entrusted with confidential and proprietary information and trade secrets, Defendants Klein and Lalvani each owed at all relevant times fiduciary duties to Plaintiff Starwood.

267.     Defendants Klein and Lalvani each breached that duty by surreptitiously stealing Starwood Confidential Information through improper means and by making or intending to make improper use of that information and those secrets for purposes contrary to Starwood's interests.  Lalvani breached fiduciary duties owed to Starwood by acting as a corporate spy for Hilton and by providing Hilton with Starwood's confidential information and business opportunities.

268.     As a direct and proximate result of the wrongful conduct of Defendants, Plaintiff Starwood has suffered and continues to suffer irreparable injury.

269.     As a direct and proximate result of the wrongful conduct of Defendants, Plaintiff Starwood has suffered and continues to suffer money damages.

## NINTH CLAIM FOR RELIEF
### (Aiding and Abetting Breaches of Fiduciary Duty)
### (Hilton)

270.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs one through 269 as though fully set forth herein.

271.     Defendant Hilton knew of the fiduciary duties owed to Starwood by Defendants Klein and Lalvani.

272.     By its wrongful actions, Defendant Hilton knowingly induced and participated in Klein's and Lalvani's breaches of their fiduciary obligations to Starwood.

273.     As a direct and proximate result of the wrongful conduct of Defendant Hilton, Plaintiff Starwood has suffered and continues to suffer irreparable injury.

274.     As a direct and proximate result of the wrongful conduct of Defendant Hilton, Plaintiff Starwood has suffered and continues to suffer money damages.

## TENTH CLAIM FOR RELIEF
### (Unjust Enrichment)
### (All Defendants)

275.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs one through 274 as though fully set forth herein.

276.     By their wrongful actions, Defendants have been unjustly enriched at Starwood's expense.

277.   It is against equity and good conscience to permit Defendants to retain the benefits derived from their wrongful conduct.

278.   As a direct and proximate result of the wrongful conduct of Defendants, Plaintiff Starwood has suffered and continues to suffer irreparable injury.

279.   As a direct and proximate result of the wrongful conduct of Defendants, Plaintiff Starwood has suffered and continues to suffer money damages.

## ELEVENTH CLAIM FOR RELIEF
### (Violation of Computer Fraud and Abuse Act)
### (All Defendants)

280.   Plaintiff repeats and realleges each and every allegation set forth in paragraphs one through 279 as though fully set forth herein.

281.   Starwood's computers and computer systems are "protected computers" under the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030(e)(2).

282.   By their wrongful actions, Defendants (and others working under their direction and at their express instruction) intentionally accessed Starwood's protected computer system, without authorization and/or in excess of authorized access, and thereby obtained information from Starwood's protected computer system.

283.   By their wrongful actions, Defendants knowingly and with intent to defraud, accessed Starwood's protected computer system, without authorization and/or in excess of authorized access.

284.   By their wrongful actions, Defendants furthered the intended fraud, obtained unauthorized use of Starwood's protected computer system, and obtained Starwood's proprietary information, the value of such exceeding $5,000 in value in any one year period.

285.     The wrongful conduct of Klein and Lalvani was done with inducement from and with the knowledge and participation of Defendant Hilton and its executives, or for the benefit of Defendant Hilton, such that Hilton is equally responsible for the wrongful conduct of Klein and Lalvani.

286.     By their wrongful actions, Defendants intentionally accessed Starwood's protected computer system without authorization, and as a result of such conduct, caused Starwood damage and loss.

287.     The wrongful actions of Defendants have caused loss to Starwood that exceeds $5,000 in value during any one year period, in that Starwood has spent far in excess of $5,000 in responding to the offense and conducting a damage assessment.

288.     The activity of Defendants constitutes a violation of the federal Computer Fraud and Abuse Act, 18 U.S.C.A. §1030(a)(2)C), (a)(4), (a)(5)C), and Starwood is entitled to full compensatory damages under that Act.

## THE WANTONNESS OF DEFENDANTS' WRONGFUL CONDUCT

289.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs one through 288 as though fully set forth herein.

290.     Defendant Hilton knowingly and intentionally induced Defendants Klein and Lalvani to breach their obligations and duties, including fiduciary obligations, to Starwood, and paid them, and others, to steal Starwood Confidential Information so that Hilton could better compete against Starwood.  The conduct of Defendant Hilton as alleged herein is intentional, outrageous, and exhibits a high degree of moral culpability.  It is not the conduct of rogue Hilton employees.  Rather, it is the outrageous conduct of Hilton's most senior management, including dozens of Hilton executives and its Chief Executive Officer, who

acted with a fraudulent motive and willfully and wantonly disregarded the rights of Starwood. Hilton has continued to use Starwood Confidential Information and/or information derived directly or indirectly therefrom across its luxury and lifestyle brands in violation of the Preliminary Injunction, and has demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations for which very substantial punitive damages are appropriate.

291.    The conduct of Defendant Klein as alleged herein is intentional, outrageous, and exhibits a high degree of moral culpability.  Klein acted with a fraudulent motive and willfully and wantonly disregarded the rights of Starwood.  Klein has demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations for which very substantial punitive damages are appropriate.

292.    The conduct of Defendant Lalvani as alleged herein is intentional, outrageous, and exhibits a high degree of moral culpability.  Lalvani acted with a fraudulent motive and willfully and wantonly disregarded the rights of Starwood.  Lalvani has demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations for which very substantial punitive damages are appropriate.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Starwood Hotels & Resorts Worldwide, Inc. prays as set forth above and for the following relief:

(i)     preliminarily and permanently enjoining Defendants, and their respective officers, agents, servants, employees and attorneys, and all other persons who are in active concert or participation with them who receive actual notice of the order by personal service or otherwise, from using or benefiting, directly or indirectly, from the use of Starwood's confidential, proprietary and trade secret information, including without limitation the Starwood Confidential Information;

(ii)    preliminarily and permanently enjoining Defendants, and their respective officers, agents, servants, employees and attorneys, and all other persons who are in active

concert or participation with them who receive actual notice of the order by personal service or otherwise, immediately to return all Starwood Confidential Information in their possession, custody or control, wherever located;

(iii)    preliminarily and permanently enjoining Defendants, and their respective officers, agents, servants, employees and attorneys, and all other persons who are in active concert or participation with them who receive actual notice of the order by personal service or otherwise, immediately to destroy and to certify under oath the destruction of all materials derived in any way directly or indirectly in whole or in part from any Starwood Confidential Information;

(iv)    purging all Starwood Confidential Information and all information derived directly or indirectly from Starwood Confidential Information from all information and material, including websites and preliminarily and permanently enjoining Hilton from any further use of any information (including websites) derived in whole or in part, directly or indirectly from Starwood Confidential Information;

(v)    preliminarily and permanently enjoining Defendants, and their respective officers, agents, servants, employees and attorneys, and all other persons who are in active concert or participation with them who receive actual notice of the order by personal service or otherwise, immediately to destroy and to certify under oath the destruction of all documents and information relating to the promotion and roll-out of Hilton's Denizen brand — thus requiring Hilton to start over without the benefit of its theft of Starwood Confidential Information;

(vi)    ordering Defendants to make appropriate corrective disclosure to property owners and industry professionals of Hilton's wrongdoing;

(vii)    ordering the appointment of one or more monitors with appropriate powers of inquiry to investigate and report concerning Hilton's compliance with all injunctions and Hilton's non-use, either directly or indirectly, of Starwood Confidential Information;

(viii)    preliminarily and permanently enjoining Defendants, and their respective officers, agents, servants, employees and attorneys, and all other persons who are in active concert or participation with them who receive actual notice of the order by personal service or otherwise, to provide a detailed accounting of and impose a constructive trust on all revenues derived and expenses saved by Hilton from the use of the Starwood Confidential Information;

(ix)    preliminarily and permanently enjoining Hilton for a reasonable time from any expansion, of Hilton's luxury and lifestyle brands (*e.g.*, Waldorf Astoria Collection, Prestige Portfolio and Conrad Hotels) that were infected with Starwood Confidential Information;

(x)    preliminarily and permanently enjoining Defendants, and their respective officers, agents, servants, employees and attorneys, and all other persons who are in active concert or participation with them who receive actual notice of the order by personal service or otherwise, for a reasonable time from pursuing any hotel owners,

developers and investors for hotel properties in the locations identified in the Starwood Confidential Information as targeted for Starwood properties;

(xi)  preliminarily and permanently enjoining Defendants, and their respective officers, agents, servants, employees and attorneys, and all other persons who are in active concert or participation with them who receive actual notice of the order by personal service or otherwise, for a reasonable time from negotiating with owners, developers, investors or any other persons with whom Starwood has current management contracts;

(xii)  ordering Defendants to disgorge all unjust enrichment as a result of their taking and use of Starwood Confidential Information;

(xiii)  ordering Defendants, jointly and severally, to pay Starwood compensatory damages in an amount to be proven at trial;

(xiv)  ordering Defendants each to pay Starwood punitive damages in the maximum amount permitted by law;

(xv)  finding Defendants in civil and/or criminal contempt of the Preliminary Injunction and awarding such relief as the Court deems appropriate; and

(xvi)  ordering such other and further relief as this Court deems just and proper.

Dated:  January 14, 2009                    CAHILL GORDON & REINDEL LLP

                                            By: _____
                                                   Charles A. Gilman
                                                   David G. Januszewski
                                                   Andrea R. Butler
                                            80 Pine Street
                                            New York, New York 10005
                                            (212) 701-3000
                                            *Attorneys for Plaintiff Starwood Hotels & Resorts Worldwide, Inc.*

## DEMAND FOR TRIAL BY JURY

Plaintiff demands trial by jury on all claims as to which it is so entitled.

                                            By: _____
                                                   Charles A. Gilman

Exhibit 1



**STARWOOD**

HOTELS & RESORTS WORLDWIDE, INC.

May 9, 2005

David K. Norton
EVP, Human Resources

Ross Klein
c/o Starwood Hotels & Resorts Worldwide, Inc.

Dear Ross,

The specifics of your assignment with Starwood Hotels & Resorts Worldwide, Inc., in connection with your promotion to President, W Hotels Worldwide, are outlined below.

**Start Date:**
Subject to the terms of this letter, your promotion with Starwood will be effective on May 1, 2005.

**Responsibilities:**
Initially, your position will be President, W Hotels Worldwide, and you shall perform such duties and services as are assigned to you by the Company as requested. You shall devote your full time and attention to the affairs of the Company and to your job duties, and use your best efforts and abilities to promote Starwood's interests. You will initially be reporting to Steve Heyer, Chief Executive Officer, though the Company may make changes in your reporting structure title, and job responsibilities at any time.

In performing your duties, you will be expected to comply at all times with all Starwood policies, procedures and directives as they currently exist or as they may be adopted or changed from time to time.

**Base Salary:**
Your base salary will be $400,000 annually, paid in or semi-monthly intervals of $16,666.66, less applicable withholdings. The Starwood salary program provides performance-based salary reviews for future salary progression.

**Annual Incentive (Bonus):**
You will be eligible to participate in the Starwood Annual Incentive Plan (AIP). Your target incentive is 75% of base salary. Your actual incentive award will be based upon a variety of factors including Company and division performance, and your achieving specified performance criteria to be established and approved with your manager. In the event that changes are made to any of the incentive plans, the changes will apply to you as they do other similarly situated employees of the Company.

Payment of your 2005 bonus (pro-rata) will be delivered according to the regular annual incentive plan payout schedule. An annual bonus shall not be deemed earned by you until the Company has determined your entitlement to such bonus and only if you are employed by the Company at the time such bonus is payable in accordance with the Annual Incentive Plan (AIP) and Company practices. The Company does not pay pro-rata bonuses upon departure.

     

WESTIN   Sheraton   Four Points   St. Regis   LUXURY COLLECTION   HOTELS

**Long Term Incentive:**
You will be eligible to participate in the Starwood Long Term Incentive Compensation Plan ("LTIP"), subject to the terms and conditions of the plan, as it may be changed from time to time. This plan currently provides for the award of stock options and/or restricted shares at the Company's discretion to high performing executives. The actual number of shares granted, if any, will be based upon your performance.

**Benefits:**
Your original hire date will remain the same for benefit accrual purposes. If your promotion necessitates a change in medical plans, information will be provided to you after your new assignment begins.

**Resolution of Disputes:**
From time to time, disagreements and misunderstandings may arise concerning your job responsibilities, performance, compensation, benefits or other matters affecting your employment with Starwood, or one of its affiliated companies. We hope that we will be able to resolve such matters through normal discussions with your immediate managers or Human Resources representatives.

In the event those efforts fail, you and Starwood agree, except as may be prohibited by law or as otherwise excluded by the terms of the attached Mutual Agreement to Arbitrate (**Attachment A**), to submit any and all disputes relating to or arising out of this offer letter, your employment with Starwood or the termination of that employment to final and binding arbitration pursuant to the employment rules then in effect of the American Arbitration Association, which shall be the sole and exclusive remedy for such disputes. Accordingly, you acknowledge and agree that this offer of employment and the benefits provided herein are contingent upon your execution of the Mutual Agreement to Arbitrate provided to you herewith and incorporated herein by reference. **In the event that the Mutual Agreement to Arbitrate is determined by a court with appropriate jurisdiction to be unenforceable, you and Starwood Hotels & Resorts Worldwide, Inc. waive any right to a trial by jury on the claims that otherwise would have been subject to the Mutual Agreement to Arbitrate.**

**Employment Term:**
While Starwood looks forward to a long and mutually beneficial relationship with you, you should understand that there is no fixed duration for your employment. In accepting this offer, you acknowledge and agree that your employment with the Company is at will, and may be terminated by Starwood at any time, with or without notice and for any or no reason. By signing below, you acknowledge that except for this letter, there is not and shall not be any written contract between you and the Company concerning this offer of employment or your prospective employment, and that nothing in this letter guarantees employment for any definite or specific term or duration or any particular level of benefits or compensation.

**Severance:**
In the event that Starwood terminates your employment for any reason other than cause, Starwood will pay to you twelve (12) months of your then current base salary, in a lump sum less all applicable withholdings (the "Severance Payment"), and it will periodically reimburse you for your COBRA expenses minus your last level of normal contribution for up to twelve (12) months

3

commencing on the termination date.   The Severance Payment will be in lieu of any compensation, damage or remedy to which you might otherwise be entitled and will be subject to and conditioned upon (a) your continuing compliance with the Non-Solicitation, Confidentiality and Intellectual Property Agreement referred to below and (b) your signing a written waiver and release of any and all claims against Starwood arising out of or relating to your employment with Starwood, in form and substance satisfactory to Starwood.   You will not be eligible for any Severance Payment or COBRA reimbursement if you resign from your employment with the Company.

For purposes of this paragraph, "cause," shall mean (i) any material breach by you of any of the duties, responsibilities or obligations of your employment, or any of the policies or practices of Starwood; (ii) your failure or refusal to properly perform, or the habitual neglect of (both as determined by Starwood in its reasonable discretion and judgment), the duties, responsibilities or obligations of your employment, or to properly perform or follow (as determined by Starwood in its reasonable discretion and judgment) any lawful order or direction by Starwood; (iii) any acts or omissions by you that constitute (as determined by Starwood in its reasonable discretion and judgment) fraud, dishonesty, disloyalty, breach of trust, gross negligence, civil or criminal illegality, or any other misconduct or behavior that could (as determined by Starwood in its reasonable discretion and judgment), subject to civil or criminal liability or otherwise adversely affect the business, interests or reputation of Starwood or any of its affiliates.

**Other Conditions and Obligations:**
You acknowledge that you are not subject to any currently effective employment contract, or any other contractual or other binding obligations pursuant to which your employment or employment activities with or on behalf of the Company may be subject to any restrictions.   Restrictions include, without limitation, any agreements or other obligations or documents relating to non-competition, confidentiality, trade secrets, proprietary information or works for hire.  By signing this letter, you represent to Starwood that there are no agreements or arrangements, whether written or oral, in effect that would prevent or conflict with your full performance of your Employments duties and responsibilities to us.

As a further condition of this offer and your right to receive any of the benefits detailed herein, you agree to execute and be bound by the Non-solicitation, Confidentiality and Intellectual Property Agreement attached hereto (**Attachment B**) and incorporated herein by reference.

4

**No Other Assurances:**

You acknowledge that in deciding to sign this offer, you have not relied on any promises, commitments, statements or representations, whether spoken or in writing, made to you by any representative of the Company, except for what is expressly stated herein  This offer replaces and cancels all previous agreements, commitments, and understandings whether spoken or written, if any, that the Company or any representative of the Company may have made in connection with your anticipated employment.

You also acknowledge that this offer is intended as written, and that no marginal notations or other revisions to either this offer, the Mutual Agreement to Arbitrate, or the Non-solicitation, Confidentiality and Intellectual Property Agreement are binding on the Company unless expressly consented to in writing by the Executive Vice President, Human Resources or Starwood's General Counsel.  This offer shall be construed, governed by and enforced in accordance with the laws of the State of New York, without regard to its conflicts of laws principles.

By signing and returning this letter, you confirm that this letter accurately sets forth the current understanding between you and Starwood and that you accept and agree to the terms as stated above.

Very truly yours,

David Norton
EVP, Human Resources
Starwood Hotels & Resorts Worldwide, Inc.

cc:   Personnel File

ACCEPTED AND AGREED TO:

_____          _____
                Ross Klein                                              Date

Attachment A

## MUTUAL AGREEMENT TO ARBITRATE

In order to gain the benefits of a speedy, impartial, and cost-effective dispute resolution procedure, and for good and valid consideration as covenanted below and in addition to any other consideration, and intending to be legally bound, Starwood Hotels & Resorts Worldwide. Inc. ("Starwood") and I hereby agree that, except as otherwise provided herein, all disputes and claims for which a court otherwise would be authorized by law to grant relief, in any manner, that I may have, now or in the future, during or after my employment with Starwood, of any and every kind or nature whatsoever with or against Starwood, any of Starwood's affiliated or subsidiary companies, partners, joint venturers, owners of properties Starwood manages, and/or any of his, her, its or their directors, officers, employees or agents , or any disputes and claims that Starwood may have against me (collectively, "Claims"), shall be submitted to the American Arbitration Association ("AAA") to be resolved and determined through final and binding arbitration before a single arbitrator and to be conducted in accordance with the National Rules for the Resolution of Employment Disputes of the AAA. Starwood and I agree that the arbitrator will have the authority to grant motions dispositive of all or part of any Claim. Starwood shall be responsible for payment of all arbitrator compensation, AAA filing fees and AAA administrative fees, other than the initial AAA filing fee for which I will be responsible to pay up to a maximum of $500.00, or as otherwise required by law.

Any reference in this Agreement to Starwood also refers to all of Starwood's affiliated entities, benefit plans, the benefit plans' sponsors, fiduciaries and administrators, and all successors and assigns of any of them.

Starwood and I each have the right to representation by counsel with respect to arbitration of any dispute pursuant to this Agreement. Except as prohibited by law, at the request of either Starwood or me, the arbitration proceedings shall be conducted in confidence, and, in such case, all documents, testimony, and records shall be received, heard, and maintained by the arbitrator in confidence, available for inspection only by me and Starwood, our respective attorneys, and experts, who shall agree, in advance and in writing, to receive all such information confidentially and to maintain the secrecy of such information until it shall become generally known. Both parties shall be allowed adequate discovery as part of the arbitration process, including reasonable access to essential documents and witnesses as determined by agreement or the arbitrator.

The arbitrator shall conduct a full hearing as to all issues and disputes not resolved by dispositive motion. At such hearing, the parties shall be entitled to present evidence and examine and cross-examine witnesses. The arbitrator shall issue a written decision revealing the essential findings and conclusions upon which any award is based. In addition, the arbitrator shall have authority to award equitable relief, damages, costs, and fees to the extent permitted by law. including, but not limited to, any remedy or relief that a governing court might order.

Starwood and I hereby agree that the Claims subject to arbitration shall include but not be limited to any and all Claims that arise out of or are related to the offer of employment, transfer or promotion extended by Starwood to me, any withdrawal or rescission of that offer, any aspect of my employment with Starwood or the terms and conditions of that employment, any claim for bonus, vacation pay or other compensation, any termination of that employment and any Claim of discrimination, retaliation, or harassment based upon age, race, religion, sex, creed, ethnicity, pregnancy, veteran status, citizenship status, national origin, disability, handicap, medical condition, sexual orientation or any other unlawful basis, or any other unlawful conduct, under

any applicable federal, state, local or other statutes, orders, laws, ordinances, regulations or the like, or case law, that relate to employment or employment practices, including without limitation, Title VII of the Civil Rights Act of 1964, as amended, the Civil Rights Act of 1991, as amended, the Civil Rights Acts of 1866 and 1871, as amended, the Age Discrimination in Employment Act of 1967, as amended, the Americans with Disabilities Act of 1990, as amended, the Family Medical Leave Act of 1993, as amended, the Employee Retirement Income Security Act of 1990, as amended, the Worker Adjustment Retraining and Notification Act, as amended, the Fair Labor Standards Act, as amended, the Vietnam Era Veterans' Readjustment Assistance Act, as amended, the Equal Pay Act, as amended, the Rehabilitation Act, as amended, the Immigration Reform and Control Act, and the state and local analogues to the foregoing.

Starwood and I further agree that the Claims subject to arbitration shall exclude any Claims required by any applicable federal, state, local or other statute or benefit or pension plan to be submitted to an administrative forum (for example, a workers' compensation claim, a claim for unemployment insurance benefits, or an administrative charge of discrimination or retaliation filed with the Equal Employment Opportunity Commission or the state or local analogue to that agency but not litigation arising from such charges) and any Claims involving solely a monetary dispute within the jurisdiction of a small claims court.  Starwood and I further agree that the Claims subject to arbitration also shall exclude any Claims to the extent they involve the alleged taking, use or disclosure of trade secrets and similar confidential or proprietary information, Claims involving a failure to pay a retention bonus or relocation expense, Claims involving a failure to repay any unearned portion of a retention bonus or relocation expense, Claims based upon any employee pension or benefit plan the terms of which contain an enforceable arbitration procedure, in which case the procedure of such plan shall apply, and Claims that cannot be compelled to mandatory arbitration under applicable federal law.

Starwood and I agree that any arbitration award rendered as the result of any arbitration under this Agreement shall be final and binding and may be entered and enforced as a court judgment in accordance with applicable law.  Starwood and I further agree that this Agreement, any arbitration under this Agreement and any arbitration award rendered in such arbitration shall be governed by the Federal Arbitration Act.

By entering into this Agreement, Starwood and I each specifically acknowledge and understand that the right to the determination and/or trial of any Claims in court before a judge or a jury is a valuable right, and that by signing this Agreement Starwood and I hereby knowingly and voluntarily waive any and all rights we may have to assert any Claims in any court of competent jurisdiction and to a determination and/or trial before a judge or a jury.

I further understand and acknowledge that this Agreement is not intended to be and shall not be deemed to constitute a contract of employment for any specific duration, and that my employment shall be and remain at will, which means that Starwood and I shall be free to terminate that employment at any time for any or no reason with or without notice and with or without cause.

Each party's promise to resolve Claims by arbitration in accordance with the provisions of this Agreement is consideration for the other party's like promise.  Additionally, I enter into this Agreement in consideration of Starwood's employment, transfer or promotion of me.

This Agreement shall survive my employer-employee relationship with Starwood and shall apply to any covered Claim whether arising or asserted during my employment or after the termination of my employment with the Company.  This Agreement can be modified or revoked only by a writing signed by both Starwood's Executive Vice President, Human Resources and me and that expressly refers to this Agreement and specifically states an intent to modify or revoke it. This is the complete agreement of the parties on the subject of arbitration of disputes, except for any arbitration provision contained in a pension or benefit plan or an agreement covering change in control benefits and protections.

EACH PARTY TO THIS AGREEMENT ACKNOWLEDGES CAREFULLY READING THIS AGREEMENT, UNDERSTANDING ITS TERMS, AND ENTERING INTO THIS AGREEMENT KNOWINGLY AND VOLUNTARILY AND NOT IN RELIANCE ON ANY PROMISES OR REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS AGREEMENT ITSELF.

EACH PARTY FURTHER ACKNOWLEDGES HAVING THE OPPORTUNITY TO DISCUSS THE AGREEMENT WITH PERSONAL LEGAL COUNSEL AND HAS USED THAT OPPORTUNITY TO THE EXTENT DESIRED.

Dated: 5 17 05

Ross Klein

Dated: 5 9 05

David Norton
EVP, Human Resources
Starwood Hotels & Resorts Worldwide, Inc.

## NON-SOLICITATION, CONFIDENTIALITY AND INTELLECTUAL PROPERTY AGREEMENT

This Non-solicitation, Confidentiality and Intellectual Property Agreement ("Agreement") is entered into as of this 1st day of May 2005, (the "Effective Date"), by and between Starwood Hotels & Resorts Worldwide, Inc. (the "Company") and [Name] ("Employee").

**WHEREAS,** the Company devotes significant time, resources and effort to the training and advancement of its management, and its management team constitutes a significant asset and important competitive advantage; and

**WHEREAS,** the Employee has and will have access to important and sensitive confidential information; and

**WHEREAS,** the Company has determined that it is in the best interests of the Company and its shareholders to enter into an agreement with Employee whereby Employee will be prohibited from soliciting employees of the Company in accordance with the terms and conditions of this Agreement; and

**WHEREAS,** Employee may create inventions, trade secrets, know-how and documents or other works of authorship and may appear or perform in various promotional materials within the scope of Employee's employment.

**WHEREAS,** in consideration of the Company's offer of employment, Employee agrees to enter into this Agreement.

**THEREFORE,** the Company and Employee agree as follows:

1.      Non-solicitation.  During the period in which Employee is employed by the Company, and for a period of one (1) year following the date of any termination of employment from the Company, Employee shall not, without the prior written consent of the Company, except in the course of carrying out Employee's duties hereunder, directly or indirectly solicit or attempt to solicit for employment with or on behalf of any corporation, partnership, joint venture or other business entity, any person who is, or at any time during the six-month period preceding the solicitation of such person was, a management-level employee of the Company (including, without limitation, for this purpose any director level employee of the Company and any General Manager of any hotel owned (in whole or in part) or managed by the Company).

2.      Confidentiality.  Employee acknowledges that during the course of his/her employment with the Company, Employee will receive, and will have access to, "Confidential Information," as such term is defined below, of the Company and that such information is a special, valuable and unique asset belonging to the Company.  Accordingly, Employee is willing to enter into the covenants contained in this Agreement in order to provide the Company with what Employee considers to be reasonable protection for the Company's interests.  All notes, memoranda, papers, documents, correspondence or writings (which shall include information recorded or stored in writing, on magnetic tape or disc, or otherwise recorded or stored for reproduction, whether by mechanical or electronic means and whether or not such

reproduction will result in a permanent record being made) ("Documents") which from time to time may be in Employee's possession (whether prepared by Employee or not) relating, directly or indirectly, to the business of the Company shall be and remain the property of the Company and shall be delivered by Employee to the Company immediately upon request, and in any event promptly upon termination of Employee's employment, and Employee shall not make or keep any copies or extracts of the Documents. At any time during or after Employee's employment with the Company ends, without the prior written consent of the Company, except (i) in the course of carrying out Employee's duties hereunder or (ii) to the extent required by a court or governmental agency, or by applicable law or under compulsion of legal process, Employee shall not disclose to any third person any information concerning the business of the Company, including, without limitation, any trade secrets, customer lists and details of contracts with or requirements of customers, the identity of any owner of a managed hotel, information relating to any current, past or prospective management agreement or joint venture, information pertaining to business methods, sales plans, design plans and strategies, management organization, computer systems and software, operating policies or manuals, personnel records or information, information relating to current, past or contemplated employee benefits or compensation data or strategies, business, financial, development or marketing plans, or manpower strategies or plans, financial records or other financial, commercial, business or technical information relating to the Company (collectively, "Confidential Information"), unless such Confidential Information has been previously disclosed to the public by the Company or is in the public domain (other than by reason of Employee's breach of this Section 2). Employee will, prior to making any such disclosure pursuant to subsection (ii), promptly notify the Company of his/her receipt of such process or requirement, consult with the Company on the advisability of taking steps to resist or narrow such request, cooperate with the Company in any attempt that the Company may make to obtain a court order or other reliable assurance that confidential treatment will be accorded to all or designated portions of such information, and not disclose such Confidential Information unless the Company shall have had reasonable opportunity to obtain a court order prohibiting or limiting such disclosure.

2.1    Employee agrees that, both during and after Employee's employment with the Company, if Employee is uncertain of whether or not information is confidential, Employee will treat that information as Confidential Information until Employee has received written verification from an authorized officer of the Company that the information is not Confidential Information.

3.    Intellectual Property and Publicity Rights. Employee acknowledges and agrees that all right, title and interest in and to patents, patent applications, inventions, improvements, discoveries, developments, processes, business methods, technical information, know-how, trade secrets, computer programs, writings, designs, copyrights, maskworks, trademarks, service marks, trade names, trade dress and the like (collectively, "Intellectual Property"), including the right to invoke the benefit of the right of priority provided by any treaty to which the United States is a party, which Employee creates, conceives, develops or obtains, either solely or jointly with others, during Employee's employment with the Company (a) with the use of the Company's time, materials, facilities or other resources; or (b) resulting from or suggested by Employee's work for the Company; or (c) in any way relating to any subject matter relating to the existing or contemplated business, products and services of the Company or the Company's affiliates, subsidiaries and licensees shall be owned by the Company. Upon request, Employee shall execute all such assignments and other documents and take all such other action as the Company may reasonably request in order to vest in the Company, or its nominee, all of Employee's right, title, and interest in and to such Intellectual Property. Employee further acknowledges and agrees that the Company shall have the perpetual, worldwide right to use

Employee's name, performance, biography, voice, image, signature and likeness in promotional or any other materials developed by or for the Company during Employee's employment with the Company. Employee hereby irrevocably and unconditionally waives any and all rights that he/she has or may have in and to the Intellectual Property, including, without limitation, any "moral rights" that he/she has or may have as "author" of the Intellectual Property, and hereby expressly agrees not to make any claim or demand against the Company or any party authorized by the Company to exploit the Intellectual Property.

4.     Equitable Relief.

4.1     Employee acknowledges that the restrictions and obligations specified in Sections 1, 2 and 3 hereof are reasonable in view of the nature of the business in which the Company is engaged and Employee's knowledge of, and responsibilities with respect to, the Company's business, and that any breach of Sections 1, 2 or 3 hereof may cause the Company irreparable harm for which there is no adequate remedy at law, and as a result of this, the Company will be entitled to the issuance by a court of competent jurisdiction of an injunction, restraining order or other equitable relief in favor of the Company, without the necessity of posting a bond, restraining Employee from committing or continuing to commit any such violation. Any right to obtain an injunction, restraining order or other equitable relief hereunder will not be deemed to be a waiver of any right to assert any other remedy the Company may have at law or in equity, including, without limitation, the right to cancel payments to which Employee is otherwise entitled under Employee's employment agreement.

4.2     Any proceeding or action seeking equitable relief for violation of Sections 1, 2 and 3 hereof may be commenced in the federal courts in the Southern District of the State of New York, or in the absence of federal jurisdiction in state court in the State of New York. Employee hereby irrevocably and unconditionally submits to the exclusive jurisdiction of such courts and agrees to take any and all future action necessary to submit to the jurisdiction of such courts. Employee irrevocably waives any objection that Employee now has or hereafter may have to the laying of venue of any suit, action or proceeding brought in any such court and further irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. Final judgment against Employee in any such suit will be conclusive and may be enforced in other jurisdictions by suit on the judgment, a certified or true copy of which will be conclusive evidence of the fact and the amount of any liability therein described, or by appropriate proceedings under an applicable treaty or otherwise.

5.     Severability.   In the event that any provision of this Agreement conflicts with the law under which this Agreement is to be construed, and/or if any such provision is held invalid by a court with jurisdiction over the parties to this Agreement and the subject matter of this agreement, (a) such provision will be deemed to be restated to reflect as nearly as possible the original intentions of the parties to the fullest extent permitted under applicable law, and (b) the remaining terms and provisions of this Agreement will remain in full force and effect.

6.     Governing Law.   This Agreement shall be construed, governed and enforced according to the laws of the State of New York, without regard to the principles of conflicts of laws.

7.     Amendments and Waivers.   No failure to act by the Company will waive any right contained in this Agreement. No provision of this Agreement may be amended or waived, except by a written agreement signed by both Employee and an authorized executive officer of the Company. Any waiver by the Company of strict performance of any provision of

this Agreement shall not be a waiver of or prejudice the Company's right to require strict performance of that same provision or any other provision of the Agreement in the future

Employee acknowledges that he/she has had a reasonable opportunity to review and consider the terms described above and to consult with an attorney if he/she so chooses prior to signing this Agreement. Fully understanding the above terms, Employee is entering into this letter agreement knowingly and voluntarily.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

EMPLOYEE

_____
[Name]

_____
Print Name

_____
Date

STARWOOD HOTELS & RESORTS
WORLDWIDE, INC.

_____
David Norton
EVP, Human Resources

_____
Date   5/9/05

Exhibit 2



**STARWOOD**
HOTELS & RESORTS WORLDWIDE, INC.

October 9, 2006

Mr. Amar Lalvani
c/o Starwood Hotels & Resorts Worldwide, Inc.

Dear Amar,

We are delighted to confirm to you our offer of promotion at Starwood Hotels & Resorts Worldwide, Inc.

Attached are documents specifically outlining our offer of promotion to you. Please review them carefully and contact me should you have any questions concerning the terms of this assignment.

We are pleased that you are continuing to be an increasingly important part of our team. Please acknowledge your acceptance of this promotion by signing and returning the attached documents to me.

Sincerely,

Andrea Davitt
Vice President, Corporate Human Resources
Starwood Hotels & Resorts Worldwide, Inc.

Sheraton      FOUR POINTS      St Regis      LUXURY COLLECTION      Z MERIDIEN      aloft            WESTIN



1111 Westchester Avenue, White Plains, New York 10604  Tel: 914-640-8100

October 9, 2006



**STARWOOD**
HOTELS & RESORTS WORLDWIDE, INC.

Mr. Amar Lalvani
c/o Starwood Hotels & Resorts Worldwide, Inc.

Dear Amar,

We are pleased to offer your promotion with Starwood Hotels & Resorts Worldwide, Inc. ("Starwood" or the "Company") under the terms and conditions stated below:

**Start Date:**
Subject to the terms of this letter, this assignment with Starwood will begin on Monday, October 2, 2006.

**Responsibilities:**
Initially, your position will be Senior Vice President, W Development - Global in the Real Estate Group at the W office in New York City and you shall perform such duties and services as are assigned to you by the Company as requested. You shall devote your full time and attention to the affairs of the Company and to your job duties, and use your best efforts and abilities to promote Starwood's interests. You will be reporting to me, though the Company may make changes in your reporting structure, title, and job responsibilities at any time.

In performing your duties, you will be expected to comply at all times with all Starwood policies, procedures and directives as they currently exist or as they may be adopted or changed from time to time.

**Base Salary:**
Your base salary will be $250,000.00 annually, paid in semi-monthly intervals of $10,416.67 and subject to applicable withholdings for FICA, state and federal taxes. The Starwood salary program provides performance-based salary reviews for future salary progression.

**Cost of Living Allowance:**
You will also receive a cost of living allowance expressed in bi-weekly terms; this C.O.L.A. will be $2,083.33 (on an annualized basis equivalent to $50,000) for year one. In year two, this C.O.L.A. will be $1,041.67 (on an annualized basis equivalent to $25,000). Both years will be subject to applicable withholdings for FICA, state and federal taxes and Medicare. There will be no cost of living adjustment in year three. Any subsequent reassignment will result in having the COLA re-evaluated.

**Annual Incentive (Bonus):**
You will be eligible to participate in the Starwood Annual Incentive Plan (AIP). Your target incentive is 60% of base salary. Your actual incentive award will be based upon a variety of factors including company and division performance, and your achieving specified performance criteria to be established and approved with your manager. In the event that changes are made to any of the incentive plans, the changes will apply to you as they do other similarly situated employees of the Company.



Sheraton   FOUR POINTS   ST. REGIS   Luxury Collection   LE MERIDIEN   aloft   W   WESTIN

1111 Westchester Avenue, White Plains, New York 10604   Tel. 914 640-8100

Please note that the AIP provides that a portion of your annual bonus will be deferred and payable in Starwood stock or stock units. The current deferral portion of the bonus is 10% and is payable in Starwood stock having a value on the date of deferral equal to 133% of the amount deferred.

Payment of your 2006 bonus will be delivered according to the regular annual incentive plan payout schedule. An annual bonus shall not be deemed earned by you until the Company has determined your entitlement to such bonus and only if you are employed by the Company at the time such bonus is payable in accordance with the Annual Incentive Plan (AIP) and Company practices. The Company does not pay pro-rata bonuses upon departure.

**Long Term Incentive:**
You will be eligible to participate in Starwood's Long Term Incentive Compensation Plan ("LTIP"). This plan provides for the award of restricted shares at the Company's discretion to high performing executives. The actual number of shares granted, if any, will be based upon your performance.

**Benefits:**
Your original hire date will remain the same for benefit accrual purposes. If your promotion necessitates a change in medical plans, information will be provided to you after your new assignment begins.

**Relocation:**
Starwood has selected Cartus Mobility Services to administer our Relocation Program. Starwood will pay the reasonable, out-of-pocket costs of relocating your family and household furnishings from Brussels to the White Plains, NY area in accordance with the provisions of Starwood's Relocation Program - Plan I Homeowner. Details of Starwood's Relocation Program are enclosed. To be eligible for reimbursement of certain benefits, you are required to utilize the services of an agent in the Cartus Mobility Preferred Network on both departure and destination.

To initiate the moving process, please contact your Human Resources office. You will be assigned to a Client Services Consultant at Cartus Mobility who will provide you with relocation assistance and the names of the Preferred Network agents. In an effort to fully utilize our relocation benefit and avoid additional tax liability, we ask that you do not begin your relocation process before being contacted by your assigned Cartus Client Services Consultant. Please do not sign a Listing Agreement or begin searching for a new home until you have spoken with your Consultant. For questions regarding policy benefits or to register a real estate agent with Cartus, please call 1-800-423-8624.

In the event that you accept this offer of transfer and relocation expenses are paid to you or on your behalf, you agree that if you voluntarily terminate your employment within one year after your first day of employment, you will repay all such relocation expenses, reduced by 1/12 for each full calendar month actually worked. In addition, eligibility for reimbursement of any and all relocation expenses will cease on the last day of employment and any relocation expenses incurred after that date will not be reimbursed by Starwood and will be your responsibility

**Resolution of Disputes:**
From time to time, disagreements and misunderstandings may arise concerning your job responsibilities, performance, compensation, benefits or other matters affecting your employment with Starwood, or one of its affiliated companies. We hope that we will be able to resolve such matters through normal discussions with your immediate managers or Human Resources representatives.

In the event those efforts fail, you and Starwood agree, except as may be prohibited by law or as otherwise excluded by the terms of the attached Mutual Agreement to Arbitrate (**Attachment A**), to submit any and all disputes relating to or arising out of this offer letter, your employment with Starwood or the termination of that employment to final and binding arbitration pursuant to the employment rules then in effect of the American Arbitration Association, which shall be the sole and exclusive remedy for such disputes. Accordingly, you acknowledge and agree that this offer of employment and the benefits provided herein are contingent upon your execution of the Mutual Agreement to Arbitrate provided to you herewith and incorporated herein by reference. In the event that the Mutual Agreement to Arbitrate is determined by a court with appropriate jurisdiction to be unenforceable, you and Starwood Hotels & Resorts Worldwide, Inc. waive any right to a trial by jury on the claims that otherwise would have been subject to the Mutual Agreement to Arbitrate.

**Employment Term:**
While Starwood looks forward to a long and mutually beneficial relationship with you, you should understand that there is no fixed duration for your employment. In accepting this offer, you acknowledge and agree that your employment with the Company is at will, and may be terminated by Starwood at any time, with or without notice and for any or no reason. By signing below, you acknowledge that except for this letter, there is not and shall not be any written contract between you and the Company concerning this offer of employment or your prospective employment, and that nothing in this letter guarantees employment for any definite or specific term or duration or any particular level of benefits or compensation.

**Severance:**
In the event that Starwood terminates your employment for any reason other than "cause," Starwood will pay to you 12 months of your then current base salary, in a lump sum less all applicable withholdings (the "Severance Payment") and it will periodically reimburse you for your COBRA expenses minus your last level of normal contribution for up to 12 months commencing on the termination date. The Severance Payment will be in lieu of any compensation, damage or remedy to which you might otherwise be entitled and will be subject to and conditioned upon (a) your continuing compliance with the Non-Soliciation, Confidentiality and Intellectual Property Agreement refered to below and (b) your signing a written waiver and release of any and all claims against Starwood arising out of or relating to your employment with Starwood. You will not be eligible for any Severance Payment or COBRA reimbursement if you resign from your employment with the Company.

For purposes of this paragraph, "cause," shall mean (i) any material breach by you of any of the duties, responsibilities or obligations of your employment, or any of the policies or practices of Starwood; (ii) your failure or refusal to properly perform, the duties, responsibilities or obligations of your employment, or to properly perform or follow (as determined by Starwood in its reasonable discretion and judgment) any lawful order or direction by Starwood; (iii) any acts or omissions by you that constitute (as determined by Starwood in its reasonable discretion and judgment) fraud, dishonesty, breach of trust, gross negligence, civil or criminal illegality, or any other misconduct or behavior that could (as determined by Starwood in its reasonable discretion and judgment) subject to civil or criminal liability or otherwise adversely affect the business, interests or reputation of Starwood or any of its affiliates.

**Other Conditions and Obligations:**

You acknowledge that you are not subject to any currently effective employment contract, or any other contractual or other binding obligations pursuant to which your employment or employment activities with or on behalf of the Company may be subject to any restrictions. Restrictions include, without limitation, any agreements or other obligations or documents relating to non-competition, confidentiality, trade secrets, proprietary information or works for hire. By signing this letter, you represent to Starwood that there are no agreements or arrangements, whether written or oral, in effect that would prevent or conflict with your full performance of your employments duties and responsibilities to us.

As a further condition of this offer and your right to receive any of the benefits detailed herein, you agree to execute and be bound by a confidentiality and non-solicitation agreement provided to you by the Company (**Attachment B**).

**No Other Assurances:**

You acknowledge that in deciding to sign this offer, you have not relied on any promises, commitments, statements or representations, whether spoken or in writing, made to you by any representative of the Company, except for what is expressly stated herein. This offer replaces and cancels all previous agreements, commitments, and understandings whether spoken or written, if any, that the Company or any representative of the Company may have made in connection with your anticipated employment.

You also acknowledge that this offer is intended as written, and that no marginal notations or other revisions to either this offer, the Mutual Agreement to Arbitrate, or the Non-solicitation, Confidentiality and Intellectual Property Agreement are binding on the Company unless expressly consented to in writing by the Senior Vice President, Human Resources or Starwood's General Counsel. This offer shall be construed, governed and enforced in accordance with the laws of the State of New York, without regard to its conflicts of laws principles.

By signing and returning this letter, you confirm that this letter accurately sets forth the current understanding between you and Starwood and that you accept and agree to the terms as stated above.

Very truly yours,

James Sabatier
Senior Vice President, Global Investments & W Development
Starwood Hotels & Resorts Worldwide, Inc.

ACCEPTED AND AGREED TO:

_____
Amar Lalvani

Oct 12, 2006
Date

Attachment A

## MUTUAL AGREEMENT TO ARBITRATE

In order to gain the benefits of a speedy, impartial, and cost-effective dispute resolution procedure, and for good and valid consideration as covenanted below and in addition to any other consideration, and intending to be legally bound, Starwood Hotels & Resorts Worldwide, Inc. ("Starwood") and I hereby agree that, except as otherwise provided herein, all disputes and claims for which a court otherwise would be authorized by law to grant relief, in any manner, that I may have, now or in the future, during or after my employment with Starwood, of any and every kind or nature whatsoever with or against Starwood, any of Starwood's affiliated or subsidiary companies, partners, joint venturers, owners of properties Starwood manages, and/or any of his, her, its or their directors, officers, employees or agents , or any disputes and claims that Starwood may have against me (collectively, "Claims"), shall be submitted to the American Arbitration Association ("AAA") to be resolved and determined through final and binding arbitration before a single arbitrator and to be conducted in accordance with the National Rules for the Resolution of Employment Disputes of the AAA. Starwood and I agree that the arbitrator will have the authority to grant motions dispositive of all or part of any Claim. Starwood shall be responsible for payment of all arbitrator compensation, AAA filing fees and AAA administrative fees, other than the initial AAA filing fee for which I will be responsible to pay up to a maximum of $125, or as otherwise required by law.

Any reference in this Agreement to Starwood also refers to all of Starwood's affiliated entities, benefit plans, the benefit plans' sponsors, fiduciaries and administrators, and all successors and assigns of any of them.

Starwood and I each have the right to representation by counsel with respect to arbitration of any dispute pursuant to this Agreement. Except as prohibited by law, at the request of either Starwood or me, the arbitration proceedings shall be conducted in confidence, and, in such a case, all documents, testimony, and records shall be received, heard, and maintained by the arbitrator in confidence, available for inspection only by me and Starwood, our respective attorneys, and experts, who shall agree, in advance and in writing, to receive all such information confidentially and to maintain the secrecy of such information until it shall become generally known. Both parties shall be allowed adequate discovery as part of the arbitration process, including reasonable access to essential documents and witnesses as determined by agreement or the arbitrator.

The arbitrator shall conduct a full hearing as to all issues and disputes not resolved by dispositive motion. At such hearing, the parties shall be entitled to present evidence and examine and cross-examine witnesses. The arbitrator shall issue a written decision revealing the essential findings and conclusions upon which any award is based. In addition, the arbitrator shall have authority to award equitable relief, damages, costs, and fees to the extent permitted by law, including, but not limited to, any remedy or relief that a governing court might order.

Starwood and I hereby agree that the Claims subject to arbitration shall include but not be limited to any and all Claims that arise out of or are related to the offer of employment, transfer or promotion extended by Starwood to me, any withdrawal or rescission of that offer, any aspect of my employment with Starwood or the terms and conditions of that employment, any claim for bonus, vacation pay or other compensation, any termination of that employment and any Claim of

discrimination, retaliation, or harassment based upon age, race, religion, sex, creed, ethnicity, pregnancy, veteran status, citizenship status, national origin, disability, handicap, medical condition, sexual orientation or any other unlawful basis, or any other unlawful conduct, under any applicable federal, state, local or other statutes, orders, laws, ordinances, regulations or the like, or case law, that relate to employment or employment practices, including without limitation, Title VII of the Civil Rights Act of 1964, as amended, the Civil Rights Act of 1991, as amended, the Civil Rights Acts of 1866 and 1871, as amended, the Age Discrimination in Employment Act of 1967, as amended, the Americans with Disabilities Act of 1990, as amended, the Family Medical Leave Act of 1993, as amended, the Employee Retirement Income Security Act of 1990, as amended, the Worker Adjustment Retraining and Notification Act, as amended, the Fair Labor Standards Act, as amended, the Vietnam Era Veterans' Readjustment Assistance Act, as amended, the Equal Pay Act, as amended, the Rehabilitation Act, as amended, the Immigration Reform and Control Act, and the state and local analogues to the foregoing.

Starwood and I further agree that the Claims subject to arbitration shall exclude any Claims required by any applicable federal, state, local or other statute or benefit or pension plan to be submitted to an administrative forum (for example, a workers' compensation claim, a claim for unemployment insurance benefits, or an administrative charge of discrimination or retaliation filed with the Equal Employment Opportunity Commission or the state or local analogue to that agency but not litigation arising from such charges), any claims involving any loans or advances paid to me that are subject to any mortgage, promissory note or other similar agreement that I have signed, and any Claims involving solely a monetary dispute within the jurisdiction of a small claims court. Starwood and I further agree that the Claims subject to arbitration also shall exclude any Claims to the extent they involve the alleged taking, use or disclosure of trade secrets and similar confidential or proprietary information, Claims involving a failure to pay a retention bonus or relocation expense, Claims involving a failure to repay any unearned portion of a retention bonus or relocation expense, Claims based upon any employee pension or benefit plan the terms of which contain an enforceable arbitration procedure, in which case the procedure of such plan shall apply, and Claims that cannot be compelled to mandatory arbitration under applicable federal law.

Starwood and I agree that any arbitration award rendered as the result of any arbitration under this Agreement shall be final and binding and may be entered and enforced as a court judgment in accordance with applicable law. Starwood and I further agree that this Agreement, any arbitration under this Agreement and any arbitration award rendered in such arbitration shall be governed by the Federal Arbitration Act.

By entering into this Agreement, Starwood and I each specifically acknowledge and understand that the right to the determination and/or trial of any Claims in court before a judge or a jury is a valuable right, and that by signing this Agreement Starwood and I hereby knowingly and voluntarily waive any and all rights we may have to assert any Claims in any court of competent jurisdiction and to a determination and/or trial before a judge or a jury.

I further understand and acknowledge that this Agreement is not intended to be and shall not be deemed to constitute a contract of employment for any specific duration, and that my employment shall be and remain at will, which means that Starwood and I shall be free to terminate that employment at any time for any or no reason with or without notice and with or without cause.

Each party's promise to resolve Claims by arbitration in accordance with the provisions of this Agreement is consideration for the other party's like promise. Additionally, I enter into this Agreement in consideration of Starwood's employment, transfer or promotion of me.

This Agreement shall survive my employer-employee relationship with Starwood and shall apply to any covered Claim whether arising or asserted during my employment or after the termination of my employment with the Company. This Agreement can be modified or revoked only by a writing signed by both Starwood's Senior Vice President, Human Resources and me and that expressly refers to this Agreement and specifically states an intent to modify or revoke it. This is the complete agreement of the parties on the subject of arbitration of disputes, except for any arbitration provision contained in a pension or benefit plan or an agreement covering change in control benefits and protections.

EACH PARTY TO THIS AGREEMENT ACKNOWLEDGES CAREFULLY READING THIS AGREEMENT, UNDERSTANDING ITS TERMS, AND ENTERING INTO THIS AGREEMENT KNOWINGLY AND VOLUNTARILY AND NOT IN RELIANCE ON ANY PROMISES OR REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS AGREEMENT ITSELF.

EACH PARTY FURTHER ACKNOWLEDGES HAVING THE OPPORTUNITY TO DISCUSS THE AGREEMENT WITH PERSONAL LEGAL COUNSEL AND HAS USED THAT OPPORTUNITY TO THE EXTENT DESIRED.

Dated: Oct 12, 2006

Amar Lalvani

Dated: _____

James Sabatier
Senior Vice President, Global Investments & W Development
Starwood Hotels & Resorts Worldwide, Inc.

# NON-SOLICITATION, CONFIDENTIALITY AND INTELLECTUAL PROPERTY AGREEMENT

This Non-solicitation, Confidentiality and Intellectual Property Agreement ("Agreement") is entered into as of this 9th day of October, 2006, (the "Effective Date"), by and between Starwood Hotels & Resorts Worldwide, Inc. (the "Company") and Amar Lalvani (the "Employee").

WHEREAS, the Company devotes significant time, resources and effort to the training and advancement of its management, and its management team constitutes a significant asset and important competitive advantage; and

WHEREAS, the Employee has and will have access to important and sensitive confidential information; and

WHEREAS, the Company has determined that it is in the best interests of the Company and its shareholders to enter into an agreement with Employee whereby Employee will be prohibited from soliciting employees of the Company in accordance with the terms and conditions of this Agreement; and

WHEREAS, Employee may create inventions, trade secrets, know-how and documents or other works of authorship and may appear or perform in various promotional materials within the scope of Employee's employment.

WHEREAS, in consideration of the Company's offer of employment, Employee agrees to enter into this Agreement.

THEREFORE, the Company and Employee agree as follows:

1.      Non-solicitation.  During the period in which Employee is employed by the Company, and for a period of one (1) year following the date of any termination of employment from the Company, Employee shall not, without the prior written consent of the Company, except in the course of carrying out Employee's duties hereunder, directly or indirectly solicit or attempt to solicit for employment with or on behalf of any corporation, partnership, joint venture or other business entity, any person who is, or at any time during the six-month period preceding the solicitation of such person was, a management-level employee of the Company (including, without limitation, for this purpose any director level employee of the Company and any General Manager of any hotel owned (in whole or in part) or managed by the Company).

2.      Confidentiality.  Employee acknowledges that during the course of his/her employment with the Company, Employee will receive, and will have access to, "Confidential Information," as such term is defined below, of the Company and that such information is a special, valuable and unique asset belonging to the Company.  Accordingly, Employee is willing to enter into the covenants contained in this Agreement in order to provide the Company with what Employee considers to be reasonable protection for the Company's interests.  All notes, memoranda, papers, documents, correspondence or writings (which shall include information recorded or stored in writing, on magnetic tape or disc, or otherwise recorded

or stored for reproduction, whether by mechanical or electronic means and whether or not such reproduction will result in a permanent record being made) ("Documents") which from time to time may be in Employee's possession (whether prepared by Employee or not) relating, directly or indirectly, to the business of the Company shall be and remain the property of the Company and shall be delivered by Employee to the Company immediately upon request, and in any event promptly upon termination of Employee's employment, and Employee shall not make or keep any copies or extracts of the Documents. At any time during or after Employee's employment with the Company ends, without the prior written consent of the Company, except (i) in the course of carrying out Employee's duties hereunder or (ii) to the extent required by a court or governmental agency, or by applicable law or under compulsion of legal process, Employee shall not disclose to any third person any information concerning the business of the Company, including, without limitation, any trade secrets, customer lists and details of contracts with or requirements of customers, the identity of any owner of a managed hotel, information relating to any current, past or prospective management agreement or joint venture, information pertaining to business methods, sales plans, design plans and strategies, management organization, computer systems and software, operating policies or manuals, personnel records or information, information relating to current, past or contemplated employee benefits or compensation data or strategies, business, financial, development or marketing plans, or manpower strategies or plans, financial records or other financial, commercial, business or technical information relating to the Company (collectively, "Confidential Information"), unless such Confidential Information has been previously disclosed to the public by the Company or is in the public domain (other than by reason of Employee's breach of this Section 2). Employee will, prior to making any such disclosure pursuant to subsection (ii), promptly notify the Company of his/her receipt of such process or requirement, consult with the Company on the advisability of taking steps to resist or narrow such request, cooperate with the Company in any attempt that the Company may make to obtain a court order or other reliable assurance that confidential treatment will be accorded to all or designated portions of such information, and not disclose such Confidential Information unless the Company shall have had reasonable opportunity to obtain a court order prohibiting or limiting such disclosure.

2.1    Employee agrees that, both during and after Employee's employment with the Company, if Employee is uncertain of whether or not information is confidential, Employee will treat that information as Confidential Information until Employee has received written verification from an authorized officer of the Company that the information is not Confidential Information.

3.    Intellectual Property and Publicity Rights. Employee acknowledges and agrees that all right, title and interest in and to patents, patent applications, inventions, improvements, discoveries, developments, processes, business methods, technical information, know-how, trade secrets, computer programs, writings, designs, copyrights, maskworks, trademarks, service marks, trade names, trade dress and the like (collectively, "Intellectual Property"), including the right to invoke the benefit of the right of priority provided by any treaty to which the United States is a party, which Employee creates, conceives, develops or obtains, either solely or jointly with others, during Employee's employment with the Company (a) with the use of the Company's time, materials, facilities or other resources; or (b) resulting from or suggested by Employee's work for the Company; or (c) in any way relating to any subject matter relating to the existing or contemplated business, products and services of the Company or the Company's affiliates, subsidiaries and licensees shall be owned by the Company. Upon request, Employee shall execute all such assignments and other documents and take all such other action as the Company may reasonably request in order to vest in the Company, or its nominee, all of Employee's right, title, and interest in and to such Intellectual Property. Employee further

acknowledges and agrees that the Company shall have the perpetual, worldwide right to use Employee's name, performance, biography, voice, image, signature and likeness in promotional or any other materials developed by or for the Company during Employee's employment with the Company. Employee hereby irrevocably and unconditionally waives any and all rights that he/she has or may have in and to the Intellectual Property, including, without limitation, any "moral rights" that he/she has or may have as "author" of the Intellectual Property, and hereby expressly agrees not to make any claim or demand against the Company or any party authorized by the Company to exploit the Intellectual Property.

4.    Equitable Relief.

4.1    Employee acknowledges that the restrictions and obligations specified in Sections 1, 2 and 3 hereof are reasonable in view of the nature of the business in which the Company is engaged and Employee's knowledge of, and responsibilities with respect to, the Company's business, and that any breach of Sections 1, 2 or 3 hereof may cause the Company irreparable harm for which there is no adequate remedy at law, and as a result of this, the Company will be entitled to the issuance by a court of competent jurisdiction of an injunction, restraining order or other equitable relief in favor of the Company, without the necessity of posting a bond, restraining Employee from committing or continuing to commit any such violation. Any right to obtain an injunction, restraining order or other equitable relief hereunder will not be deemed to be a waiver of any right to assert any other remedy the Company may have at law or in equity, including, without limitation, the right to cancel payments to which Employee is otherwise entitled under Employee's employment agreement.

4.2    Any proceeding or action seeking equitable relief for violation of Sections 1, 2 and 3 hereof may be commenced in the federal courts in the Southern District of the State of New York, or in the absence of federal jurisdiction in state court in the State of New York. Employee hereby irrevocably and unconditionally submits to the exclusive jurisdiction of such courts and agrees to take any and all future action necessary to submit to the jurisdiction of such courts. Employee irrevocably waives any objection that Employee now has or hereafter may have to the laying of venue of any suit, action or proceeding brought in any such court and further irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. Final judgment against Employee in any such suit will be conclusive and may be enforced in other jurisdictions by suit on the judgment, a certified or true copy of which will be conclusive evidence of the fact and the amount of any liability therein described, or by appropriate proceedings under an applicable treaty or otherwise.

5.    Severability.  In the event that any provision of this Agreement conflicts with the law under which this Agreement is to be construed, and/or if any such provision is held invalid by a court with jurisdiction over the parties to this Agreement and the subject matter of this agreement, (a) such provision will be deemed to be restated to reflect as nearly as possible the original intentions of the parties to the fullest extent permitted under applicable law, and (b) the remaining terms and provisions of this Agreement will remain in full force and effect.

6.    Governing Law.  This Agreement shall be construed, governed and enforced according to the laws of the State of New York, without regard to the principles of conflicts of laws.

7.    Amendments and Waivers.  No failure to act by the Company will waive any right contained in this Agreement.  No provision of this Agreement may be amended or waived, except by a written agreement signed by both Employee and an authorized executive

officer of the Company.  Any waiver by the Company of strict performance of any provision of this Agreement shall not be a waiver of or prejudice the Company's right to require strict performance of that same provision or any other provision of the Agreement in the future.

Employee acknowledges that he/she has had a reasonable opportunity to review and consider the terms described above and to consult with an attorney if he/she so chooses prior to signing this Agreement.  Fully understanding the above terms, Employee is entering into this letter agreement knowingly and voluntarily.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement on the day and year first above written.

Dated: _Octobor 12, 2006_ _____
                              Amar Lalvani

Dated: _____ _____
                              James Sabotier
                              Senior Vice President, Global Investments & W Development
                              Starwood Hotels & Resorts Worldwide, Inc.

Exhibit 3

)                                    )

## SEPARATION AGREEMENT AND MUTUAL GENERAL RELEASE OF CLAIMS

Ross Klein (hereinafter referred to as "Employee") and Starwood Hotels & Resorts Worldwide, Inc. (hereinafter referred to as the "Company") agree as follows:

ONE:  Termination of Employment.

Employee acknowledges that his employment with the Company will end upon his resignation, which he hereby tenders and which will be effective May 30, 2008 (hereinafter referred to as the "Termination Date").  After the Termination Date, Employee will perform no further duties, functions or services for the Company or any of its affiliates, nor will he be entitled to any further compensation and/or benefits except as described herein.

TWO:  Benefits.

In consideration for Employee's agreements and covenants including the release of claims set forth in this Agreement and as full and complete and final satisfaction of any and all claims which Employee had, has or may have against the Company through the date of execution of this Agreement, the Company agrees that after its receipt of this fully executed Agreement, provided that Employee does not revoke pursuant to Paragraph EIGHT herein, it will (i) pay Employee an amount equal to 12 months of his base salary in a lump sum of $496,116.00, less applicable deductions within 10 business days of the date when this Agreement becomes binding; (ii) make COBRA premium payments on Employee's behalf, minus Employee's normal contributions, for a period of 12 months commencing on the Termination Date should Employee choose to continue coverage under the Company's applicable plans; (iii) pay Employee $59,475.00, less applicable deductions, within 10 business days of the date when this Agreement becomes binding, which amount represents one half of the initial HOT Feature deduction of $118,950.00 made on March 1, 2007 under the Company's Annual Incentive Plan; and (iv) pay Employee $106,635.00, less applicable deductions, within 10 business days of the date when this Agreement becomes binding, which amount represents the full amount of the HOT Feature deduction made on March 1, 2008 under the Company's Annual Incentive Plan.  Employee also shall be entitled to receive a payout for accrued and unused vacation time as of the Termination Date in accordance with the Company's policies.

THREE:  Mutual General Release.

In exchange for the agreement to provide the severance pay and other benefits and arrangements provided for in this Agreement, Employee, on behalf of himself and his heirs, dependents, beneficiaries, executors, administrators, representatives, successors, and assigns, hereby irrevocably, fully and unconditionally releases and discharges the Company and its affiliates and subsidiaries and its and their officers, directors, employees, agents, shareholders, employee benefit programs, administrators, insurers, attorneys and successors and assigns (collectively "Releasees"), from any and all claims, actions, suits, damages, complaints and

1

grievances the Employee, his attorneys, heirs, dependents, beneficiaries, executors, administrators, successors, and assigns, ever had, now have or hereafter can, shall or may have of any nature whatsoever, whether in law or in equity, whether known or unknown, including any and all claims related to the Employee's employment with the Company or the termination of that employment. This includes a release of any rights or claims the Employee may have under the **Age Discrimination in Employment Act**, which prohibits discrimination in employment based on age; Title VII of
the Civil Rights Act of 1964, as amended, and the Civil Rights Act of 1991, which prohibit discrimination in employment based on race, color, national origin, ancestry, religion or sex; the Pregnancy Discrimination Act, which prohibits discrimination based on pregnancy; the Equal Pay Act, which prohibits paying men and women unequal pay for equal work; the Civil Rights Acts of 1866 and 1871, as amended, which protect against certain discrimination and violations of individuals' civil rights; the Americans with Disabilities Act, which prohibits discrimination on the basis of physical or mental disability; the Employee Retirement Income Security Act (ERISA), which regulates certain conduct and practices relating to employee benefit and health plans; the Family and Medical Leave Act, which provides time off to employees for certain family and medical events and prohibits discrimination relating to such leaves of absence; the Immigration Reform and Control Act, which prohibits discrimination based upon an individual's national origin citizenship status and/or work authorization documents; the Older Worker Benefit Protection Act (OWBPA) the New York State Executive Law, the New York City Administrative Code, and the New York State Constitution; or any other federal, state or local laws or regulations prohibiting employment discrimination or regulating employment or termination of employment. This also includes a release by the Employee of any claims for wrongful discharge and any other common law claims. This release applies to all claims through the date of execution of this Agreement and covers both claims that the Employee knows about and those he may not know about but excludes (i) any claim by Employee to enforce the terms of this Agreement; and (ii) any claim to enforce Employee's indemnification rights; and (iii) any claims related to actions or omissions occurring after the execution of this Agreement.

In consideration of Employee's agreements hereunder, the Company, on its own behalf and on behalf of its current and former affiliates or related companies, subsidiaries, branches and divisions, and the successors and assigns of all of the foregoing (collectively, the "Company Releasor") hereby releases Employee and Employee's heirs, executors, administrators, successors and assigns from or in connection with any and all actions, claims or demands, known or unknown and of any nature whatsoever and which Company Releasor ever had, now has or hereafter can, shall or may have as of the date hereof relating to Employee's employment with the Company, except that this Release shall not apply to (i) any obligation of Employee pursuant to this Agreement and the Non-Solicitation, Confidentiality and Intellectual Property Agreement dated May 1, 2005 (the "Confidentiality Agreement"); (ii) any act by Employee during his employment that would constitute fraud or embezzlement; or (iii) any actions, claims or demands related to actions or omissions occurring after the date hereof.

       FOUR: Acknowledgment of Full Payment.

Employee acknowledges that the payments and arrangements specified in Paragraph TWO above represent sufficient consideration for Employee's release of claims and the other covenants contained in this Agreement. Employee expressly acknowledges that the severance pay provided for in this Agreement exceeds, supersedes and extinguishes any amount, if any, to which Employee may be entitled under any employment agreement, verbal or written, as well as any employment or personnel policies, procedures or handbooks including but not limited to severance plans, policies or precedent utilized by the Company or any other legal obligation which the Company may have to Employee. Employee further acknowledges that in the absence of this Agreement, Employee would not be entitled to, among other things, all of the payments and benefits specified in paragraph TWO above. Other than Employee's accrued but unused vacation pay for which Employee will be compensated and Employee's 401k plan benefits, Employee also acknowledges that the Company has paid all sums owed to him as a result of his employment with the Company and/or the termination of that employment and that, other than as provided in this Agreement, Employee is not entitled to, among other things, any further pay, benefits or severance.

Employee and the Company acknowledge and agree that to the extent that Employee currently holds stock options and restricted stock, that this information is accurately set forth on Exhibit A attached hereto, Employee has no other rights that relate to the securities of the Company or any of its affiliates or subsidiaries and that such equity will expire in accordance with the applicable long-term incentive plan and/or stock option agreements and/or restricted stock agreements. Other than the fact that Employee's employment was terminated on the Termination Date and other than as detailed expressly in Paragraph TWO herein, nothing in this Agreement shall be construed to alter, amend or modify the terms and conditions governing any restricted stock, stock options or similar rights, and any rights pertaining thereto, granted to Employee prior to the Termination Date.

   FIVE:  Termination of All Existing Agreements.

Except as otherwise expressly provided herein and other than agreements relating to confidentiality, non-solicitation and non-disclosure, including, without limitation, the Confidentiality Agreement, all rights and obligations of the Company and Employee under any employment agreement Employee may have had with the Company, and any other agreement, arrangement, obligation or understanding between the Company and the Employee are hereby cancelled and terminated as of the Termination Date without liability of any party thereunder.

   SIX:  Non-Admission of Liability.

The parties have entered into this Agreement to effect a mutually acceptable termination of Employee's employment with the Company. Neither the Company nor the Employee believes nor admits that either or both of them have done anything wrong.

   SEVEN:  Period for Review and Consideration of Agreement.

3

Employee understands that he has been given a period of 21 calendar days to review and consider this Agreement. Employee further understands that he may take as much or as little of this 21-day period of time to consider this Agreement as he wishes, before signing this Agreement.

EIGHT: Revocation Period and Payment of Benefits.

This Agreement will not become effective or binding on the parties until seven (7) days after it is signed, during which time Employee may revoke this Agreement if he desires. Any revocation must be in writing and directed to Chief Administrative Officer and General Counsel, 1111 Westchester Avenue, White Plains, NY 10604.

NINE: Encouragement to Consult with Attorney.

Employee is encouraged to consult with an attorney before signing this Agreement. Employee understands that whether to do so is his decision.

TEN: Binding Agreement.

This Agreement shall be binding upon and inure to the benefit of the parties, as well as their heirs, administrators, representatives, agents, executors, successors and assigns.

ELEVEN: Arbitration.

Any controversy, dispute or claim arising out of or related to this Agreement or its enforceability shall be finally settled by final and binding arbitration conducted by a single arbitrator selected by the parties in accordance with the Employment Rules of the American Arbitration Association.

TWELVE: Confidentiality.

Employee represents and agrees that he will keep the terms and dollar amount contained in this Agreement confidential, and that he will not disclose any information concerning this Agreement to any third person, including, but not limited to any past or present employee of the Company, except as may be required by law. Nothing herein shall preclude Employee from disclosing the terms of this Agreement to his spouse or to his accountant, legal counsel, insurer or tax advisors; provided that his spouse and such accountant, legal counsel, insurer or tax advisors are advised of and agree to be bound by the provisions of this Paragraph. Employee acknowledges that he will be responsible for any violation of the terms of this Paragraph TWELVE by any of those persons.

THIRTEEN: Confidential Information.

As a senior executive of the Company, Employee acknowledges that he has had access to Confidential Information (as hereinafter defined) of the Company through the Termination Date. Without limiting Employee's continuing legal obligations pursuant to the

4

Confidentiality Agreement, in recognition of Employee's legal obligations and the consideration set forth in this Agreement, Employee agrees not to disclose, communicate or divulge to, or use for the direct or indirect benefit of, any person (including Employee), firm, association or other entity (other than the Company or its affiliates) any Confidential Information.

"Confidential Information" includes, but is not limited to, customer lists, customer financial information, vendor lists, joint venture lists, actual, contemplated and potential development projects, opportunities and partners, development strategies, brand marketing and other brand strategies, information relating to any current, past or prospective management agreement or joint venture, design plans and strategies, personnel information, labor and personnel strategies, databases, computer programs and software, frameworks, designs, models, blueprints, marketing programs and plans, sales, financial, design, training and technical information and plans, sales data and contacts, business methods, business policies, procedures, techniques, research or development projects or results, trade secrets (which includes the Company's customer and prospective customer lists), pricing policies, financial records, or other financial, commercial, business or technical information relating to the Company or any of its subsidiaries.  Employee's obligation with respect to Confidential Information shall terminate with respect to any particular portion of the Confidential Information when Employee can document that such information was in the public domain at the time of its communication or it entered the public domain through no fault of Employee.

Employee hereby represents and agrees that on or before the Termination Date:  (i) Employee has returned or will return to the Company, and has not retained or will not retain originals or any copies of all documents, records or materials of any kind, whether written or electronically created or stored, which contain, relate to or refer to any Confidential Information ("Confidential Materials"); and (ii) Employee has not disclosed and will not disclose any Confidential Information or Confidential Materials to any person or entity without the express written authorization of an authorized officer of the Company.

In the event that Employee receives a subpoena or any other written or oral request for disclosure or release of any Confidential Information, Confidential Materials or any other information concerning the Company or its subsidiaries, or its or their current or former employees, officers, directors, shareholders or agents, Employee shall, within two (2) business days of the service or receipt of such subpoena or other request notify the Company in writing directed to Chief Administrative Officer and General Counsel, Starwood Hotels & Resorts Worldwide, Inc., 1111 Westchester Avenue, White Plains, New York 10604 and provide the Company with a copy of any subpoena or other written request, or disclose the nature of the request for information, if oral.

FOURTEEN:  Noninterference.

During the period commencing on the Termination Date and ending on the first anniversary of the Termination Date, Employee solely with respect to matters of which he is aware on or before the Termination Date, shall not take or omit to take any action or actions which are intended to or actually cause or encourage any person or prospective entity with which the

5

Company intends to enter into a business relationship or transaction (or any agent or affiliate thereof) to fail to enter into the contemplated business relationship or complete the contemplated transaction. Without limiting the generality of the foregoing, Employee agrees not to pursue on his behalf or on behalf of any other person or entity or otherwise interfere with the Company's pursuit of any pending or contemplated deal, merger or acquisition of which he was aware on or before the Termination Date.

FIFTEEN:  Non-Disparagement.

Employee agrees not to engage in any act or say, publish or disseminate anything (either directly or by or through another person) that is intended, or may reasonably be expected, to harm the reputation, business or operations of the Company, its customers, its employees, officers, directors or shareholders prior to or after the Termination Date. The Company agrees that it will not make any statements that are intended, or would reasonably be expected, to disparage or defame Employee.

SIXTEEN:  Future Cooperation.

After the Termination Date, Employee will comply with reasonable requests from any Releasee for assistance and/or information in connection with any matters and/or issues relating to or encompassed within the duties and responsibilities of Employee's employment, including without limitation, consulting with any of the employees and/or attorneys of any Releasee with respect to, and/or appearing as a witness in, any dispute, controversy, action or proceeding of any kind. Employee agrees to appear as a witness in any proceeding of any kind and to make himself available in advance for reasonable preparation upon the request of the Company with reasonable advance notification without the need for the Company to issue a subpoena. In connection with any of Employee's cooperation efforts mandated by this Paragraph SIXTEEN, Employee shall be entitled to receive an agreed hourly or per diem amount (or reimbursement of lost wages as the case may be) and reimbursement of reasonable travel and other out of pocket expenses provided that those expenses are submitted pursuant to and are in conformance with the then applicable Company policy relating to expense reimbursement.

SEVENTEEN:  Non-Solicitation

During the 12-month period commencing on the Termination Date, Employee agrees that he will not, without the prior written consent of the Company, directly or indirectly, solicit or attempt to solicit for employment with or on behalf of any corporation, partnership, joint venture or other business entity, any person who is, or at any time during the six-month period preceding the solicitation of such person was, a management-level employee of the Company (including, without limitation, for this purpose any employee at director level or above and any General Manager of any hotel owned (in whole or in part) or managed by the Company).

EIGHTEEN:  Injunctive Relief

6

Employee acknowledges and agrees that Paragraphs THIRTEEN, FOURTEEN, FIFTEEN and SEVENTEEN hereof relate to special, unique and extraordinary matters and that a violation of any of the terms of such Paragraphs will cause the Company irreparable injury for which adequate remedies are not available at law. Therefore, Employee agrees that the Company shall be entitled to an injunction, restraining order or such other equitable relief (without the requirement to post bond) in a court of law restraining Employee from committing any violation of the covenants and obligations contained in Paragraphs THIRTEEN, FOURTEEN, FIFTEEN and SEVENTEEN. These remedies are cumulative and are in addition to any other rights and remedies the Company may have at law or in equity.

NINETEEN: Return of Company Property.

Employee agrees that within 1 week after the Termination Date, he will return to the Company all Company property in his possession or over which he has retained control such as printers, scanners and accessories, disks, laptops, computers, PDA's, such as Blackberry devices, keys, cell phones, credit cards, access cards, Company records, documents and files and all copies and recordings thereof. To the extent Employee subsequently discovers Company property in his possession or within his control, he shall immediately return such property and all copies, recordings or duplicates thereof to the Company.

TWENTY: Severability.

If any portion of this Agreement is declared unlawful or unenforceable, the remaining parts will remain enforceable.

TWENTY-ONE: Public Announcement

Employee is required to request and receive approval of the Company of the content of any voluntary statements, whether oral or written, to be made by Employee to any third party or parties regarding Employee's separation from employment with the Company, including, without limitation, any press release or other statements to the press, except that this Paragraph TWENTY-ONE shall not apply to any statements required to be made by reason of law, regulation, or any judicial or other similar proceeding or order. Employee hereby covenants and agrees not to make any public statements (either directly or by or through another person) to any third party, including, without limitation, to any representative of any news organization, which are inconsistent in any material respect with the aforementioned agreed upon statements to the public.

7

TWENTY-TWO:  Entire Agreement.

This Agreement, including Exhibits A hereto, is the entire agreement between Employee and the Company regarding the subjects addressed in this document and this Agreement supersedes any other agreements between the parties, other than agreements relating to confidentiality, non-disclosure and non-solicitation, including without limitation, the Confidentiality Agreement.  The Company has made no promises to Employee other than those in this Agreement.

EMPLOYEE ACKNOWLEDGES THAT HE HAS READ THIS AGREEMENT, UNDERSTANDS IT, HAS TAKEN SUFFICIENT TIME TO CONSIDER IT AND IS VOLUNTARILY ENTERING INTO IT.

EMPLOYEE UNDERSTANDS THAT THIS AGREEMENT CONTAINS A RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS AND A RESTRICTION ON RELEASE OF CONFIDENTIAL INFORMATION.

ROSS KLEIN

Signed: _____

Dated: _____

STARWOOD HOTELS & RESORTS WORLDWIDE, INC.

By: _____
Name: JEFFREY M. CAVA
Title: EVP-Chief HR Officer

Dated: 5/30/08

8

**EXHIBIT A**

**[Equity Statement]**

1

# Exhibit 4



**STARWOOD**
HOTELS & RESORTS WORLDWIDE, INC.

Keith D. Grossman
Senior Vice President and Deputy General Counsel

August 26, 2008

**VIA FEDERAL EXPRESS**

Mr. Ross Klein
Global Head of Luxury & Lifestyle Brands
Hilton Hotels Corporation
9336 Civic Center Drive
Beverly Hills, CA  90210

Dear Mr. Klein:

As you know, you resigned your employment with Starwood Hotels & Resorts Worldwide, Inc. (the "Company") effective May 30, 2008. In connection with your resignation from the Company, you executed a Separation Agreement and Mutual General Release of Claims (the "Agreement"). This letter is to remind you of your continuing obligations under the Agreement, including, among other things, to refrain from directly or indirectly soliciting certain employees of the Company.

As you no doubt are aware, Erin Shaffer has resigned from her employment with Starwood and has accepted employment as Senior Director of Luxury Portfolio Marketing Strategies and Communications with your current employer, the Hilton Hotel Group ("Hilton"). At this time, we assume that the Hilton Hotel Group's recruitment and offer of employment, as well as Ms. Shaffer's decision to resign from the Company, was not a result of any direct or indirect solicitation by you. We trust that any future recruitment or hiring by Hilton will not be a result of your direct or indirect solicitation of employees of the Company.

We also wish to remind you of your obligations not to disclose or use the Company's Confidential Information (as defined in the Agreement). You remain responsible for safeguarding such Confidential Information and for any damages that may result from your possession and/or use of such information.

Sincerely,

Keith D. Grossman

cc:    Richard M. Lucas, Esq., EVP and General Counsel

Sheraton    Four Points    ST. REGIS    LUXURY COLLECTION    HOTELS    WESTIN

1111 Westchester Avenue, White Plains, New York 10604-3500   Tel: 914 640 8233   Fax: 914 640 8277   keith.grossman@starwoodhotels.com

Exhibit 5

# HOGAN &
# HARTSON

Hogan & Hartson LLP
875 Third Avenue
New York, NY 10022
+1.212.918.3000 Tel
+1.212.918.3100 Fax

www.hhlaw.com

November 17, 2008

Michael Starr
Partner
(212) 918-3638
mstarr@hhlaw.com

_**VIA FEDERAL EXPRESS**_

Mr. Ross A. Klein
1354 Miller Place
Los Angeles, CA 90069

Re:  _In the Matter of the Arbitration Between Starwood_
     _Hotels & Resorts Worldwide, Inc. and Ross A. Klein_

Dear Mr. Klein:

This firm represents Starwood Hotels & Resorts Worldwide, Inc. ("_Starwood_") in the arbitration that Starwood has commenced against you pursuant to the Separation Agreement and Mutual General Release of Claims, that you signed on May 29, 2008.

This letter is to advise you that in connection with this arbitration we will, at the appropriate time, seek documents in your possession, custody or control that are relevant to the issues in this action. Accordingly, you should take care not to delete or destroy any hard copy or electronic documents and/or e-mails that you have in your files or on your computer(s), including the non-intentional deletion of electronically-stored information by automatic processes. Such documents include but are not necessarily limited to the following:

- Documents or e-mails concerning the hiring and recruitment of Jeffrey Darnell, Amar Dalvani, Erin Shaffer, or Stephanie Heer by Hilton Hotel Corporation ("_Hilton_");

- E-mails from or to you, including indirectly to you as a recipient who was "cc'd" or "bcc'd," concerning Hilton's hiring and recruitment of Jeffrey Darnell, Amar Dalvani, Erin Shaffer, and Stephanie Heer;

- Documents or e-mails concerning any attempted or actual recruitment or solicitations, by Hilton, including by any persons who were at the time of such solicitation or recruitment, employed by Hilton, of any other person who at the time of such activity, was a management-level employee of Starwood, whether or not that person was actually hired by Hilton; and

Mr. Ross A. Klein
November 17, 2008
Page 2

- Documents or e-mails concerning any other person who at the time of his or her hiring, or immediately preceding his or her hiring by Hilton, was a management-level employee of Starwood.

Please understand that the destruction or altercation in any way, of the documents that may be needed by Starwood in a legal proceeding, is a serious matter and may be wrongful on your part. We expect your full compliance with this request.

Very truly yours,

Michael Starr

MS:scc

cc:        Jamie E. Balanoff, Esq.

Exhibit 6

# HOGAN & HARTSON

Hogan & Hartson LLP
875 Third Avenue
New York, NY 10022
+1.212.918.3000 Tel
+1.212.918.3100 Fax

www.hhlaw.com

November 17, 2008

Michael Starr
Partner
(212) 918-3638
mstarr@hhlaw.com

*VIA FEDERAL EXPRESS*

Richard M. Lucas, Esq.
EVP & General Counsel
Hilton Hotels Corporation
9336 Civic Center Drive
Beverly Hills, CA  90210

Re:  *In the Matter of the Arbitration Between Starwood*
     *Hotels & Resorts Worldwide, Inc. and Ross A. Klein*

Dear Mr. Lucas:

This firm represents Starwood Hotels & Resorts Worldwide, Inc. ("*Starwood*") in a certain arbitration that Starwood has commenced against your employee, Ross Klein, pursuant to the Separation Agreement and Mutual General Release of Claims, that he signed with Starwood on May 29, 2008.

While we cannot at this time disclose to you the precise nature of the claims asserted, we have reason to believe that Hilton Hotel Corporation ("*Hilton*") is likely to have documents that are relevant to the issues raised in that proceeding.  As such, at the appropriate time we intend to seek a subpoena for the production of relevant documents in Hilton's possession, custody or control.  In the interim, we urge that Hilton take care not to delete or destroy any hard copy or electronic documents and/or e-mails stored in shared or personal networks or hard copy files of the corporation or its employees that could bear on this litigation. Hilton's preservation efforts should include prevention of routine destruction of documents pursuant to the corporation's regular document retention policies or the non-intentional deletion of electronically-stored information by automatic processes.

The documents that Starwood may seek in connection with this proceeding include but are not necessarily limited to the following:

- Personnel files of Jeffrey Darnell, Amar Dalvani, Erin Shaffer, and Stephanie Heer;

Richard M. Lucas, Esq.
November 17, 2008
Page 2

- Documents or e-mails concerning Hilton's hiring and recruitment of Jeffrey Darnell, Amar Dalvani, Erin Shaffer, and Stephanie Heer;

- E-mails from or to Ross Klein, including indirectly to Mr. Klein as a recipient who was "cc'd" or "bcc'd," concerning Hilton's hiring and recruitment of Jeffrey Darnell, Amar Dalvani, Erin Shaffer, and Stephanie Heer;

- Documents or e-mails concerning any attempted recruitment by Hilton of any other person who at the time of the recruiting effort, was a management level employee of Starwood, whether or not that person was actually hired by Hilton; and

- Documents or e-mails concerning any other person who at the time of his or her hiring or immediately preceding his or her hiring by Hilton, was a management level employee of Starwood.

We are sure that you understand that the destruction or alteration in any way of documents that may be needed by Starwood as evidence in a legal proceeding is a serious matter and may be wrongful. Now that this matter has been brought to Hilton's attention, we expect its full cooperation.

Very truly yours,

Michael Starr

MS:scc

cc: Jamie E. Balanoff, Esq.

Exhibit 7



## Hilton

February 5, 2009









Kenneth S. Siegel
Chief Administrative Officer & General Counsel
Starwood Hotels and Resorts Worldwide, Inc.
1111 Westchester Avenue
White Plains, NY 10604

Dear Ken:

  In connection with an arbitration proceeding that Starwood has pending against Ross Klein, you requested that Hilton Hotels Corp. preserve all potentially responsive documents and information in our possession, custody and control. In the process of implementing a litigation hold of such materials, we learned that Ross had certain materials that he developed or obtained while working for Starwood. Starwood apparently boxed up and shipped most of the materials to Ross at Hilton after he left Starwood and after Starwood barred him from entering his office. Based on a cursory review of these documents by counsel, it appears that at least some of the materials might be the type that Ross's separation agreement with Starwood requires him to return to Starwood. With the concurrence of Ross and his attorneys, we are returning them to you.

  After learning about the materials that Ross had, Hilton's Legal Department took possession of the materials and restricted access to them. Hilton's Legal Department also inquired whether other Hilton employees who formerly worked for Starwood had similar materials, and we determined that some of them also brought to Hilton documents or materials that they developed or acquired while they worked for Starwood. Hilton's Legal Department similarly took possession of those materials, preserved them, and restricted access to them. We also are taking steps to ensure that no such materials remain at Hilton.

  In short, we have conducted a diligent and thorough search of physical and electronic files to collect documents and materials brought to Hilton by former Starwood employees. Enclosed with this letter are the materials we have collected, along with some additional materials that certain of the former Starwood employees had at home. While much of the materials appear to be publicly available or historic in nature, and seem to be neither sensitive nor confidential, we are returning them nonetheless in an abundance of caution.

Sincerely,

Richard M. Lucas
Executive Vice President, General
Counsel and Corporate Secretary

Encls.
 Cc: Ronald J. Nessim (without encls.)

official sponsor   {000011-999999 RS0002.DOC; 1}

Hilton Hotels Corporation World Headquarters
9336 Civic Center Drive • Beverly Hills, CA 90210
• hiltonfamily.com

# Exhibit 8

# BIRD | MARELLA

### BIRD • MARELLA • BOXER • WOLPERT • NESSIM • DROOKS & LINCENBERG

A PROFESSIONAL CORPORATION

Ronald J. Nessim
rjn@birdmarella.com

1875 Century Park East, 23rd Floor
Los Angeles, California  90067-2561
Telephone (310) 201-2100
Facsimile (310) 201-2110
www.BirdMarella.com

File 3541.2

February 9, 2009

**Via E-Mail and U.S. Mail**

Michael Starr
Hogan & Hartson LLP
875 Third Avenue
New York, NY  10022

Re:    Arbitration Dispute - Klein and Starwood Hotels

Dear Michael:

In connection with the litigation hold that Hilton implemented in connection with the pending arbitration proceeding against Ross Klein, we and Hilton became aware that Ross had certain Starwood materials in his possession, the vast majority of which was shipped by Starwood to Ross at Hilton, along with other contents of his office, after he left Starwood.

At least some of these materials might be the type that Ross' Separation Agreement with Starwood requires him to return to Starwood, and we agreed with Hilton that in abundance of caution, these documents should be returned to Hilton. Rich Lucas, Hilton's General Counsel, sent those documents, as well as other Starwood documents possessed either at Hilton or at home by other Starwood former employees now at Hilton, to Ken Siegel at Starwood last Friday. We are now also representing these other former Starwood employees, and if you have any questions concerning the document return, do not hesitate to contact us or Hilton's counsel.

On a related but separate note, we have not heard anything from you or AAA since we stipulated in December to move the pending arbitration from New York to Los Angeles. Please call me at your convenience to discuss issues related to the

| | | | | |
|---|---|---|---|---|
| Sharon Ben-Shahar | Jennifer S. Chang | Jason B. Kogan | Bonita D. Moore | Ekwan E. Rhow |
| Terry W. Bird | Orly Degani | Lisa M. Lawrence | Ronald J. Nessim | John K. Rubiner |
| Joel E. Boxer | Mark T. Drooks | Benjamin D. Lichtman | Angela E. Oh | Peter J. Shakow |
| Eric E. Bronson | Thomas R. Freeman | Gary S. Lincenberg | Thomas V. Reichert | Dorothy Wolpert |
| Paul S. Chan | Benjamin N. Gluck | Vincent J. Marella | Jean Y. Rhee | Steven K. Yoda |
| | | Marc E. Masters | | |

BIRD | MARELLA
BIRD • MARELLA • BOXER • WOLPERT • NESSIM • DROOKS & LINCENBERG

Michael Starr
Jessica P. Feingold
February 9, 2009
Page 2

arbitration, including timing, Hilton's move later this year from Los Angeles to Virginia
and discovery.

Sincerely,

Ronald J. Nessim

RJN:srs

cc:     Jessica P. Feingold, Esq. (via e-mail)
        Richard M. Lucas, Esq. (via e-mail)
        Paul S. Chan, Esq. (via e-mail)
        Jennifer S. Chang, Esq.

259014.1